1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


In re:                        )
                              )
BRUCE S. SMITH,               ) No. 05 B 40196
                              )
              Debtor.         )
------------------------------)
TRINA TIDWELL,                )
                              ) No. 07 A 00011
              Plaintiff,      )
                              )
        vs.                   )
                              )
BRUCE S. SMITH,               )
                              )
              Defendant.      )
------------------------------)
SANDRA STERLING-AHLLA,        )
                              ) No. 07 A 00012
              Plaintiff,      )
                              )
        vs.                   )
                              )
BRUCE S. SMITH,               ) Chicago, Illinois
                              ) September 17, 2007
              Defendant.      ) 1:30 p.m.


        TRANSCRIPT OF PROCEEDINGS BEFORE THE
            HONORABLE JACK B. SCHMETTERER


APPEARANCES:

MR. DARRYL ROBINSON
on behalf of Trina Tidwell and Sandra
Sterling-Ahalla;

MR. STEVEN H. JESSER
on behalf of Bruce S. Smith.

2

1                    **I N D E X**

2

3

4    WITNESS:              DX      CX     REDX      RECX

5    CHYKOLA JONES         15

6    NATHANIEL SINN        25      36      39

7    BRUCE SMITH           41      64      65

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1          THE CLERK:  Smith, 05 40196, with related

2    adversaries, Tidwell versus Smith, 07 A 11,

3    Sterling-Ahlla versus Smith, 07 A 12.

4          MR. ROBINSON:  Good afternoon, Your

5    Honor.  Darryl Robinson for Trina Tidwell and Sandra

6    Ahalla-Sterling.

7          THE COURT:  Good afternoon, folks.  I

8    read your opening statements contained within your

9    proposed findings of fact and conclusions of law.  I

10   assume you plan to offer the evidence that you

11   mention in there.  Does the plaintiff want to take

12   five minutes to add to that?

13         MR. ROBINSON:  Yes, Judge.

14         THE COURT:  Go ahead.

15         MR. ROBINSON:  Yes, Judge.  On

16   December -- approximately on December 18th, 2003,

17   Judge, Trina Tidwell and Sandra Sterling-Ahalla

18   filed --

19         THE COURT:  Use the microphone.  Speak a

20   little --

21         MR. ROBINSON:  Trina Tidwell and Sandra

22   Ahalla-Sterling filed a complaint in the Circuit

23   Court of Cook County, Judge, against Bruce Smith on

24   two counts.  One was sexual assault, and two was

25   respondent superior against Kennedy Medical Center.

4

1          THE COURT:  Is this Sandra Sterling here?

2          MR. ROBINSON:  No, they're not, Judge.

3          THE COURT:  No.  Is Trina Tidwell here?

4          MR. ROBINSON:  No, they're not, Judge.

5          THE COURT:  Okay.  Go ahead.

6          MR. ROBINSON:  Okay.  And --

7          THE COURT:  Is this your first witness?

8          MR. ROBINSON:  My first witness, yes.

9          THE COURT:  Go ahead.

10          MR. ROBINSON:  Against Bruce Smith,

11    Judge.  The case proceeded in state court.  Sometime

12    around September of 2005, Bruce Smith filed a

13    Chapter 7 bankruptcy petition in U.S. Bankruptcy

14    Court in the Northern District of Illinois, and in

15    such petition he failed to list both Trina Tidwell

16    and Sandra Sterling-Ahalla as creditors under the

17    schedule of creditors.  That petition has been

18    stipulated to, Judge, and should be the list of

19    creditors as outlined by the yellow tabs outlining

20    where the list of creditors is.

21               As a result of failing to list Trina

22    Tidwell and Sandra Ahalla-Sterling as creditors,

23    they did not receive notice of the bankruptcy, did

24    not receive notice of the meeting of creditors as

25    far as being able to file their objections.

1                   On December the 23rd, 2005, a notice

2    of a motion to transfer the state case from

3    bankruptcy -- from state court to bankruptcy was

4    filed over to the Law Offices of Darryl Robinson and

5    John F. Lyke.

6             THE COURT:  You say the plaintiffs'

7    lawyer got notice of that?

8             MR. ROBINSON:  Yes.

9             THE COURT:  On what date?

10            MR. ROBINSON:  It was on December the

11   23rd, 2005, Judge, one of the documents that was

12   stipulated to.

13            THE COURT:  Go ahead.

14                  That was about 16 days before the

15   deadline.

16            MR. ROBINSON:  Yes, Judge.  Let me

17   finish.  That was the notice that was faxed over to

18   the office.  The testimony will show that, in fact,

19   the attorney on the particular case was on vacation

20   until after January the 1st.  So although the

21   office --

22            THE COURT:  So when did the attorney come

23   back?

24            MR. ROBINSON:  The attorney came back on

25   January the 3rd when he obtained knowledge of the

6

1    bankruptcy.  So notice --

2            THE COURT:  That was six days before the

3    deadline.

4            MR. ROBINSON:  Yes, it is, Judge.

5            THE COURT:  Yes.

6            MR. ROBINSON:  Six days before the

7    deadline.  The hearing was heard on January the 7th.

8            THE COURT:  What hearing?

9            MR. ROBINSON:  The hearing on

10   transferring the case from state court to bankruptcy

11   court.

12           THE COURT:  And what happened at that?

13           MR. ROBINSON:  The judge agreed,

14   obviously, to transfer the case based upon the

15   pending bankruptcy, although the discharge date,

16   obviously, Judge, was --

17           THE COURT:  When was there a discharge

18   entered in that bankruptcy?

19           MR. ROBINSON:  The discharge would have

20   been entered on January the 17th, Judge.

21           THE COURT:  So the attorney received

22   notice two weeks before the discharge entered.

23           MR. ROBINSON:  Yes, but had knowledge six

24   days before, six days.

25           THE COURT:  You said he received the

1    notice January 3rd.

2              MR. ROBINSON:  Yes.

3              THE COURT:  Discharge entered

4    January 17th.

5              MR. ROBINSON:  Oh, the 17th.

6              THE COURT:  Deadline for filing something

7    past January 9th.

8              MR. ROBINSON:  Yes.

9              THE COURT:  Do I have those dates right?

10             MR. ROBINSON:  Yes, Judge, you have those

11   dates right.

12             THE COURT:  Go ahead.

13             MR. ROBINSON:  Yes, Judge.  And based on

14   this information and factors that we've set out,

15   we've made a -- filed an adversary complaint, both

16   Trina Tidwell and Sandra Sterling-Ahalla, based

17   upon, one, failure to receive proper notice.  In

18   this case we believe notice is actual knowledge, as

19   written out in our findings and conclusions of law.

20   And also based on fraud.

21                  As this court laid out in the

22   beginning of this adversarial proceeding, it assumes

23   that an attorney knows what he is doing when he --

24             THE COURT:  The court laid out?

25             MR. ROBINSON:  Yes.

8

1          THE COURT:  Did I enter an opinion in
2     this case or no?
3          MR. ROBINSON:  Not a written opinion,
4     Judge.  It was a verbal opinion.
5          THE COURT:  Go ahead.
6          MR. ROBINSON:  So that an attorney knows
7     what he is doing when he is actually doing it,
8     Judge, those -- Trina Tidwell and Sandra
9     Sterling-Ahalla, along with about four or five other
10    pending creditors and lawsuits against Bruce Smith
11    at that time, were left off the schedule and put in
12    the statement of financial affairs.
13          THE COURT:  Did the same attorney
14    represent Sandra Sterling-Ahalla as well as Trina
15    Tidwell?
16          MR. ROBINSON:  Yes, Judge.
17          THE COURT:  Okay.
18          MR. ROBINSON:  And based on that, we had
19    a second account of fraud.  That's all we wanted to
20    add, Judge.
21          THE COURT:  Thank you.
22          Counsel, do you want to take five
23    minutes to add something to your proposed findings?
24          MR. JESSER:  Yes, Judge.  Thank you.
25    Steven H. Jesser, J-e-s-s-e-r, for Dr. Bruce S.

1    Smith.  Mr. Robinson is indeed the attorney who has

2    been representing the plaintiffs throughout this

3    process.  If it weren't --

4              THE COURT:  Both in state court and here

5    you mean?

6              MR. JESSER:  Yes.

7              THE COURT:  In state court and here,

8    right?

9              MR. JESSER:  Yes.

10              THE COURT:  Okay.

11              MR. JESSER:  Your Honor has entered no

12    written or oral opinions in the past other than the

13    orders of the court.  If it were not a fiction, I

14    might be inclined to move for judgment on the basis

15    of the opening statement.  But there will be

16    absolutely no testimony or evidence from either side

17    this afternoon in the nature of fraudulent conduct

18    by Dr. Smith or his attorney who prepared the

19    bankruptcy petition, who is on his way over here to

20    testify this afternoon that Dr. Smith or his

21    attorney intended to omit these two lawsuits which

22    were scheduled, but admittedly not in the preferred

23    position, not in the proper place in the bankruptcy

24    petition.  I'm not going to stand before Your Honor

25    and claim that the lawsuits, which were very well

1    described, were in the right place.  They were in

2    the statement of financial affairs.

3              THE COURT:  Sir, the problem comes

4    because if they're in the statement of financial

5    affairs, that is not the way that they get on the

6    distribution list for notice of the bankruptcy,

7    which gets sent out only to people who are scheduled

8    as creditors.

9              MR. JESSER:  And --

10             THE COURT:  Do you concede that they were

11   creditors, that these two plaintiffs are creditors?

12             MR. JESSER:  Yes, Your Honor, because two

13   of the exhibits which -- if I'm speaking too loud

14   tell me.  Two of the exhibits that we submitted to

15   Your Honor pursuant to the pre-trial order were a

16   prior bankruptcy filing from a year before, the year

17   2004, where indeed there can be no argument about

18   Dr. Smith listing --

19             THE COURT:  What's the explanation why it

20   wasn't listed on the particular case that's in --

21   that's involved here, that is the second bankruptcy

22   filing?

23             MR. JESSER:  As you'll hear in a few

24   minutes from Mr. Sinn, who may be waiting outside to

25   testify, when it comes time for our case in chief,

1    he was a very young attorney, first year of

2    practice, in somewhat of a mill; there was an

3    impending statutory change-over date; his office was

4    extremely busy; he was handling 15 bankruptcies a

5    day.  I'm not excusing all of that, Judge.  It's

6    just background for the fact that he made a mistake.

7    His people --

8              THE COURT:  Sir --

9              MR. JESSER:  -- his staff --

10              THE COURT:  -- I'd like to ask you this

11    question:  Do you concede that an electronic

12    signature of your client's signature was put on the

13    bankruptcy filing?

14              MR. JESSER:  We concede, yes.  And we

15    concede --

16              THE COURT:  Because all signatures are

17    electronic.  Do you concede that his electronic

18    signature went on the bankruptcy filing?

19              MR. JESSER:  Yes.  And more, Judge,

20    Dr. Smith is an obstetrician and gynecologist

21    professional.  We don't back away from the fact that

22    the 2005 voluntary petition is what it is.  It's

23    Dr. Smith's petition.  He takes --

24              THE COURT:  And since -- do you take the

25    view that his electronic signature was affixed

12

1  without him reading it, reading the petition --

2          MR. JESSER:  No.

3          THE COURT:  -- he swore to or --

4          MR. JESSER:  No.

5          THE COURT:  -- not?

6          MR. JESSER:  No, I didn't say that,

7  Judge, as you'll hear in a few minutes.

8          THE COURT:  Do you concede he read it

9  before his electronic signature was affixed?

10         MR. JESSER:  What I'd like to concede,

11 Your Honor, is that he sat with his attorney,

12 Mr. Sinn.  Mr. Sinn went through it with him.  And

13 not being a legal professional, but a medical

14 professional, he indeed signed the petition based on

15 advice of counsel.  The counsel is going to come

16 into court in a few minutes and admit to you --

17         THE COURT:  I think he's here.

18         MR. JESSER:  Okay.  Very well.  Mr. Sinn

19 is here.  That in retrospect, the lawsuits which

20 Mr. Robinson has prosecuted in state court were not

21 in the preferred place in the petition.

22             What's more, I may have no questions

23 of this very nice lady who works for Mr. Robinson

24 because what he has said in his survey of the

25 evidence is that on December 23 my office received a

13

1    fax from Johnson & Bell, which has been representing

2    Dr. Smith in state court, to come to court in early

3    January about a motion to mothball the case on the

4    bankruptcy section of Judge Maddocks.  It doesn't

5    matter that Mr. Robinson was away on vacation.  It

6    doesn't matter that when I'm out of town I'm

7    checking e-mails and voice mails 12 times a day.

8    His office received notice that there was an

9    '05 bankruptcy action pending on December 23, '05,

10   which is more than three weeks before Your Honor

11   discharged this case on January 16.  Again, and I'm

12   bucking up on my five minutes.  There's no fraud

13   here, Judge, which is the gist of the action.

14           THE COURT:  Thank you.

15               All right.  Case for the plaintiff.

16           MR. ROBINSON:  Yes, Judge.

17           THE COURT:  On Friday we went over the

18   stipulation which, unhappily, was filed in the

19   district court instead of the bankruptcy court.  But

20   the record is very clear that Plaintiffs' Exhibits

21   1, 2, 3, and 4 are stipulated to.

22           MR. ROBINSON:  Yes, they are, Judge.

23           THE COURT:  And, therefore, they are

24   admitted into evidence.  And you may proceed with

25   your witness.

1          MR. ROBINSON:  Yes, Judge.  Before I

2    proceed with my witness, Judge, we filed an

3    adversary complaint on two counts.  On the count of

4    fraud, we want to stand on the bankruptcy petition

5    alone.  We believe that the standard is

6    preponderance of evidence, so --

7          THE COURT:  Use that microphone and speak

8    into it --

9          MR. ROBINSON:  I'm sorry, Judge.

10          THE COURT:  -- so I can hear you.

11          MR. ROBINSON:  On the count of fraud, we

12    want to stand on the bankruptcy petition alone.  We

13    believe that the standard is a preponderance of

14    evidence.  And Bruce Smith's failure to list Trina

15    Tidwell and Sterling-Ahalla as creditors we believe

16    is fraud per se, and that the burden of proof moves

17    to the defendant to prove that it was not fraud.  My

18    witness is only going to testify to the issue of

19    notice, Judge.  There's two counts.

20          THE COURT:  Do you have case law

21    authority for what you just said?

22          MR. ROBINSON:  Yes, Judge.  It's a part

23    of my findings of fact and conclusions.

24          THE COURT:  Okay.

25          MR. ROBINSON:  Thank you, Judge.

                                                            15

 1                    THE COURT:  One of those citations in

 2      there?

 3                    MR. ROBINSON:  Yes, Judge.

 4                    THE COURT:  Okay.  Thank you.  Do you

 5      want to put on your witness?

 6                    MR. ROBINSON:  Yes, I'd like to call my

 7      first witness.

 8                    THE COURT:  Over there, ma'am, please.

 9                        (Witness sworn.)

10                    THE CLERK:  Please state your name for

11      the record.

12                    THE WITNESS:  Chykola Jones.

13                    THE CLERK:  You may be seated.

14                    THE COURT:  Spell your last name, please.

15                    THE WITNESS:  J-o-n-e-s.

16                    THE COURT:  J-o what?

17                    THE WITNESS:  n-e-s.

18                    THE COURT:  And your first name?

19                    THE WITNESS:  Chykola, C-h-y-k-o-l-a.

20                    THE COURT:  Proceed, counsel.

21                    CHYKOLA JONES, WITNESS, SWORN

22                        DIRECT EXAMINATION

23      BY MR. ROBINSON:

24          Q    Ms. Jones, what is your current

25      occupation?

1        A    I'm an office clerk.

2        Q    And where is your place of employment at?

3        A    1505 East 53rd Street.

4             THE COURT:  What office?  Whose office is

5     that?

6             THE WITNESS:  It's a law office, Attorney

7     Darryl Robinson and Attorney John F. Lyke.

8     BY MR. ROBINSON:

9        Q    Are there any other attorneys working in

10    that office?

11       A    Yes, there are.

12       Q    And what are their names?

13       A    Roger Best.  We also have Attorney Randy

14    Peterson who is out on leave.

15       Q    Approximately how long have you been

16    working at that location, Ms. Jones?

17       A    Approximately three years.

18       Q    What are some of your primary

19    responsibilities?

20       A    I answer phones, I take messages, I file,

21    I collect faxes, I sort mail.

22       Q    You said that you collect faxes.  How

23    often would you receive faxes over at that office?

24       A    I would say daily.

25       Q    And what would you do with those faxes

17

1    after you received them?

2        A    I would see who it's to the attention of,

3    and I would put it on the respective person's desk.

4        Q    Now, after you place that fax on the

5    respective person's desk, would you call that

6    respective person?

7        A    No, I wouldn't.

8        Q    Do you recall receiving --

9        MR. ROBINSON:  Strike that, Judge.

10   BY MR. ROBINSON:

11       Q    Are you familiar with the case of Trina

12   Tidwell versus Bruce Smith and Sandra

13   Ahalla-Sterling versus Bruce Smith?

14       A    Yes.  I know the names from the office.

15       Q    Yes.  Do you recall receiving a fax

16   concerning that case on December 23rd, 2005?

17       A    I can't say that I recall December of

18   2005.

19       Q    If you had received a fax on that day,

20   what would you have done with it?

21       A    I would have placed it on the respective

22   person's desk.

23       Q    And who was the lead attorney in the

24   Trina Tidwell and Sandra Ahalla-Sterling case?

25       A    Attorney Darryl Robinson.

18

1      Q    And would you have placed that fax on

2   Attorney Darryl Robinson's desk?

3      A    Yes, I would have, sir.

4      Q    Was Darryl Robinson in the office on

5   December 23rd?

6      A    I can't say that he was.

7      Q    Do you know where he would have been on

8   December 23rd?

9      A    Attorney Robinson always takes vacation

10  around that time.

11     Q    Do you know when he would have returned

12  from vacation?

13     A    It would have been after the 1st of the

14  year.

15     Q    Mrs. Jones, are you an attorney?

16     A    No, I'm not, sir.

17     Q    Have you ever worked in a bankruptcy law

18  firm?

19     A    Not at all, sir.

20     Q    If you had received that motion to

21  transfer to bankruptcy, would you have known what it

22  is?

23     A    No, I would not have.

24          MR. ROBINSON:  No further questions,

25  Judge.

19

1          THE COURT:  Any cross?

2          MR. JESSER:  No, Your Honor.

3          THE COURT:  Do you have any more

4  questions of the witness?

5          MR. ROBINSON:  No more questions, Judge.

6          THE COURT:  You may step down.  Thank you

7  for your help.

8          THE WITNESS:  Thank you.

9               (Witness excused.)

10         THE COURT:  At this point I note from the

11  pre-trial order that all well-pleaded facts admitted

12  in the pleadings are admitted into evidence unless

13  objections were filed before trial, and no such

14  objections have been noted by us.  So all of the --

15  I will now admit into evidence all admissions in the

16  answers to the complaint to well-pleaded facts.

17               Now, do you rest?

18         MR. ROBINSON:  Yes, Judge, we rest.

19         MR. JESSER:  Judge, I'd like to move for

20  a directed finding at this time, if that's allowed

21  in this type of proceeding, in that the evidence is

22  that Mr. Robinson's office received not as directly

23  as it could have been in retrospect, but notice of

24  doctor's pending bankruptcy before Your Honor, as

25  early as December 23, 2005, some three weeks before

20

1  Your Honor discharged the petition on January 17,

2  2005.  There's no even conceding arguendo

3  Mr. Robinson cited standard of preponderance of the

4  evidence, there's no evidence whatsoever in the

5  plaintiffs' case in chief of any fraudulent conduct

6  on the part of Dr. Smith or any of his attorneys,

7  any intentional conduct to mislead Ms. Tidwell or

8  Ms. Sterling-Ahalla or to otherwise conceal the

9  existence of the 2005 petition for bankruptcy relief

10  before Your Honor.

11         THE COURT:  Was the signature of your

12  client, even though it was electronic, but you

13  conceded it was his signature even though

14  electronic, was the -- was it -- was his schedule

15  truthful and complete since these two cases were not

16  placed in the schedules, they were only placed in

17  the statement of affairs?

18         MR. JESSER:  With respect to the first

19  part of the court's inquiry, I might -- since we

20  both admitted to you we're not bankruptcy

21  specialists, I might like to defer that part to my

22  examination of Mr. Sinn concerning electronic

23  signatures, et cetera, since Mr. Robinson as late as

24  last week was running into problems with electronic

25  filing.

1          THE COURT:  Now, wait a second.  Did you

2     just back away from your concession that we should

3     treat the electronic signature of your client as a

4     signature by your client?

5          MR. JESSER:  No, I'm not.  This is

6     doctor's petition.  I'm not acting off of --

7          THE COURT:  Well, then assuming it's the

8     same as if he signed it with a pen on a piece of

9     paper, that's what electronic signature does, wasn't

10    part of that schedule he filed under oath erroneous?

11         MR. JESSER:  No.  Your Honor --

12         THE COURT:  There's a certificate --

13    there's a -- he scheduled -- he filed a schedule --

14    pardon me, an affidavit saying that everything on

15    the schedules were true and complete, but the

16    schedule of his creditors was not complete, right?

17         MR. JESSER:  I think there's an

18    explanation, Judge, as --

19         THE COURT:  There may be an explanation.

20    But, I mean, isn't that the state of things at the

21    moment --

22         MR. JESSER:  No.

23         THE COURT:  -- that he did not file a

24    complete schedule?

25         MR. JESSER:  Doctor's intention in

1   signing the petition was to certify that his

2   petition was true and complete.  As it turns out,

3   and sometimes this even befuddles attorneys such as

4   me, the precise information that should have been on

5   the schedule was somewhere off in another part of

6   the petition.

7               THE COURT:  I understand.  Thank you.  I

8   will reserve ruling on your motion until the end of

9   the case --

10              MR. JESSER:  Thank you.

11              THE COURT:  -- until all of the evidence

12  is in.  Present your evidence.

13              MR. JESSER:  All right.  Initially before

14  I call Mr. Sinn, will the court receive Defendant's

15  Exhibits 1 and 2?

16              THE COURT:  Well, let's deal with that.

17  I've got those in front of me.

18                  I do believe that the defense has

19  not objected to 3 and 4; am I right, folks?

20              MR. ROBINSON:  Yes, Judge.

21              THE COURT:  So 3 and 4 are admitted.

22                  And you've only objected to 1 and 2,

23  right, sir?

24              MR. ROBINSON:  Yes, Judge.

25              THE COURT:  Is there anything you want to

23

1    add to your objection?

2             MR. ROBINSON:  Judge, I'm objecting to 1

3    and 2 on the basis of, obviously, relevance and

4    prejudice.

5             THE COURT:  What do you mean prejudice?

6             MR. ROBINSON:  Well, their allegation,

7    Judge, is that, in fact, we received notice of a

8    bankruptcy in 2004.  So therefore that notice

9    transfer of the 2005 bankruptcy, that's an issue of

10   relevance.  One bankruptcy has nothing to do with

11   the other in terms of that.  And so we believe that

12   if the judge was to look at that notice as

13   transferred, then that would be prejudice to my

14   client.  That's all, Judge.

15            MR. JESSER:  Judge, if I've heard it

16   once, I've heard it 50 times, "counsel, it goes to

17   the weight.  I'll allow the exhibit but then

18   decide --"

19            THE COURT:  The two exhibits are

20   admissible.  I think they're relevant.

21            MR. JESSER:  Very well.  Thank you.

22            THE COURT:  And they are admitted.

23                 Proceed with your evidence.

24            MR. JESSER:  I'm going to call --

25            THE COURT:  That's Exhibit -- so your

24

1    exhibit -- Defense Exhibit 1, 2, 3, and 4 have now

2    been admitted.

3              MR. JESSER:  All right.  I'd like to call

4    Mr. Nathaniel Sinn, S-i-n-n.

5              THE COURT:  Would you go over there, sir,

6    please.

7                     (Witness sworn.)

8              THE CLERK:  Please state your name for

9    the record, please.

10             THE WITNESS:  Nathaniel Sinn.  Last name

11   is spelled S-i-n-n, first name is N-a-t-h-a-n-i-e-l.

12             THE COURT:  Spell that last name again,

13   please.

14             THE WITNESS:  S-i-n-n.  Two Ns like

15   Nancy.

16             THE COURT:  Thank you.

17             THE WITNESS:  Thank you.

18             MR. JESSER:  May I examine him from here,

19   Judge?

20             THE COURT:  Yes, indeed.

21             MR. JESSER:  Good afternoon, Mr. Sinn.

22             THE WITNESS:  Good afternoon.

23

24

25

25

1           NATHANIEL SINN, WITNESS, SWORN

2                 DIRECT EXAMINATION

3    BY MR. JESSER:

4           Q    You have previously represented

5    Dr. Smith?

6           A    I did.

7           Q    All right.  I'd like to just ask you a

8    little background about your career, might try to

9    take the liberty of leading you just a little.

10   First, where did you attend college?

11          A    University of Notre Dame.

12          Q    And you graduated there in?

13          A    2001.

14          Q    From there you proceeded to law school?

15          A    I did.  I went to Indiana University,

16   Bloomington, and graduated in 2004.  I went straight

17   through.

18          Q    All right.  Decided to come to the big

19   city?

20          A    I did.  I was tired of the small town.  I

21   grew up in a small town in Indiana, so...

22          Q    All right.  And your first position here

23   in Chicago was?

24          A    My first job was with Macey & Aleman,

25   also known as Legal Helpers.  They do a lot of

1   bankruptcy work.

2        Q   All right.  And I think His Honor

3   indicated he was well familiar with Legal Helpers.

4   But what is Legal Helpers?  It is a bunch of firms?

5            THE COURT:  Oh, I don't know that I'm

6   well familiar with them.

7            MR. JESSER:  All right.

8            THE COURT:  It's just one of the many

9   firms that practices here.

10  BY MR. JESSER:

11       Q   Is it a number of firms or...

12       A   It's one firm.  They have offices in a

13  bunch of different states.  It's very similar to a

14  couple firms here in the city.  It's based on volume

15  business.  Get as many people as you can, file

16  petitions as quickly as possible, basically.

17       Q   How long did you spend at that firm?

18       A   A little over a year.  I believe December

19  of '04 to January of '06.

20       Q   Did you do mostly or exclusively

21  bankruptcy work there?

22       A   I did all of the bankruptcies, mostly

23  Chapter 7s.

24       Q   How many other attorneys were working

25  with you there?

1          A    In our office, in the Chicago office,

2     there was probably 25 other attorneys.

3          Q    All right.  And just for clarity, you did

4     not represent Dr. Smith in his first bankruptcy

5     petition filed in 2004?

6          A    No, I did not.

7          Q    All right.

8          A    I wasn't even licensed, I don't think, if

9     I recall.

10               THE COURT:  So you were at Legal Helpers

11     when he filed his second petition?

12               THE WITNESS:  That's correct.

13               THE COURT:  And you helped him prepare

14     it?

15               THE WITNESS:  I did.  I met with him,

16     went over the petition when he signed it.  It was

17     a -- and then I did the filing.

18               THE COURT:  Go ahead.

19     BY MR. JESSER:

20          Q    And you somehow do remember Dr. Smith of

21     all of the many clients you had?

22          A    I do.  I only remember a couple of cases.

23     I remember his just because of the nature of the

24     cases that are at issue.  My father is a doctor, and

25     so medical malpractice kind of just stuck out in my

1  mind.  It kind of hit home, if you will, so...

2      Q    How many times do you recall having

3  conferred with Dr. Smith?

4      A    Just once.

5      Q    All right.  And at that point in time,

6  was anything unusual occurring in your office?

7      A    The bankruptcy reform law was going into

8  effect.  It was probably -- I remember meeting with

9  him right before that.  I don't remember the exact

10  date.  Probably September of 2005.  So my job at

11  that time was I met with all of our clients to file

12  their petitions before the law changed, and so I met

13  with anywhere from 10 to 20 people a day.  And it

14  was my job to go through the petition with them and

15  make sure everything was accurate before we filed.

16      Q    Am I correct you met him on a Saturday,

17  or you don't recall?

18      A    I don't recall what day it was.

19      Q    Okay.  Can you explain to His Honor how

20  the petitions were prepared within this firm before

21  they reached you.

22      A    The petitions were usually prepared by

23  either a legal assistant or a law clerk or a

24  paralegal-type employee.  They were then mailed out

25  to the clients to make corrections, come back to us,

29

1    and then we would meet with them to go over and

2    ensure that everything was correct, and then we

3    would file the case for them or file the petition.

4         Q    On the day on which you met with

5    Dr. Smith, do you have an independent recollection

6    that you met with other clients as well?

7         A    Yeah, I did.  I met with quite a few, I'm

8    sure.  But I don't know the exact number.

9         Q    Do you recall how long approximately you

10   spent with Dr. Smith?

11        A    Probably -- I believe I spent probably

12   half an hour or so with him, probably a little bit

13   longer just because I was asking about the cases

14   that were on the statement of financial affairs and

15   the cases at issue, basically.

16        Q    Now, these two lawsuits, I'm not sure

17   when you walked in, but we have conferred in the

18   past that Mr. Robinson was prosecuting in state

19   court, although they're on the bankruptcy calendar

20   right now, they are within the four corners of the

21   2005 voluntary petition that your firm filed on

22   behalf of Dr. Smith?

23        A    Yeah.  I mean, if you're asking that

24   they're listed somewhere in there, they're on the

25   statement of financial affairs.

30

1     Q   Can you explain to His Honor why it so

2   happened that even after your review of these two

3   matters were listed on the statement of financial

4   affairs as opposed to the schedule?

5     A   Well, I know they're listed on there

6   because anytime there was any ongoing litigation, I

7   put it on the statement of financial affairs.

8   Probably -- I typically would list them as creditors

9   as well.  I'm not sure why I did not.  I don't

10  recall why they weren't on Schedule F.

11          THE COURT:  Did you have his earlier

12  bankruptcy that was filed earlier and dismissed

13  before you?

14          THE WITNESS:  I had reviewed it.  I don't

15  remember if I had it in front of me when we met.

16          THE COURT:  You didn't go over it page by

17  page to see if you covered the same topics?

18          THE WITNESS:  I know that I would have.

19  I mean, I don't remember the exact situation.  But

20  anytime there was a prior bankruptcy, I always

21  reviewed the prior petition as well.

22          THE COURT:  Well, the prior petition did

23  schedule in the schedule of creditors the two

24  lawsuits that were pending in state court.  Can you

25  explain why they were not scheduled in the new

31

1   lawsuit that you went over?

2          THE WITNESS:  I know that they were

3   scheduled on Schedule F just because I reviewed both

4   petitions recently because this matter came up.  I

5   do not know why they were omitted from Schedule F.

6   To the best of my knowledge, it was just an error on

7   my part.

8          THE COURT:  Well, you said you went over

9   the finished product with your client.

10          THE WITNESS:  I did.

11          THE COURT:  Did your client do something

12   to indicate whether or not what you had prepared was

13   accurate and complete?

14          THE WITNESS:  We went through and I asked

15   him -- basically I went through all of the creditors

16   that were listed and asked him if they were supposed

17   to be on there, and then I asked if there were any

18   other creditors.  That's basically what I did with

19   every client I met with.

20          THE COURT:  Do you remember what he said

21   when you asked him if there were any other

22   creditors?

23          THE WITNESS:  I do not remember the

24   specific conversation.  I just know that's the way I

25   handled things.

1        THE COURT:  If he had told you there were

2  other creditors, would you have added them to the

3  list or omitted them?

4        THE WITNESS:  I would have added them.

5        THE COURT:  Now, these days, for a while,

6  for several years, all filings have been electronic

7  in our court here.

8        THE WITNESS:  That's correct.

9        THE COURT:  And signatures on the

10  petitions are electronic signatures, right?

11        THE WITNESS:  Um-hmm, yes.

12        THE COURT:  So in what way did he signify

13  his approval of the accuracy and completeness?

14        THE WITNESS:  I'm pretty sure it was an

15  electronic signature.

16        THE COURT:  A what?

17        THE WITNESS:  Electronic signature.

18        THE COURT:  Well, he doesn't affix it.

19  Who affixes it?

20        THE WITNESS:  Well, we would have typed

21  it into the petition.

22        THE COURT:  Right.  And when you say

23  "electronic signature," apart from typing in his

24  name, what else was done, if anything, to put his

25  electronic signature on it?

33

1          THE WITNESS:  I know there was -- are you

2     referring -- there was a signature page that he had

3     to actually sign to certify that the electronic

4     signature was his.

5          THE COURT:  So you retained that?  Or

6     that is to say your office retained that?

7          THE WITNESS:  They would have, yes.

8          THE COURT:  Okay.  Did he sign anything

9     like that?

10          THE WITNESS:  I don't recall, but I would

11     go ahead and say yes because we wouldn't have been

12     able to file the petition otherwise.

13          THE COURT:  Okay.

14          MR. JESSER:  And, Judge, may I --

15          THE COURT:  Go ahead, counsel.

16          MR. JESSER:  -- just inject --

17          THE COURT:  You want to what?

18          MR. JESSER:  May I just inject for the

19     court's clarification --

20          THE COURT:  Go ahead.  Let the witness do

21     the injecting.

22          MR. JESSER:  Okay.

23     BY MR. JESSER:

24          Q    Notwithstanding our -- we attorneys, our

25     high accountability to the court to be factually

1    correct and to be forthright at all times, were you

2    under some pressure in your office at that time

3    regarding your daily or weekly production?

4        A    Yeah, I was.  I mean, we were putting a

5    lot of hours in just because of the volume right

6    before that launching.  General volume business was,

7    I mean, ridiculous.  But, I mean, I was within my

8    first year as an associate.  I was just -- you know,

9    they said be there 12 hours, I was there 12 hours.

10   So it was -- I was seeing a lot of people.

11       Q    And when they said to be there for 12

12   hours, were they saying that with a smile on their

13   face and...

14       A    Usually as they left around like 4:00 or

15   so, yeah.

16       Q    Okay.  Now, you did feel at the time

17   that placing doctor's lawsuits on the statement of

18   financial affairs was legally efficacious, legally

19   permissible?

20       A    Well, I listed them on there just to show

21   pending litigation.  I believe that I would have --

22   I should have listed them on Schedule F as well,

23   though.

24       Q    Did doctor indicate -- strike that.

25                  Did doctor express or imply to you

1    that he wanted you to withhold any information from

2    his creditors?

3         A    No.  I mean, that would definitely stick

4    out in my mind if he had because, I mean, I

5    obviously wouldn't have gone along with anything

6    like that.

7         Q    Well, that was my next question.  Did

8    doctor request that you do anything that you felt

9    was either not ethical or in violation of the Code

10   of Professional Responsibility?

11        A    No, absolutely not.

12        Q    Did doctor ever request you to do

13   something or not do something that you felt was

14   contrary to the rights of his creditors?

15        A    No, no, he didn't ask me to do anything.

16        Q    Did doctor ever say anything to you or

17   imply anything to you that you felt was contrary to

18   your obligations to the United States Bankruptcy

19   Court?

20        A    No.

21        Q    Did you have any personal interest in

22   secreting any information from doctor's creditors?

23        A    No.

24        Q    Or from the court?

25        A    No.

1      Q    Did you make any observations or opinions

2    regarding doctor's comportment, whether he seemed

3    forthcoming or evasive with you or nervous?

4      A    No.  I remember -- I mean, this is really

5    the only reason why I even remember meeting with

6    him, was because of these cases.  And I remembered

7    to ask him -- I asked him about it, but told him,

8    you know, I didn't want to know anything about the

9    state case, just give me as few details as possible.

10   But, I mean, he was -- my recollection is that he

11   was very forthcoming with me.  I mean, he was pretty

12   open to talk about it and what his situation was.

13            MR. JESSER:  Thank you very much.  I have

14   nothing further at this time.

15            THE COURT:  Cross?

16            MR. ROBINSON:  Yes, Judge, I have a few

17   questions.

18                CROSS-EXAMINATION

19   BY MR. ROBINSON:

20      Q    Attorney Sinn, you stated -- as you sit

21   here today, do you believe that pending litigation

22   should be on the schedule of creditors or statement

23   of financial affairs?

24      A    Well, I believe it should be on the

25   statement of financial affairs, but I believe that

37

1    the creditors should also be listed on Schedule F as

2    potential creditors.

3         Q    And where did you learn that from?

4         A    Basically I just kind of picked --

5    through my year working there -- or just to kind of

6    get into it a little bit, our training wasn't the

7    greatest.  You know, it was kind of by trial and

8    error.  And I would have eventually figured that out

9    looking at the bankruptcy code and talking to other

10   bankruptcy attorneys.

11        Q    Now, prior to filing the bankruptcy

12   petition for Dr. Smith --

13        A    Yes.

14        Q    -- how long had you been practicing

15   bankruptcy?

16        A    At that point, probably seven or eight

17   months.

18        Q    Approximately how many Chapter 7s had you

19   filed?

20        A    In the little over the year I was there,

21   Chapter 7 petitions, I maybe filed 350, 400.  I

22   mean, quite a bit.

23        Q    You testified earlier there was

24   approximately 25 bankruptcy attorneys in that

25   Chicago office?

38

1        A    To the best of my recollection, yeah.

2        Q    The same office that you work at; isn't

3    that true?

4        A    I don't work there anymore.  But when I

5    worked there, yeah.

6        Q    But the office you worked at when you

7    filed the bankruptcy petition for Dr. Smith?

8        A    That's correct.

9        Q    Wouldn't it be safe to say that the

10    experience of the attorneys working at that office

11    varied?

12        A    Yeah, it did.  The majority of the

13    attorneys were less than a year.  It was a pretty

14    high turnover rate.  But there were several that had

15    been practicing three or four years.

16        Q    Wouldn't it also be safe to say that if

17    you had any questions concerning the bankruptcy

18    petition that you could talk to one of the more

19    experienced attorneys?

20        A    Absolutely.  If I had questions, that's

21    what I'd do.

22            MR. ROBINSON:  No further questions,

23    Judge.

24            THE COURT:  Redirect?

25

39

1                    REDIRECT EXAMINATION

2    BY MR. JESSER:

3         Q    Did the firm have any formal training or

4    in-services?

5         A    Not really.  My first day, they just gave

6    me a stack of bills and told me to type a petition

7    and figure it out.  My training was basically if I

8    had questions, there were several attorneys I

9    thought I could ask questions to, and they would

10   clarify things for me.

11        Q    How would you characterize the fact that

12   the lawsuits in question were not on the schedule of

13   creditors?  As an oversight or...

14        A    I mean, I really just think it was an

15   oversight, I mean, on my part.

16             MR. JESSER:  All right.  Thank you.

17             May I reopen to ask one more

18   question?

19             THE COURT:  Go ahead.

20   BY MR. JESSER:

21        Q    Did Dr. Smith demonstrate to you any

22   particular layman's knowledge of bankruptcy law by

23   virtue of the fact that he had been through the

24   process once before?

25        A    I mean, I don't recall, so not to my

40

1   knowledge.

2              MR. JESSER:  Thank you.

3              THE COURT:  All righty.

4                   Are you finished?

5              MR. ROBINSON:  I'm finished.

6              THE COURT:  May step down.  Thank you,

7   sir.

8              THE WITNESS:  Thanks a lot.

9              MR. JESSER:  May he be excused, Your

10  Honor.

11             THE COURT:  Yes, of course.

12                  Is that all right with you?

13             MR. ROBINSON:  Yes, Judge.

14             THE COURT:  All right.

15                  You're excused.  Thank you.

16                  (Witness excused.)

17             THE COURT:  And do you have another

18  witness?

19             MR. JESSER:  Yes.  Our last witness is

20  Dr. Bruce S. Smith.

21             THE COURT:  Doctor, will you please take

22  the stand.

23                  (Witness sworn.)

24             THE CLERK:  Please state your name for

25  the record.

41

1          THE WITNESS:  Bruce Smith.

2          THE CLERK:  You may be seated.

3          MR. JESSER:  All right.  Good afternoon,

4    Doctor.

5               BRUCE SMITH, WITNESS, SWORN

6                  DIRECT EXAMINATION

7    BY MR. JESSER:

8          Q   I'd like to spend just a few moments with

9    you concerning your background for the court's

10   knowledge.  When were you born?

11         A   1952.

12         Q   And where did you grow up?

13         A   Brooklyn, New York.

14         Q   Which part of Brooklyn, New York?

15         A   South Brooklyn.

16         Q   All right.  And in those days, was that a

17   nice neighborhood?

18         A   It was the projects.

19         Q   And you went to elementary school in

20   South Brooklyn?

21         A   Yes.

22         Q   By the time you reached high school --

23   was there a high school right across the street from

24   you?

25         A   Yes.

42

1   Q What was the name of that high school, do
2 you recall?
3   A East New York Vocational High School.
4   Q All right.  Did you attend that high
5 school?
6   A No, I did not.
7   Q Where did you attend high school?
8   A Brooklyn Technical High School.
9   Q And how long did it take you to commute
10 there?
11   A An hour.
12   Q Each way?
13   A Yes.
14   Q How did you do so?
15   A Subway.
16   Q And when you matriculated at Brooklyn
17 Technical, how many students were there?
18   A About 6,000 boys.
19   Q All right.  So it sounds like Lane
20 Technical.  Would that be a fair comparison?
21   A There are some similarities between the
22 two schools.
23   Q All right.  And when you matriculated
24 there, what was the composition of the school, the
25 racial composition?

43

1          A    Well, I don't know the exact composition,

2     but there were only 50 Black and Puerto Rican

3     students.  The rest were white.

4          Q    And you were one of the 50?

5          A    Yes.

6          Q    All right.  And by the time you graduated

7     Brooklyn Technical, had you been awarded any

8     scholarships?

9          A    I got the National Merit Scholarship.

10         Q    All right.  And did they have something

11    similar to a major or area of concentration at

12    Brooklyn Technical?

13         A    Yes.  I majored in structural

14    engineering.

15         Q    Was that unusual for a young man from

16    South Brooklyn?

17         A    It's unusual for anybody.  It's one of

18    the few high schools -- it was one of the six

19    science high schools in New York where you could

20    have a major as a high school student.

21         Q    From there did you proceed to college?

22         A    Yes.  To the University of Connecticut

23    after that.

24         Q    And you transferred from UCON?

25         A    No.  I actually left UCON because I

44

1    couldn't afford the tuition anymore.  My scholarship

2    only covered --

3                    THE COURT:  Sir, pull the microphone much

4    closer to you.

5                    THE WITNESS:  I actually withdrew --

6                    THE COURT:  Slide it closer, please.

7                    THE WITNESS:  I actually withdrew from

8    the University of Connecticut to join the military

9    to get the GI Bill.

10   BY MR. JESSER:

11        Q    At the time that you withdrew, do you

12   recall your grade point average?

13        A    I don't remember.  I think it was like

14   3.0 or something like that.

15        Q    All right.  And then which branch of

16   service did you serve?

17        A    The U.S. Army.

18        Q    And how many years did you serve?

19        A    Three.

20        Q    This was in wartime?

21        A    It was at the end of the Vietnam War.

22        Q    In which divisions did you serve?

23        A    It was in military intelligence.

24        Q    And did that take you to different parts

25   of the homeland or overseas?

45

1          A    Mostly in the U.S.  We were assigned to

2    go overseas, but we never went.

3          Q    All right.  After your second tour, would

4    that be, was completed for three years, then where

5    did you go?

6          A    Then I went back to school.  I went to

7    the University of Hartford in Connecticut.

8          Q    And that was partially -- did they still

9    have the GI Bill in those days?

10         A    Yes.  That's what I used to go.

11         Q    And you graduated from the University of

12   Hartford?

13         A    Yes.

14         Q    Which year was that?

15         A    1980.

16         Q    Did you have enough money to go to

17   medical school at that time?

18         A    No.

19         Q    What did you do then?

20         A    I was a -- well, I did several things.

21   One, I was a high school teacher for about six

22   years.

23         Q    And that was back in New York or --

24         A    Yes, high school, a New York teacher.

25         Q    All right.  Were those in easy schools?

46

1          A    Actually, it was a pretty good school.

2     It was Christ the King High School in Middle

3     Village, New York.

4          Q    All right.  I think that's a pretty

5     prominent basketball school, isn't it?

6          A    It's number one in the country.

7          Q    Okay.  That takes us to about 1986.  By

8     the way, I may be a New York attorney, but I don't

9     know the geography that well.  Did you say that

10    Brooklyn was next to Queens?

11         A    Yes.

12         Q    So Secretary Powell -- General Powell

13    grew up nearby?

14         A    Yes.

15         Q    All right.  In 1986 were you able to go

16    to medical school?

17         A    Yes.

18         Q    And where was that?

19         A    At Loyola University.

20         Q    Of Chicago?

21         A    Yes.

22         Q    And when did you graduate?

23         A    1992.

24         Q    All right.  Did you have any distinctions

25    in medical school?

47

1          A    No.

2          Q    All right.  Did you proceed directly into

3    residency?

4          A    Yes, I did.

5          Q    By the way, didn't we miss some civilian

6    employment for a pharmaceutical house?

7          A    No.  That was after my residency.

8          Q    Okay.  All right.  And which residency

9    did you pursue?

10         A    Obstetrics and gynecology.

11         Q    And where were you matched into a

12   residency?

13         A    Mount Sinai of Chicago.

14         Q    All right.  And Mount Sinai was in those

15   days affiliated with a medical school, University of

16   Chicago Medical School?

17         A    I believe so, yes.

18         Q    All right.  And did you then complete a

19   residency on a continuous basis or an interrupted

20   basis?

21         A    Continuous.

22         Q    And how long was that residency?

23         A    Four years.

24         Q    So that takes us to about 1996 or so?

25         A    Yes.

48

1          Q    All right.  You're not board certified in

2    obstetrics or gynecology?

3          A    Not yet.

4          Q    Are you yet board-eligible?

5          A    I'm board-eligible.

6          Q    But you still have time to take the oral

7    exams?

8          A    Yes.

9          Q    Have you taken the written exams?

10         A    Yes.

11         Q    And you've passed those?

12         A    I passed it the first time, yes.

13         Q    All right.  Is it like an integrated

14   OB-GYN, or do you pass writtens in OB and then you

15   pass writtens in GYN?

16         A    It's integrated.  You take a complete

17   exam, and then you have to present cases, surgical

18   cases and obstetric cases orally.

19         Q    Okay.  So at the end of this journey of

20   Brooklyn Technical and UCON and the University of

21   Hartford and Loyola, some years later, 1996, you

22   went in -- in Mount Sinai in 1996 you went into

23   practice?

24         A    Yes.

25         Q    Can you explain to His Honor how your

49

1    practice evolved from one location to another and

2    the medical staffs to which you were admitted.

3         A    I started at Trinity Hospital on the

4    south side.  I worked for Dr. Kennedy as an

5    associate.

6         Q    And you were on the medical staff at

7    which -- at Trinity?

8         A    At Trinity and Michael Reese Hospital.

9         Q    Where was your office at Trinity?

10        A    93rd Street.

11        Q    Was that an outbuilding or a doctor's

12   building?

13        A    It's a doctor's building across the

14   street.

15        Q    All right.  You were his associate.  I

16   don't know who he is.  Was he an older practitioner?

17        A    Yes.

18        Q    And then did you move into another

19   practice or your own practice?

20        A    No.  I went to work at Michael Reese

21   Hospital as an employee at the hospital.  I stayed

22   there for two years.  Then I moved to Streator,

23   Illinois, and started my own practice.

24        Q    All right.  Now, Michael Reese years ago

25   was one of the most prominent maternity centers in

50

1   the city?

2           A    Yes.

3           Q    All right.  Then somewhere in this period

4   of time was there Glaxo or the pharmaceutical --

5           A    Yes.  I was on the National Speakers

6   Bureau for GlaxoSmithKline.

7           Q    What does that mean, National Speakers

8   Bureau?

9           A    I went around the country.  I was the

10  expert from out of town that gave lectures on the

11  various products to doctors.

12          Q    Were there any other medical staffs on

13  which you were attending physician other than

14  Trinity and Reese?

15          A    Lincoln Park Hospital.

16          Q    And that's the old Grant Hospital?

17          A    Yes.

18          Q    Okay.  During your residency at Sinai,

19  did you serve an underserved population?

20          A    Yes.

21          Q    Did you serve an affluent clientele?

22          A    No.  Well, a few.  A few baseball

23  players, I took care of their wives.

24          Q    All right.  But, otherwise, what types of

25  patients did you deliver and tend to in their

51

1    gynecological disorders?

2          A    Mostly public aid patients or uninsured

3    patients.

4          Q    Was this the experience you had at

5    Trinity and at Reese as well?

6          A    Yes.

7          Q    Were many of those patients appreciative?

8          A    Most.

9          Q    Were some of those patients very

10   difficult?

11         A    Some.

12         Q    Let's just talk for a moment or two about

13   your current practice in Streator, Illinois.  Where

14   is Streator, Illinois?

15         A    It's in LaSalle County.  It's about an

16   hour-and-a-half south of Chicago.

17         Q    Are there many obstetricians in Streator,

18   Illinois?

19         A    No, there aren't.  There's three.  I'm

20   one of the three.

21         Q    And there have been times I've asked you

22   to come to Chicago, but you've been on call?

23         A    Yes.

24         Q    And that's a problem?

25         A    Yes.  It's very difficult to find

1    coverage because only one of the other obstetricians

2    actually has obstetrical privileges.  The other one

3    is retired, semi-retired.

4         Q    You've had a license to practice in

5    Illinois since 1990 something; is that correct?

6         A    That's correct.

7         Q    I'm losing track of the years here.

8         A    I guess since 1994.

9         Q    Has your -- are you in good standing with

10   the Illinois State Department of Financial and

11   Professional Regulation Division of Professional

12   Regulation?

13        A    Yes, I am.

14        Q    Has that good standing ever been

15   interrupted?

16        A    No.

17        Q    And do you have an active obstetrical and

18   gynecological practice in Streator, Illinois?

19        A    Yes.

20        Q    Now, you in the year 2004 sought

21   bankruptcy relief in the United States Bankruptcy

22   Court for the Northern District of Illinois?

23        A    That's correct.

24        Q    And we've been through the exhibits

25   before coming to court.  The voluntary petition you

53

1    filed with the assistance of this Legal Finders

2    thing was what you understand to be Exhibit 1 which

3    His Honor has?

4           A    Yes.

5           Q    And that petition was discharged by the

6    court?

7                THE COURT:  Dismissed.

8                MR. JESSER:  Dismissed --

9                THE WITNESS:  Dismissed.

10               MR. JESSER:  -- by the court.

11               THE WITNESS:  Yes.

12   BY MR. JESSER:

13          Q    But in the year 2005, apparently you

14   reassessed the need to again seek bankruptcy relief;

15   is that correct?

16          A    That's correct.

17          Q    Now, the first firm to which you went, I

18   believe it was on North Wells Street, was a

19   different firm from that firm in which Mr. Sinn

20   practiced?

21          A    Yes.

22          Q    Okay.  And did you visit this second

23   Legal Finders firm for the 2005 petition that came

24   before His Honor as the first petition, the '04 had

25   come before His Honor, did you visit this Legal

54

1   Finders firm in the year 2005 once or more than

2   once?

3         A    Just once.

4         Q    Okay.  Did you have any intention -- and

5   I'll have to dissect this question a little.  Did

6   you have any intention to defraud or mislead or

7   secrete from your creditors the fact that you were

8   seeking bankruptcy relief for a second time?

9         A    No.  I wanted to make sure that they all

10  knew.

11        Q    Did you ever express or imply to Mr. Sinn

12  that you wanted something covered up or not said or

13  put in the wrong place so that Mr. Robinson's

14  clients wouldn't find out about the second

15  bankruptcy?

16        A    No, I didn't.

17        Q    Did you have any intention to mislead or

18  secrete from Mr. Robinson or from Judge Schmetterer,

19  although that doesn't make any sense because the

20  case was coming before him again, any information

21  about your creditors?

22        A    No.

23        Q    Having now gone through bankruptcy relief

24  for the second time, did you consider yourself some

25  sort of a lay expert on bankruptcy law?

55

1          A    No, not at all.

2          Q    Did you rely on what Mr. Sinn was -- on

3     the counseling and the advice he was providing to

4     you?

5          A    Yes.

6          Q    And whether you signed the second

7     petition, which was the 2005 petition, manually

8     and/or electronically, as you sit here today, you're

9     not backing away -- strike that.

10              You're not denying that it's your

11    petition?

12         A    No.  I was under the understanding that

13    everything that was on the first petition was on the

14    second petition and everything was included that I

15    gave them, and that's what I signed.

16         Q    And on the first petition in 2004, you

17    now have the knowledge that Mr. Robinson was listed

18    under the creditors section?

19         A    Yes.

20         Q    Okay.

21         A    And I did not understand the difference

22    between sections.  I just thought it was a

23    bankruptcy filing and everybody on the paper which I

24    was asked to sign was notified and included.

25         Q    And before you signed the second petition

56

1   which you filed in 2005, you indeed --

2           MR. JESSER:  Forgive me if I'm leading,

3   Judge.

4   BY MR. JESSER:

5       Q   But you indeed observed that Ms. Tidwell

6   and Ms. Sterling-Ahalla were listed within the four

7   corners of the 2005 voluntary petition?

8       A   Yes.

9       Q   You didn't realize then that where they

10  were listed would become a problem and end up in

11  court today?

12      A   No, not whatsoever.

13      Q   Did you in the military as a military --

14  did you say intelligence officer?

15      A   Yes.

16      Q   Did you have to -- well, to join the

17  United States Army, did you have to take an oath?

18      A   Yes.

19      Q   Did being a military officer require you

20  to swear to any additional code of conduct?

21      A   Yes.

22      Q   What was that code of conduct?

23      A   I'm sorry, Your Honor.

24      Q   Are you on call right now?

25      A   No.  I just leaned on the button.

1          Q    What was that code of conduct?

2          A    Just a standard U.S. Army military code

3     of conduct.

4          Q    Did Mr. Sinn suggest to you any clever

5     ways of not having Ms. Tidwell or

6     Ms. Sterling-Ahalla not find out about the second

7     bankruptcy?

8          A    No, not at all.  As I stated before, I

9     wanted everybody to know.

10              THE COURT:  Sir, those cases Mr. Robinson

11    had filed against you in state court, they were for

12    a medical malpractice, were they, or not?

13              THE WITNESS:  No, not medical

14    malpractice.

15              THE COURT:  They were for something else?

16              THE WITNESS:  Yes.

17              THE COURT:  Did you have any form of

18    insurance that defended you for those cases?

19              THE WITNESS:  I had insurance that

20    defended me for legal costs, but not for --

21              THE COURT:  Say again.  Louder, please.

22              THE WITNESS:  I had insurance.  But the

23    way the insurance was interpreted, they would

24    provide legal counsel but not pay any claims because

25    it wasn't --

1          THE COURT:  Did they provide counsel?

2          THE WITNESS:  Yes, they did.

3          THE COURT:  And when you say it was

4    interpreted that way, was that by a declaration of a

5    court or by the insurance company's point of view?

6          THE WITNESS:  By the insurance company.

7    It was pretty gracious on their part because I had

8    actually fallen out of the grace period for the

9    insurance policy.

10         THE COURT:  So the lawyer defending you

11   in state court in those cases brought by

12   Mr. Robinson, they were insurance-funded lawyers?

13         THE WITNESS:  Yes.

14         THE COURT:  Did you have -- what did you

15   call the insurance policy that they defended you

16   under?

17         THE WITNESS:  It was under a medical

18   malpractice insurance policy, but it was a

19   claims-made policy and not an occurrence policy,

20   which means that after a certain time frame, any

21   claims that came in would not be covered unless I

22   had purchased a tail.

23         THE COURT:  Did you purchase a tail?

24         THE WITNESS:  No, I did not.

25         THE COURT:  Were your contacts with his

1  clients while you were in practice where?

2        THE WITNESS:  At Kennedy Medical Center

3  as an employee of Dr. Kennedy.

4        THE COURT:  Did Dr. Kennedy's practice

5  have any insurance --

6        THE WITNESS:  Yes.

7        THE COURT:  -- that he provided for his

8  employees?

9        THE WITNESS:  Dr. Kennedy -- this is a

10  bone of contention.  Dr. Kennedy -- I was insured by

11  a policy purchased by Dr. Kennedy.  But when the

12  policy was up, Dr. Kennedy chose not to purchase the

13  tail for that policy, and --

14        THE COURT:  And then --

15        THE WITNESS:  -- I was on my own after

16  that.

17        THE COURT:  And you went to work where?

18        THE WITNESS:  At Michael Reese Hospital.

19        THE COURT:  Did the hospital provide you

20  with any insurance?

21        THE WITNESS:  Yes, they did.

22        THE COURT:  Starting -- which covered you

23  from what date?

24        THE WITNESS:  From the day I started

25  working for them.

60

1          THE COURT:  Did you file any actions

2    against the insurance company to seek a declaration

3    that it covered you for any recovery that might come

4    against you for the suits --

5          THE WITNESS:  No, I didn't.

6          THE COURT:  -- represented by

7    Mr. Robinson?

8          THE WITNESS:  No, Your Honor.

9          THE COURT:  You did not?

10          THE WITNESS:  At this time, Your Honor, I

11    was broke and unable to afford an attorney.  And at

12    the same time, my son was in the ICU at

13    Northwestern.

14          THE COURT:  Okay.

15          THE WITNESS:  So I was, you know, unable

16    to pursue any --

17          THE COURT:  You're telling me that if for

18    any reason the suits got revived in state court,

19    you'd be represented by insurance-funded lawyers.

20    But if you lost, the insurance company would not pay

21    for anything against you; is that what you're

22    saying?

23          THE WITNESS:  That's correct.

24          THE COURT:  All right.

25    BY MR. JESSER:

1      Q    And those attorneys are Johnson & Bell?

2      A    Yes.

3      Q    And were the two cases which are being

4  mothballed down in the bankruptcy section to be

5  revived, that would be your personal attorney?

6      A    Yes.

7      Q    I feel like Mike Ditka and forgot his

8  whole family at the Hall of Fame.  I never asked you

9  about your family.  You're married?

10     A    Yes.

11     Q    And you have children?

12     A    Yes.

13     Q    And what are their ages?

14     A    Eleven, two, and one.

15     Q    Nine months?

16     A    Yes.

17     Q    All right.  And which hospitals are you

18  on staff at in LaSalle County?

19     A    Only St. Mary's.

20     Q    Is that the only hospital in Streator?

21     A    Yes, it is.

22     Q    What is high-risk obstetrics?

23     A    High-risk obstetrics basically is

24  obstetrics involving patients who are outside the

25  normal range, meaning a normal pregnancy, nine

1    months, no medical problems, no prior history of

2    obstetrical problems.

3        Q    And occasionally even in the finest

4    facilities these can lead to catastrophic deliveries

5    and catastrophic lawsuits; is that correct?

6        A    That's correct.

7        Q    How many years have you dealt with

8    high-risk pregnancy?

9        A    Eleven years now.

10       Q    And did you deal with it in training as

11   well?

12       A    Yes.

13       Q    And does your practice now include

14   high-risk pregnancy?

15       A    Yes, it does.

16           MR. JESSER:  Your Honor, even though as

17   part of their complaints the plaintiffs alleged

18   intentional conduct on the part of doctor toward

19   them, Your Honor told us months ago you would not be

20   receiving any evidence concerning the underlying

21   facts, so I'm not going there.

22           THE COURT:  Sir, I'm not going to stop

23   you from offering into evidence -- you want subject

24   to the possibility that your opponent may object and

25   I'll have to pass on objections.

63

1          MR. JESSER:  All right.

2          THE COURT:  But it's clear, of course,

3    that in no way am I going to decide the issues

4    pending in the state court case.  But if you thought

5    they were relevant, don't let anything I may have

6    said some time ago dissuade you from --

7          MR. JESSER:  All right.  Well --

8          THE COURT:  -- putting it on here, okay?

9          MR. JESSER:  All right.

10   BY MR. JESSER:

11       Q    Doctor, as part of her amended complaint

12   before Judge Schmetterer, Sandra Sterling-Ahalla has

13   alleged, among other things, that you committed

14   intentionally sexual assault against her; is that

15   correct?  Is it correct that you committed on an

16   intentional basis any -- putting her in apprehension

17   of being battered or that you inappropriately or

18   maliciously touched her?

19          MR. ROBINSON:  Object to that, Judge.  I

20   object to that question, Judge.

21          THE COURT:  What is your objection?

22          MR. ROBINSON:  Well, one of the bases is

23   relevance.  He's having the witness make testimony

24   as to conclusion of law.

25          THE COURT:  Not yet.  Anything else?

64

1              MR. ROBINSON:  No, Judge.

2              THE COURT:  Why do you think it's

3    relevant, counsel?

4              MR. JESSER:  Because it's -- I'm reciting

5    it out of the plaintiffs' own complaint.

6              THE COURT:  I know.

7              MR. JESSER:  I don't have to --

8              THE COURT:  Why do you think it's

9    relevant here?

10             MR. JESSER:  I don't have to go there,

11   Judge.  I appreciate the latitude you've given me,

12   but I can withdraw the question.

13             THE COURT:  Very well.

14             MR. JESSER:  I have nothing further at

15   this time.

16             THE COURT:  Cross?

17             MR. ROBINSON:  Yes, Judge, a couple of

18   quick questions.

19                  CROSS-EXAMINATION

20   BY MR. ROBINSON:

21        Q    Dr. Smith, by the time you filed your

22   2005 bankruptcy petition you were aware of the

23   pending lawsuits by Trina Tidwell and Sandra

24   Ahalla-Sterling; is that correct?

25             A    That's correct.

1        Q    And your attorneys in the underlying
2   state case were Johnson & Bell; wasn't that correct?
3        A    Yes.
4        Q    And when you filed that petition in
5   September of '05, did you inform them about that
6   bankruptcy petition?
7        A    Yes, I did.
8        Q    Can you recall approximately when you let
9   them know you filed that bankruptcy petition?
10       A    No.  I don't remember.
11       Q    You don't remember?
12                 Would it be in October?
13       A    I don't remember exactly when it was.
14       Q    December?
15       A    I just said I don't remember when it was.
16            MR. ROBINSON:  No further questions,
17   Judge.
18                 REDIRECT EXAMINATION
19   BY MR. JESSER:
20       Q    But you are aware that --
21            THE COURT:  Wait, wait.
22                 Have you finished your
23   cross-examination?
24            MR. ROBINSON:  Yes, that's all I'm going
25   to take.

1           THE COURT:  Okay.

2                 Redirect.  Go ahead.

3     BY MR. JESSER:

4           Q    You are aware that Mr. Robinson has

5     admitted into evidence without objection on our part

6     a notice to Mr. Robinson from Johnson & Bell which

7     Ms. Jones testified she received on December 23,

8     2005; is that correct?

9           A    That is correct.

10          Q    And that pertained to notifying

11    Mr. Robinson of the bankruptcy?

12          A    Yes, I am aware that he was notified.

13          MR. JESSER:  Thank you.

14          THE COURT:  Sir, after you filed this

15    bankruptcy case, the second bankruptcy case, were

16    there any sessions in state court on the cases

17    pending there?

18          THE WITNESS:  Yes, there were.

19          THE COURT:  Were you present in state

20    court?

21          THE WITNESS:  Yes, I was.

22          THE COURT:  Approximately how long after

23    you filed bankruptcy was the first time you remember

24    being in state court on one of these cases?

25          THE WITNESS:  You know, I don't really

1    remember, Your Honor.

2              THE COURT:  A couple weeks or months or

3    days?

4              THE WITNESS:  It must have been months, I

5    think.

6              THE COURT:  Okay.  Was it before or after

7    the notice went out by your state court lawyers to

8    mothball these state court cases?

9              THE WITNESS:  In this particular case, I

10   don't think I was in court again.

11             THE COURT:  Well, after you filed

12   bankruptcy, did you go to court on those state court

13   cases?

14             THE WITNESS:  On these?  No.  On these

15   two particular cases?  No.

16             THE COURT:  No?

17                  Okay.  Do you have any more

18   questions of the witness?

19             MR. ROBINSON:  No further questions,

20   Judge.

21             THE COURT:  Do you have any more

22   questions of the witness?

23             MR. JESSER:  No, Your Honor.

24             THE COURT:  You may step down, sir.

25   Thank you very much.

1                    (Witness excused.)

2              THE  COURT:  Do  you  have  any  more  evidence

3    to offer?

4              MR.  JESSER:  No,  Your  Honor.  The  defense

5    rests.

6              THE  COURT:  You  rest.

7                    And  do  you  have  any  rebuttal?

8              MR.  ROBINSON:  No  rebuttal,  Your  Honor.

9              THE  COURT:  You  rest  in  rebuttal?

10             MR.  ROBINSON:  Yes.

11             THE  COURT:  I'll  hear  your  respective

12   final argument.

13                    Plaintiff.

14             MR.  ROBINSON:  Yes,  Judge.

15                    Judge,  as  mentioned  in  my  findings

16   of fact and conclusions of law, Judge, the purpose

17   of --

18             THE  COURT:  May  I  just  stop  --  start  on

19   an issue?

20             MR.  ROBINSON:  Yes,  Judge.

21             THE  COURT:  The  reason  I  went  into

22   insurance was that there would be a different sort

23   of issue than anybody has briefed if there were

24   insurance that could pay any judgment.  There's a

25   line of cases the circuit has given us that might be

1    relevant in such a case.

2              Now, I have had testimony about

3    being defended by a policy that has no possibility,

4    the witness said, of actually paying off a judgment.

5    Would you start by telling me whether or not you

6    feel any of that is relevant to this case.  I went

7    into it only because there's a line of cases that

8    might make it relevant if there was insurance that

9    could pay a judgment.  Do you feel it's relevant

10   here or not?

11             MR. ROBINSON:  Judge, no, I don't feel it

12   is relevant.  I am slightly familiar with that line

13   of cases, Judge.

14             THE COURT:  Pardon me?

15             MR. ROBINSON:  I am slightly familiar

16   with the ruling in that line of cases, Judge,

17   particularly as it pertains to medical malpractice.

18   Obviously we're claiming an intentional tort at this

19   particular time, Judge.  So I don't really feel it's

20   relevant.

21             THE COURT:  Okay.

22             And I don't suppose you think it is

23   either?

24             MR. JESSER:  No, Your Honor.

25             THE COURT:  All right.

1          Go ahead with your argument, folks.

2          MR. ROBINSON:  Yeah.  Judge, as I started

3    to say when I -- in the findings of fact and

4    conclusions of law, Judge, obviously the purpose of

5    requiring a debtor to list creditors with their

6    proper --

7          THE COURT:  Use the microphone.  Speak

8    closer to the --

9          MR. ROBINSON:  Their proper --

10         THE COURT:  -- microphone.

11         MR. ROBINSON:  -- mailing address, Judge,

12   is to afford us a due process and due notice to be

13   able to object, Judge, to any discharge of any

14   pending claims, Judge, as far as that is concerned.

15         Judge, as was testified to, a notice

16   was faxed over to the Law Offices of Darryl Robinson

17   on December 23rd, although he was on vacation and

18   didn't receive knowledge of such notice until after

19   January the 2nd in terms of that.  As the case law

20   basically supports, Judge, there's a difference

21   between notice and knowledge.  Because a notice came

22   over doesn't necessarily mean that the plaintiff has

23   knowledge of the pending bankruptcy.  And as the

24   case law supports in the in re Walker case, Judge --

25         THE COURT:  Well, you had both notice and

1   knowledge, didn't you, two weeks ahead of the

2   discharge?

3             MR. ROBINSON:  I understand, Judge.  But,

4   obviously, as case law supports, Judge, the court

5   must take into -- the total circumstances as far as

6   that is concerned.  And in looking at the total

7   circumstances, the court must look at the knowledge

8   of the parties, the opportunity that they may have

9   to investigate the bankruptcy and find out what

10  motions to file, if any, what adversary complaints

11  they can file, if any.  In the Walker case, if this

12  court will remember, the individuals --

13            THE COURT:  What case?

14            MR. JESSER:  In re Walker case, Judge.

15  The individuals had --

16            THE COURT:  That was one of my opinions?

17            MR. ROBINSON:  I don't know if it's one

18  of your opinions, Judge?

19            THE COURT:  You cited that in your --

20            MR. ROBINSON:  Yes, I did.  I cited that.

21            THE COURT:  Walker.  Okay.

22            MR. ROBINSON:  In re Walker, Judge.  And

23  I cited that.  And in that particular case, it was

24  20 days, Judge, before the time elapsed to contest

25  discharge.  And the court in that particular case

1    says that 20 days was not enough.  In this -- in our

2    particular case, we're saying that we received

3    knowledge within six days.  So if 20 days is not

4    enough in Walker, I don't understand how the

5    defendant can think six days is enough,

6    particularly, Judge --

7              THE COURT:  In theory at least you could

8    have rushed into bankruptcy court and made a motion

9    to extend your time to file an adversary.

10             MR. ROBINSON:  In theory, obviously,

11   Judge.  But in terms of --

12             THE COURT:  Now, what have you to say

13   about that theoretical possibility?

14             MR. ROBINSON:  Well, in practice, Judge,

15   it doesn't necessarily.  In theory, obviously, it

16   could have happened.  In Walker it could have

17   happened.  But in -- Judge, the court has to take in

18   the totality of the circumstances.  For example, the

19   knowledge of attorneys.  There's no bankruptcy

20   attorneys in that office on 1505 East Bankruptcy

21   Court (sic), so an investigation would have to

22   occur.  So, in theory, an investigation would have

23   to occur within those six days to understand which

24   motions would have to be filed.

25             THE COURT:  What kind of an

73

1   investigation?

2            MR. ROBINSON:  An investigation into the

3   bankruptcy, what type of bankruptcy it is, what

4   claims that needed to be made.  An attorney can't

5   just run into bankruptcy court and file any motion.

6            THE COURT:  What investigation would have

7   to be made other than just getting a bankruptcy

8   lawyer that knew what he or she was doing?

9            MR. ROBINSON:  Well, I understand that,

10  Judge, in terms of that.

11           THE COURT:  I'm not being critical --

12           MR. ROBINSON:  Right, I understand.

13           THE COURT:  -- of a state court

14  practitioner that is not familiar with the details

15  of bankruptcy.

16           MR. ROBINSON:  Right.  I understand that,

17  Judge.

18           THE COURT:  I did a lot of practice

19  myself outside of bankruptcy and had virtually no

20  bankruptcy experience when I got this job.

21           MR. ROBINSON:  Right.  I understand,

22  Judge.

23           THE COURT:  But I learned some more about

24  the bankruptcy at that point.

25           MR. ROBINSON:  I do understand that,

74

1    Judge.

2              THE COURT:  But isn't the lawyer in state

3    court someone that would have to get some bankruptcy

4    lawyer to help him out and interpret what the

5    consequences were of everything?

6              MR. ROBINSON:  Yes, Judge, that would be

7    a part of the investigation as far as that is

8    concerned, along with, Judge, like I said, the

9    totality of the circumstances, managing of the

10   caseload, dealing with every other situation in

11   terms of -- at that particular time.  Six days,

12   Judge, still is not enough time to file a motion in

13   bankruptcy court as far as contesting discharge.

14   That still is our position as far as that is

15   concerned, Judge.

16             THE COURT:  Why did you take so long to

17   file your litigation in federal court to upset the

18   discharge?

19             MR. ROBINSON:  After --

20             THE COURT:  In other words, is there

21   anything in this record that explains the answer to

22   that question?

23             MR. ROBINSON:  No, there's not anything

24   in this record that explains the answer to that

25   question.  The adversary complaint in federal court

75

1    was not really filed until after the attorneys for

2    Dr. Smith moved to dismiss the case in state court

3    in terms of that, and that's when -- for example,

4    the bankruptcy petition was filed, it was

5    transferred over to the bankruptcy calendar.  The

6    attorneys for the plaintiff was not aware that the

7    bankruptcy had been discharged, they hadn't received

8    any information.  They didn't even become aware that

9    the bankruptcy had been discharged until the

10   attorney for Dr. Smith had filed a motion to have

11   the case dismissed in state court months after the

12   discharge had taken place as far as that is

13   concerned.

14              So in addition to that, Judge,

15   Dr. Smith -- these cases were pending when he filed

16   his petition in September.  His attorneys were

17   Johnson & Bell, the same attorneys who filed a

18   motion to transfer to the bankruptcy calendar in

19   December, almost three months after he had initially

20   filed his notice for bankruptcy and --

21              THE COURT:  What's your explanation --

22   what's your argument, that is to say, as to why they

23   waited three -- almost three months before filing a

24   motion to mothball the cases on the bankruptcy

25   calendar?

1          MR. ROBINSON:  We think the evidence,

2   Judge, basically supports and is all

3   circumstantial -- the evidence basically supports is

4   that they were trying to get the case discharged

5   before the attorneys had an opportunity to object.

6   Why would they file a motion for a hearing on

7   January the 7th, three days before the time lapsed

8   for discharge and ten days before the case was going

9   to ask leave -- be discharged.  What were they

10  trying to gain by doing that?

11         THE COURT:  Three days before the

12  deadline for filing an adversary --

13         MR. ROBINSON:  An adversary --

14         THE COURT:  -- to object to discharge.

15         MR. ROBINSON:  Yes, Judge, three days

16  before the deadline and ten days before the actual

17  discharge.  What were the attorneys trying to gain

18  at that particular point by transferring the case at

19  that stage of the game?  It just doesn't add up.

20  It's all circumstantial evidence, Judge, but we --

21         THE COURT:  What do you argue is inferred

22  by the circumstantial evidence?

23         MR. ROBINSON:  We're arguing that -- we

24  infer that circumstantial evidence that, in fact,

25  that they intend to deny the plaintiffs' proper

1   notice in being able to file that adversary.

2            THE COURT:  You say you give -- you used

3   the word "proper."

4            MR. ROBINSON:  Proper notice means --

5            THE COURT:  What do you mean by "proper

6   notice"?

7            MR. ROBINSON:  Notice in -- proper

8   notice, Judge, in terms of notice to have enough

9   time to contest a discharge.

10           THE COURT:  How much time would have been

11   enough time?

12           MR. ROBINSON:  Probably two months would

13   have been enough time.

14           THE COURT:  How do we pick two months as

15   opposed to two days or three months or one month?

16           MR. ROBINSON:  Well, Judge, it's the

17   timing of the notice.  They filed it on

18   December 23rd.  There's a great likelihood that no

19   one would have been in the office on the 23rd as far

20   as that is concerned.  It was around the holiday

21   time.  So if it was --

22           THE COURT:  Part of this is your argument

23   about when they filed the notice near the holiday --

24   in the holiday season.

25           MR. ROBINSON:  Yes, as part of the notice

1   to -- as far as that is concerned, Judge.  Not only

2   that, because, as a practicing attorney, I do know

3   those tricks take place.  So it was a lot of

4   personal knowledge, too.  Typically attorneys file

5   motions during the holidays when attorneys don't

6   have an opportunity.  It may not be in the spirit of

7   practicing law, but it does happen, particularly in

8   state court as far as that is concerned.

9          THE COURT:  Oh, not only in state court.

10         MR. ROBINSON:  So that is our argument,

11  Judge, and the terms on the issue on notice.

12             On the issue of fraud, Judge, we

13  would have never expected Attorney Sinn to get up

14  here and say, "Yes, I committed fraud."  I mean, he

15  would have more issues to deal with in terms of

16  that.  But we believe that the bankruptcy petition

17  stands on its own as far as that is concerned.

18             There were six --

19         THE COURT:  Do you have any theories

20  other than fraud?

21         MR. ROBINSON:  Do I have any theories

22  other than fraud?  No.  No, Judge, no theories other

23  than fraud that we can stand on.

24         THE COURT:  Hmm?

25         MR. ROBINSON:  No theories other than

1   fraud that we can stand on, none that I'm aware of.

2   I mean, because -- if, in fact, it was a simple

3   mistake, as the law says, if it was a simple

4   mistake, it doesn't define -- the case law doesn't

5   define what a mistake is, then that wouldn't

6   necessarily be fraud.

7              But we would -- we would argue,

8   Judge, that if he had left one lawsuit out or two

9   lawsuits out of the schedule of creditors, then that

10  would be a mistake.  But to leave them all out, that

11  leans more towards fraud, Judge.

12             THE COURT:  You're referring to the fact

13  that in the second case --

14             MR. ROBINSON:  Yes, the second.

15             THE COURT:  -- he filed -- he

16  scheduled -- not scheduled, but he put in his

17  statement of affairs six lawsuits?

18             MR. ROBINSON:  Yes, six lawsuits.

19             THE COURT:  None of which were scheduled.

20             MR. ROBINSON:  None of them which were

21  scheduled.

22             THE COURT:  Did you -- in the first case

23  he didn't schedule any of them.  What he did was to

24  schedule you as a lawyer.

25             MR. ROBINSON:  Right.  Exactly.  You mean

1    in the 2004 bankruptcy petition.

2              THE COURT:  Yes.  So in the first case he

3    did not schedule his pending cases, did he?

4              MR. ROBINSON:  Schedule of creditors, I

5    don't have --

6              THE COURT:  I can't hear you.

7              MR. ROBINSON:  I don't have the 2004 with

8    me, Judge, but...

9              THE COURT:  Well, he just scheduled your

10   name.

11             MR. ROBINSON:  Okay.

12             THE COURT:  So you got notice of the

13   first bankruptcy.

14             MR. ROBINSON:  I can't recollect whether

15   or not I did get --

16             THE COURT:  Well, I'm not --

17             MR. ROBINSON:  -- notice, Judge.

18             THE COURT:  -- asking you to testify.  At

19   least --

20             MR. ROBINSON:  Yeah, I --

21             THE COURT:  -- you were put into a

22   position where you could get such notice.

23             MR. ROBINSON:  Right.  Exactly.

24             THE COURT:  Go ahead, counsel.

25             MR. ROBINSON:  So, Judge, based on that

1    alone in terms of that, the fact that all pending

2    lawsuits were not scheduled on the creditors, we

3    think that leans more to intent.  He intentionally

4    did that.

5              THE COURT:  Whose intent?

6              MR. ROBINSON:  The intent of Bruce Smith

7    and/or his attorneys at --

8              THE COURT:  Do you attribute that attempt

9    to Mr. Sinn, the lawyer?

10             MR. ROBINSON:  Yes, Judge.

11             THE COURT:  Why?

12             MR. ROBINSON:  Well, because he

13   purposefully did it, Judge.  He had an opportunity

14   as far as -- he had filed -- he even testified that

15   he had filled out about 350 Chapter 7s, that, in

16   fact, as he sat here today that he believed it

17   should be scheduled, that he was in an office with

18   25 attorneys, someone with great experience.  So if

19   he had any questions at that time, he could have

20   asked someone.  So it's not like the knowledge was

21   not available to him, Judge.  So we believe --

22             THE COURT:  Well, he didn't claim that he

23   didn't know what to do.  Didn't he say he just made

24   a mistake?  And he -- and then didn't he also say

25   that he showed the petition to the doctor --

1          MR. ROBINSON:  Yes.

2          THE COURT:  -- and asked him if it was

3    accurate and complete, and the doctor -- if the

4    doctor had said no, then he wouldn't have filed it?

5          MR. ROBINSON:  He didn't say if the

6    doctor had objected to certain things.  He didn't

7    say what the doctor would have objected to in terms

8    of that.  My inclination would be if the doctor

9    said, well, no, those are not some of my creditors,

10   then maybe he wouldn't have filed it in terms of

11   that, not any pending lawsuit creditors.

12         THE COURT:  Well, I thought he asked the

13   -- he said he asked the doctor whether the schedules

14   were accurate and complete.

15         MR. ROBINSON:  Yes.

16         THE COURT:  And if the doctor had said,

17   no, they're not accurate or complete, he wouldn't

18   have filed it.

19         MR. ROBINSON:  That's true, Judge.  That

20   is absolutely true, not knowing what the

21   underlying intent of --

22         THE COURT:  Anything else, counsel?

23         MR. ROBINSON:  That will be all, Judge.

24         THE COURT:  Your argument, counsel.

25         MR. JESSER:  As the court is well aware,

1    for generations in the law, fraud has to be alleged

2    and proven with great factual specificity.  To the

3    contrary, Mr. Sinn's testimony and Dr. Smith's

4    testimony that there was no fraudulent intention, no

5    intention to deceive or to secrete is

6    uncontroverted.  The plaintiff has adduced no

7    testimony whatsoever or other evidence to refute the

8    clear and convincing -- and we don't back away from

9    our burdens, the burdens that have shifted, the

10   clear and convincing testimony of both defense

11   witnesses that this was an honest mistake, if a

12   mistake at all because Mr. Sinn testified he thought

13   in good faith he was listing the specific lawsuits

14   in the statement of financial affairs correctly.

15                It would have been another matter

16   had there been no mention of these lawsuits.  But

17   the court sees in the exhibits that have been

18   received into evidence clear explanations and

19   details.

20                And even to be more semantical, I

21   really haven't tried to justify in these last few

22   months putting the lawsuits on the statement of

23   financial affairs.  But it's easy for the layperson,

24   or even Steve Jesser who has been practicing 35

25   years, to make a mistake when the statement of

84

1    financial affairs asks for the court, civil; where,

2    Cook; status, pending.  The doctor cannot, I would

3    submit, Your Honor, be expected to know the

4    intricacies of the Bankruptcy Code, as even I don't

5    know, that they should have been alternatively

6    scheduled in the creditor list.

7                    Another area, Judge, is a difference

8    in styles of counsel and myself.  And I've said here

9    in open court in past months, he's been a very

10   worthy adversary, and we've been very civil to each

11   other.  But I have no secretary, but I have for

12   years called my receptionist.  And no matter where I

13   am, since like it or not I go 365, I ask her what is

14   in the mail today.  This is a routine with us.  She

15   doesn't read me my junk mail.  She reads me anything

16   that she thinks might be of any importance.  Now,

17   with my faxes, they go into my e-mail.  So I carry

18   my faxes 365.

19              THE COURT:  Do you have any --

20              MR. JESSER:  I just don't close up the

21   shop on December 22nd and come back to the shop on

22   January 6th.

23              THE COURT:  I understand.  Counsel, let's

24   assume somebody wanted to make sure that the state

25   court lawyer didn't have enough practical time to

1   come in under the wire and by the deadline find out

2   what bankruptcy is all about and get someone to file

3   an adversary complaint.  You can understand that one

4   way of doing that is by not scheduling the creditor,

5   right?

6                  MR. JESSER:  You said the state court

7   lawyer?

8                  THE COURT:  Yeah.  If somebody wanted to

9   keep the state court lawyer from finding out about

10  the case, the bankruptcy case, until it was too late

11  to do something about it, one way would be not to

12  schedule them so that it would deprive them of the

13  ordinary period of notice from the clerk's office.

14                 MR. JESSER:  I'm with you on your

15  hypothetical.

16                 THE COURT:  Well, in this case, why is it

17  that the state court lawyer took so much time to

18  notify this plaintiffs' lawyer about the pendency of

19  the bankruptcy case?

20                 MR. JESSER:  I don't have --

21                 THE COURT:  We don't have any answer in

22  the record, do we?

23                 MR. JESSER:  Well, I don't have a precise

24  answer to the court's question, but three months'

25  time when even thereafter -- let's go with your

86

1    hypothetical.  Mr. Robinson returns to his office

2    after New Year's, he's in court on January 6th, the

3    case isn't discharged by --

4              THE COURT:  His deadline is January 9th,

5    right?

6              MR. JESSER:  Well, I stood here two weeks

7    ago, Judge, and Your Honor said, "Where's the

8    notice?"  I said, "I issued it last night."  Your

9    eyebrows went up.  But as a solo practitioner,

10   believe me that happens.  Even though you and I

11   were -- and you were the First Assistant State's

12   Attorney.  There are hundreds of attorneys in our

13   office.  When you're in solo practice, things get

14   done -- and I think Mr. Robinson would admit, things

15   get done at the last minute, as with his 364th-day

16   filing of the adversary proceedings.

17              I hope I've been responsive, but I

18   don't think three months ascribes any bad motives.

19   He's taken on a huge burden by alleging fraud, so --

20   he hasn't met this burden.  There's been no -- not

21   only no factual specificity of what fraud, he

22   hasn't -- all he can stand up here and say is,

23   "Well, it goes to."  And maybe it's just a figure of

24   speech.  I found it rather odd in the plaintiffs'

25   case that they referred to --

87

1          THE COURT:  What figure of speech?  What

2     figure of speech?

3          MR. JESSER:  Well, they kept referring to

4     the attorney, the plaintiffs' attorney.  The

5     attorney is Mr. Robinson.  It's Mr. Robinson's

6     office, Mr. Robinson's fax machine, Mr. Robinson's

7     secretary.  And I think Mr. Robinson, although this

8     may not be in the record, would admit to you he was

9     in state court in the law division on or about

10    January 6th.

11          If we go back to the statute, Your

12    Honor, I don't want to lose the forest for the

13    trees, the statute that counsel alleges was

14    violated, 11 U.S.C. 727(a)(4) that I'm sure Your

15    Honor could cite for us word for word, requires the

16    proving of a false oath or account.  I submit there

17    has been no proof at this trial this afternoon of

18    any false oath or account.

19          THE COURT:  Sir, the oath that the

20    schedules are true and complete is false, isn't it?

21    It does not include a batch of creditors; isn't that

22    right?

23          MR. JESSER:  No, I don't concede that,

24    Judge.

25          THE COURT:  Why not?

1      MR. JESSER:  And I'm not being semantical

2  with Your Honor.  It was in, arguably, the wrong

3  place.  The next schedule --

4      THE COURT:  No, no, no.  Each schedule

5  has to be accurate.  There's one thing called a

6  statement of affairs which asks you to list

7  litigation.  There are reasons why you want to

8  require litigation to be listed.  There is another

9  section, a different section, Schedule F, which

10  requires the listing of unsecured claims, unsecured

11  creditor claims.  A creditor in Bankruptcyland is

12  very broadly defined, and it certainly includes

13  somebody that's brought a lawsuit.  It doesn't have

14  to be a liquidated claim.  Creditors in -- that is

15  claimants, plaintiffs in lawsuits, are creditors.

16  So there's absolutely no doubt that it should have

17  been listed in both places, just like the lawyer

18  said tonight.

19      MR. JESSER:  And I was going to say

20  assuming arguendo --

21      THE COURT:  Now, therefore, since it

22  wasn't listed, why is that not a false pleading or a

23  false affidavit?

24      MR. JESSER:  But assuming arguendo that

25  it is false for the sake of this very highly

1  scholarly dialogue that we're having, counsel has

2  alleged it was fraud, it was fraudulently --

3              THE COURT:  Yes.  But as you --

4              MR. JESSER:  -- intended.

5              THE COURT:  -- properly recited the

6  statute, fraud may consist of a false affidavit.

7  I'm just asking you why isn't this a false

8  affidavit, that is his affidavit at the end of the

9  filing.  The bankruptcy filing is where the debtor's

10  affidavit comes, and he says it's complete and

11  truthful, everything is complete and truthful.

12              MR. JESSER:  Well, obviously, Dr. Smith

13  is a layperson to the law.  And this may not be very

14  lawyerly for me to say, but as a nonbankruptcy

15  practitioner, I find it rather disingenuous that

16  Dr. Smith can so easily file a voluntary petition,

17  and I know the court is engaging in a very

18  scholarly, appellate-type dialogue, but then be

19  expected to know the hyper-critical nuances of the

20  Code and just where -- relying on his attorney, he's

21  yet nevertheless supposed to know where exactly to

22  schedule his creditors that he forthrightly names

23  within the four corners of the petition.

24              THE COURT:  Counsel, there's nothing

25  hyper-technical and there's nothing complex about

1  this dialogue.  In Bankruptcyland the schedules have

2  to be filled out accurately so that the creditors

3  can get notice.

4           MR. JESSER:  And we're --

5           THE COURT:  It's that Schedule F that is

6  the basis for the clerk's notice to creditors

7  telling them about the bankruptcy.

8           MR. JESSER:  Okay.

9           THE COURT:  Now, sometimes people

10  actually send notice to their creditors.  The lawyer

11  will say, "You got to stop this lawsuit because I've

12  just filed bankruptcy."  But for some unexplained

13  reason that wasn't done until the very -- a few

14  days, only a few days were left in the deadline.

15           MR. JESSER:  Well, Judge, we have these

16  colloquial expressions sometimes put on the White

17  Sox, "They don't win pretty, they win ugly."  This

18  wasn't a textbook case.  But we seem to overlook the

19  fact that Mr. Robinson knew in 2004 the doctor had

20  sought bankruptcy relief in 2004.  I'm not --

21           THE COURT:  Yes, he did.

22           MR. JESSER:  -- hanging my hat --

23           THE COURT:  He did.

24           MR. JESSER:  -- on that.

25           THE COURT:  But, of course, that cuts --

1    that doesn't cut against the plaintiff because he

2    knew the case was dismissed.  All the creditors find

3    out the case gets dismissed once it's dismissed.  So

4    it didn't mean anything.  It doesn't mean that he

5    should watch the bankruptcy court every day to find

6    out if there was a new case.  Surely you're not

7    implying that.  And, of course, it cuts the other

8    way, that your client went through bankruptcy and

9    knew to schedule Mr. Robinson, and he -- so that his

10   clients would get notice in the first case but not

11   in the second.

12          MR. JESSER:  We used to have, I thought

13   at least when I went to law school, a reasonable man

14   standard.  If Dr. Smith, although I did not examine

15   him on that, has knowledge that Johnson & Bell has

16   notified Mr. Robinson of his 2005 bankruptcy, what

17   is this poor man further to do?

18          THE COURT:  Say that again, please.

19          MR. JESSER:  Under a reasonable man

20   standard, if that still exists in the law as it did

21   when we were in law school, if Dr. Smith knows that

22   Johnson & Bell, a highly distinguished firm, is

23   notifying on December 23 Mr. Robinson that he has

24   gone and received -- he has gone into bankruptcy

25   court the end of September, what more is Dr. Smith

1    expected to do?

2           THE COURT:  Well, first of all, he's

3    expected to sign accurate schedules.  And as you

4    read the statute, counsel, and if he has filed false

5    schedules, even though his heart is pure, can he be

6    guilty of fraud?

7           MR. JESSER:  No.

8           THE COURT:  If his heart is pure but his

9    schedules are false, you're saying he cannot be

10   guilty of fraud?

11          MR. JESSER:  Well, I don't know about --

12   that's a hard characterization for me to relate to.

13   He committed no overt acts of fraud, and then we

14   have the, if I recall correctly, fraudulent

15   withholding.  He withheld nothing from Mr. Sinn.  To

16   the contrary, he told Mr. Sinn about Mr. Robinson's

17   lawsuits.

18          THE COURT:  Well, the question we're

19   going to have to decide, I guess, is whether -- I

20   mean, you have put on evidence that said, in effect,

21   his heart is pure, his lawyer made a mistake, and

22   his lawyer's heart was pure.  You haven't explained

23   why the state court lawyer didn't notify anybody

24   earlier.  But you've implied that your client

25   doesn't know what the duties are particularly, and

1   therefore his heart remains pure.  So it is a

2   classic type of case as to whether or not somebody

3   that files a false affidavit in bankruptcy, whether

4   he has a defense because his heart was pure.

5        MR. JESSER:  Well, the court raised with

6   me a moment ago, and I may have misinterpreted this,

7   that doctor, or any other bankrupt, it could be me

8   seeking bankruptcy court, has to almost recertify

9   every section of the petition.  I think if I were to

10  recall doctor to the witness stand, he would testify

11  that he was signing at the end.  Whether it's manual

12  or electronic, it doesn't matter.  He stands behind

13  what he signed.  But he was trying to certify the

14  accuracy and completeness of the whole petition.  I

15  submit, Your Honor, and I never use the word

16  "technicality," but we're here discussing a highly

17  procedural point.

18       THE COURT:  Well, counsel, keep in mind

19  that you are seeking the advantage of a very highly

20  procedural point, which is the deadline for filing

21  an objection to a discharge, a deadline which --

22       MR. JESSER:  He came --

23       THE COURT:  -- protects debtors.

24       MR. JESSER:  He came in on time.  He came

25  in on the 364th day.

1          THE COURT:  No.  He has to come in with a

2     heavy burden on the 364th day.  If he came in by the

3     first deadline, which is for filing of an adversary

4     complaint objecting to discharge, he would only have

5     to show that the type of case pending in state court

6     is a type of case which, if he won, should be one in

7     which dischargeability of that debt should be

8     denied, a much lesser burden.  I don't mean to

9     pester you with a lot of questions --

10          MR. JESSER:  No, I --

11          THE COURT:  -- but these are the

12     questions on which the case turns.

13          MR. JESSER:  Well, obviously the court is

14     not pestering me.  There are very few courts that

15     would be so intellectually -- that would engage me

16     in such an intellectual discussion.  It's for the

17     very reason that no one could ever expect -- and I'm

18     not flattering you, Judge, but no one could ever

19     expect to walk into this courtroom and try to

20     buffalo you or spin you into something that these

21     two witnesses testified as forthrightly as they did.

22     And there was no attempt to make excuses, but

23     rather, "Yeah, we put it in a place that Your Honor

24     doesn't approve of.  We're sorry.  We made a

25     mistake."  It didn't defraud anyone.  Mr. Robinson

95

1   had ample time to rectify it.  I get calls at 10:30

2   at night if -- when I'm trying to go to bed.  If I

3   have to, I stay up until 2:00 in the morning to fix

4   a problem so I can sleep easily.  He had time.

5            THE COURT:  Thank you, counsel.

6            Counsel, any rebuttal?

7            MR. ROBINSON:  Just a small rebuttal.

8   Judge, in terms -- like I said before, the court

9   must look at the totality of the circumstances.  The

10  court must --

11           THE COURT:  Slower, counsel, and use the

12  mic.

13           MR. ROBINSON:  Yes, Judge.  I'm sorry.

14  The court must look at the totality of the

15  circumstances, Judge, and determine whether or not

16  there was any alleged inadequacies, and I quote

17  that, that did not prejudice the creditor.  So there

18  is no way the defendant can sit here today, Judge,

19  and say that there were not any inadequacies that

20  prejudiced Trina Tidwell and Sandra Sterling-Ahalla

21  in terms of that.  He filed his bankruptcy in

22  September, didn't file a motion to transfer the

23  bankruptcy until December the 23rd, almost three

24  months later at -- during the period of time where

25  not only attorneys, but a lot of individuals, Judge,

1   would likely be on vacation, noticing up a case for

2   a hearing -- actually, the hearing was on January

3   the 7th, Judge.

4           THE COURT:  Let's assume that he had --

5   that they had given you notice a few days after they

6   filed the bankruptcy, actual notice by a letter from

7   the lawyer saying, "I just filed a bankruptcy," but

8   they had omitted scheduling your clients or you on

9   Schedule F so the clerk never sent you notice --

10          MR. ROBINSON:  Right, Judge.

11          THE COURT:  -- but you got notice a

12  couple of days after the bankruptcy was filed.  The

13  oath would still have been false, right?

14          MR. ROBINSON:  Yes, the oath would still

15  have been false, Judge.  Yes.

16          THE COURT:  So could you rely on that

17  falsity if you had had three months' notice, actual

18  notice?

19          MR. ROBINSON:  Not in the terms of

20  notice, Judge.  No, I don't think I would be able to

21  rely on that falsity.

22          THE COURT:  Why not?

23          MR. ROBINSON:  Because I think at that

24  particular time --

25          THE COURT:  Isn't it your argument that

1    the oath was false and, therefore, there was fraud?

2              MR. ROBINSON:  Oh, in terms of fraud,

3    yes.  I thought you said in terms of notice.

4              THE COURT:  So could you still make that

5    argument if you had actually gotten notice a couple

6    days after the bankruptcy was filed?

7              MR. ROBINSON:  Yes.  The fraud argument

8    is --

9              THE COURT:  Not from the clerk, not based

10   on the false Schedule F, but just based on a

11   lawyerly letter from the debtor's lawyer?

12             MR. ROBINSON:  On a basis of fraud, I

13   would say, yes, Judge, that argument could be made.

14             THE COURT:  You could still argue fraud

15   if you got notice and disregarded the deadline?

16             MR. ROBINSON:  Yes, Judge, I think it

17   would be argument on fraud.  The only exception

18   would be if, in fact, it was -- there was -- had

19   bankruptcy experience or had dealt with the

20   situation before as far as that is concerned.

21             THE COURT:  So we'd have to make an ad

22   hominem, that is an analysis of the lawyer as to

23   whether the lawyer had experience?

24             MR. ROBINSON:  Well, Judge, I mean, it's

25   kind of ambiguous, but it does say the totality of

1    the circumstances.  And I would envision that cases

2    have been decided based upon that.  In the Walker

3    case it says two nonlawyers, so it obviously is

4    looking at the individuals who actually received

5    notice.

6                    That would be all, Judge.

7              THE COURT:  Anything else?

8              MR. ROBINSON:  That's all.

9              THE COURT:  Thank you, folks.  I'll rule

10   by mail.  Thank you and good night.

11                        (Which were all the proceedings
                          had in the above-entitled cause,
12                        September 17, 2007.)

13

14   I, GARY SCHNEIDER, CSR, RPR, DO HEREBY CERTIFY THAT
     THE FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT OF
15   PROCEEDINGS HAD IN THE ABOVE-ENTITLED CAUSE.

16

17

18

19

20

21

22

23

24

25