KJ

# United States Bankruptcy Court
NORTHERN DISTRICT OF ILLINOIS
219 S. Dearborn Street
Chicago, IL 60604

**Kenneth S. Gardner**, Bankruptcy Clerk

Date _____ April 14, 2008 _____

Michael Dobbins, Clerk
United States District Court
Northern District of Illinois
219 S Dearborn Street
Chicago, IL 60604

Case Number _____ 08 cv 46 / 07 A 12 _____

Case Name _____ Smith vs Sterling - Ahlla _____

Notice of Appeal Filed _____ 12/17/07 _____

Appellant _____ Bruce S. Smith _____

Dear Sir:

Pursuant to **Bankruptcy Rule 8007** transmitted herewith is the Record on Appeal. The Record on Appeal consist of:

☐ Transmittal Letter and Civil Cover Sheet
☐ Designation and Statement of Issues
☐ Transcript of Proceeding
☐ In Forma Pauperis

☐ Notice of Appeal
☐ Copy of Documents Designated
☐ Exhibits
☐ Expedited Notice of Appeal

Additional Items Included

☐ _____

**FILED**
APR 1 4 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

☐ Total Volumes Transmitted

The following items will be transmitted as a supplemental to the Record on Appeal

☑ Brief of Appellee Sandra Sterling-Ahlla with Notice of Filing _____

Previous D C Judge _____ gottschall/valdez _____    Case Number _____

By Deputy Clerk _____

Revised 03/26/08rj

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RECEIVED
'08 APR 14 PM 10: 26
CLERK
U.S. DISTRICT COURT

BRUCE S. SMITH, MD
    DEFEDANT-APPELLANT,

NO. 1:08-CV-46

v.

SANDRA STERLING-AHLLA,
PLAINTIFF-APPELLEE

Hon. Harry D. Lienenweber, Presiding

ADVERSARY NO. 07 A 00012

BANKRUPTCY NO. 05 40196

BRUCE S. SMITH, MD
    FORMER DEBTOR,

## Notice of Filing

To: Steven H. Jesser
    790 Frontage Road, Suite 110
    Northfield, IL 60093

        PLEASE TAKE NOTICE that I have filed this day with the Clerk of the Above Court,
PLAINTIFF-APPELLEE SANDRA STERLING-AHLLA'S RESPONSE BRIEF, a copy of
which is attached hereto and herewith served upon you.

        DATED at Chicago, Illinois this 10th day of April 2008.

Respectfully Submitted,

Darryl E. Robinson, P.C.
1505 East 53rd Street, Suite 200
Chicago, Illinois 60615

FILED
UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
APR 1 1 2008
KENNETH S. GARDNER, CLERK
PS REP. - AI

## CERTIFICATE OF SERVICE

I, Darryl E. Robinson, an attorney, certify that the attached response was delivered to the above named parties on the 10th day of April 2008 by mailing a copy of same in the U.S. Post Box located at 1505 East 53rd Street in Chicago, Illinois to the address above.

Darryl E. Robinson



IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRCIT OF ILLINOIS
EASTERN DIVISION

IN RE.                                    )
                                          )
    BRUCE S. SMITH                        )        Court Number 1:08-cv-00046
        DEFENDANT-APPELLANT)
                                          )        Honorable Harry D. Lienenweber
                                          )        Schmetterer
        v.                                )
                                          )        ADVERSARY NO. 07 A 00012
------------------------------------------ )
SANDRA STERLING-AHLLA                     )
        PLAINTIFF-APPELLEE                )
                                          )        BANKRUPTCY NO. 05 40196
                                          )
                                          )
BRUCE SMITH                               )
        FORMER DEBTOR                     )
                                          )

**FILED**
UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS

APR 1 1 2008

KENNETH S. GARDNER, CLERK
PS REP. - AI

## BRIEF OF APPELLEE SANDRA STERLING-AHLLA

Plaintiff, Appellee, Sandra Sterling-Ahlla, by her attorneys, Darryl E. Robinson, PC and

John F. Lyke, Jr. and Associates submits her brief to this Court and in support of the Facts and

Conclusions of Law entered by the Honorable Jack B. Schmetterer in the United States

Bankruptcy Court for the Northern District of Illinois, Eastern Division, on 12/17/07.

## TABLE OF POINTS AND AUTHORITIES

### CASES

Grella v. Salem Five Cent Sav. Bank, 42 F.3d 26, 30 (1st Cir. 1994)........................3

In re O'Shaughnessy, 252 B.R. 722, 738 (N.D. Ill. 2000)........................5

In re Castle, 289 B.R. 282 (E.D. Tenn. 2003)........................5

In re Glenwood Med. Group, Ltd., 211 B.R. 282, 285 (Bankr. N.D. Ill. ....................5

1

In re Longardner and Associates, Inc., 855 F.2d 455, 465 (7th Cir. 1988) cert. denied, 489 U.S. 1015, 109 S.Ct. 1130, 103 L.Ed. 2d 191 (1989)..................................................5

Illinois ex rel. Hartigan v. Peters, 871 F.2d 1336, 1340 (7th Cir. 1989)...............................5

In re S.N.A. Nut Co., 198 B.R. 541, 543 (Bankr. N.D.Ill. 1996)........................................5

In re Walker, 149 B.R. 511, 514 (Bankr. N.D.Ill. 1992).................................................5

In re Marino, 195 B.R. 886, 894 (Bankr. N.D.Ill. 1996).................................................6

Stathopoulos v. Bostrom (In re Bostrom), 286 B.R. 352 (Bankr. N.D.Ill. 2002)....................7

In re Lowell & Kay Shelton, 58 B.R. 748..................................................................8

In re Fadem, 96 F.3d 792, 795 (5th Cir. 1996)............................................................8

Rion v. Springer (In re Springer), 127 B.R. 702, 708 (Bankr. M.D.Fla. 1991).......................8

## TABLE OF CONTENTS

STATEMENT OF THE BASIS OF APPELLATE JURISDICTION...................................2

STATEMENT OF ISSUES PRESENTED.............................................................3

APPLICABLE STANDARD OF APPELLATE REVIEW............................................3

STATEMENT OF THE CASE..........................................................................5

ARGUMENT.............................................................................................8

CONCLUSION...........................................................................................8

## STATEMENT OF THE BASIS OF APPELLATE JURISDICTION

Rule 8013. Disposition of Appeal: Weight Accorded Bankruptcy Judge's Findings of Fact:

On appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a Bankruptcy Judge's judgment, order, or decree or remand with instructions for further Proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.



## STATE OF ISSUES PRESENTED

1. Whether debtor committed fraud in failing to list plaintiff-appellee, among many others, in the schedule of creditors as required by the bankruptcy rules.

2. Whether debtor failed to provide the creditor adequate notice by not listing the plaintiff-appellee in the schedule of creditors and certificate of service.

3. Whether the Bankruptcy committed clear error in its finding of facts and legal conclusions.

## APPLICABLE STANDARD OF APPELLATE REVIEW

When a district court reviews a decision of a bankruptcy court, it reviews the factual findings for clear error and its legal consideration de novo. Fed R. Bankr. P. 8013; Grella v. Salem Five Cent Sav. Bank, (1st Cir. 1994)

## STATEMENT OF THE CASE

1. . Bruce Smith (Hereinafter the "Defendant") filed a voluntary petition for relief pursuant to Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") on September 26, 2005 under case number 05 b 40196.

2. This adversary proceeding arises out of and relates to the Chapter 7 case of the debtor on the docket of this court.

3. At the time he filed his Bankruptcy Petition, Debtor knew that Ms. Sterling-Ahalla was suing him for an intentional tort in the Circuit Court of Cook County, Illinois in the case Sterling-Ahlla v. Dr. Bruce S. Smith et al., 06 L 7670 Formerly 03 L 15759 ("the Lawsuit").

4. The Debtor actually listed the Lawsuit in his Statement of Financial Affairs but did not list her anywhere else in his Petition. See Exhibit A, Copy of Transcript Pg.9, lines 11-25 and Pg 10, lines 1-22 , Pg. 29, lines 23-25

5. During that period Ms. Sterling-Ahlla's intentional tort claim (See Attached

3

Complaint-Exhibit B) against Debtor continued.

6. A notice of motion in state court was faxed over to plaintiff-appellee's attorney on December 23, 2005. See Exhibit C

7. At the time Debtor gave plaintiff-appelleel notice via fax; however, Attorney Robinson was on vacation for the holidays from December 23, 2005 through January 3, 2006. See Exhibit A, Pg. 17, lines 11-25, Pg. 18, lines 1-14

8. A hearing over the issue was not held until January 7, 2006, two days before the due date to contest dischargeability.

9. In addition, the Debtor represented to Attorney Robinson in court that the Bankruptcy had just been filed.

10. The Lawsuit is still progressing against the Debtor in the Circuit Court of Cook County. No judgment has been entered.

11. USBC ND IL ED No. 05-40196 was dismissed on January 17, 2006.

12. In his findings of facts and conclusions of law, Judge Schmetterer found, inter alia,

   A. Debtor made a false oath when he signed the Declaration Concerning Debtor's Schedules. It is no excuse that Debtor signed the declaration on the advice of counsel with belief that his attorney had included such information, or that he did not know the difference between schedule F and the Statement of Financial Affairs.

   B. Moreover, the Judge held that the Debtor had a financial motive for attempting to conceal his bankruptcy petition from plaintiffs because his insurance carrier would not cover any judgment against him as a result of his employer failure to purchase a "tail rider."

4

# ARGUMENT

## The Creditor did not received timely and adequate notice under Federal Rule of Bankruptcy Procedure 4007(c)

The fact that the Debtor knowingly failed to list Ms. Sterling-Ahllal as a creditor and further deliberately failed to tell her or her attorney that he had filed for Bankruptcy is itself a basis to allow Ms. Sterling-Ahlla to file for up to one year from the Discharge a complaint seeking to declare the debt non-dischargeable or to seek to revoke the discharge. E.g., In re O'Shaughnessy, 252 B.R. 722, 738 (N.D. Ill. 2000); 11 U.S.C. 727; In re Castle, 289 B.R. 282 (E.D. Tenn. 2003).

The purpose of requiring a debtor to list creditors with their proper mailing addresses is to afford those creditors basic due process notice. In re Glenwood Med. Group, Ltd., 211 B.R. 282, 285 (Bankr. N.D.Ill. 1997). Thus, if a creditor is not given reasonable notice of the bankruptcy case and the relevant bar dates, its claim cannot be constitutionally discharged. See In re Longardner and Assocs., Inc., 855 F.2d 455, 465 (7th Cir. 1988), cert. denied, 489 U.S. 1015, 109 S.Ct. 1130, 103 L.Ed.2d 191 (1989). The Court must look at the totality of the circumstances in determining whether notice was reasonable. Illinois ex rel. Hartigan v. Peters, 871 F.2d 1336, 1340 (7th Cir. 1989). What constitutes reasonable notice, however, varies according to the knowledge of the parties. See In re S.N.A. Nut Co., 198 B.R. 541, 543 (Bankr. N.D.Ill.1996). One circumstance to consider in evaluating the sufficiency of notice is whether alleged inadequacies in the notice prejudiced the creditor. In re Walker, 149 B.R. 511, 514 (Bankr. N.D.Ill.1992) Another circumstance to consider is whether notice was given to the creditor in time for it to take meaningful action in response to the impending deprivation of its rights. Id

5

Actual notice of the bankruptcy proceeding may, in certain cases, constitute reasonable notice for purposes of due process. However, such notice satisfies the Bankruptcy Code and due process requirements only if the creditor receives notice adequate enough to afford it an opportunity to file a complaint or seek to extend the time to file a complaint for dischargeability…" In re Marino, 195 B.R. 886, 894 (Bankr. N.D.Ill.1996) (citing Walker, 149 B.R. at 514). In the Walker case, the creditor first learned of the debtor's bankruptcy case from a non-lawyer third party, only twenty days before the deadline for filing 11 U.S.C. Section 523 dischargeability actions. Because the only information known to the creditor was that some form of bankruptcy had been filed; the information was acquired through a conversation between two non-lawyers; and the party conveying the information was not a representative of the debtor, the court held that the requisite notice under the Bankruptcy Code and the Fifth Amendment had not been provided. Walker, 149 B.R. at 516-17. The Court stated that after the conversation between the parties, the creditor was left with a mere twenty days to find out that some special action in the bankruptcy court would be required, to contact and possibly hire a lawyer, investigate the creditor's rights in the debtor's bankruptcy, and finally file an Adversary Complaint or motion to extend time prior to bar date. Id at 515

In the case at hand, the only information known to creditor on January 7, 2006 at a hearing in state court was that some form of bankruptcy had been filed. "Consequently, the creditor was left with a mere two days to find out that some special action in the bankruptcy court would be required, investigate the creditor's rights in the debtor's bankruptcy, and finally file an Adversary Complaint or motion to extend time prior to bar date." As in the Walker case, the creditor found out about the Debtor's bankruptcy from a third party in a pending state court action against the debtor. However, unlike in Walker, the creditor only had two days to

investigate and file the appropriate responses prior to the bar date (January 9)." The debtor believes that two days was adequate notice to take such action. If twenty days is not adequate notice, then this Court must surely find that two days is not adequate. This Court must look at the totality of the circumstances to determine whether notice was reasonable. In this case, the Debtor had many opportunities to notify all of the parties listed in the statement of financial affairs because his Bankruptcy was filed on September 26, 2005. Although, he failed to schedule creditor, among others, he still had every opportunity to notify all interested parties. Instead, he waits until two days before the bar date for contesting discharge to file a motion to stay the state case although his bankruptcy was scheduled for discharged on January 17, 2006. This Court must inquire as to: 1.What motive did the debtor have when he filed his motion to stay the state case? 2. What was the debtor's intent for attempting to stay the state case for only ten days? 3. Why was a motion to stay the state case not filed soon after the bankruptcy filing on September 26, 2005? In looking at the totality of the circumstances, it is obvious that the debtor's intent was to deny reasonable and timely notice to all parties who were not properly scheduled.

**WHEREFORE,** Sandra Sterling-Ahlla requests that the Court enter an order affirming the Bankruptcy Court.

**The Debtor was fraudulent in not scheduling all of the creditors who had pending lawsuits against him**

The purpose of Section 727(a) (4) is to enforce the debtor's duty of disclosure and to ensure that the debtor provide reliable information to those who have an interest in the administration of the estate. Stathopoulos v. Bostrom (In re Bostrom), 286 B.R. 352 (Bankr. N.D.Ill. 2002) For purposes of Section 727(a)(4), a debtor's petition and schedules, statement of financial affairs, statements made at a Section 341 creditor's meeting, and testimony at a Rule

7

2004 examination all constitute statements that are made under oath. Id at 359-60. Filing false schedules with material omissions or representations with an intent to mislead creditors as to debtor's financial condition constitutes a false oath under Section 727(a) (4). Id at 360. Section 727(d) (1) provides that a court shall revoke a discharge granted under subsection (a) of this section if such discharge was obtained through fraud. In re Lowell & Kay Shelton, 58 BR. 748. The burden is on the debtor to complete their schedules accurately. In re Fadem, 96 F.3d 792,795 (5th Cir. 1996) The burden is on the debtor...to demonstrate absence of fraud or intentional design. Id at 796 (quoting Rion v. Springer (In re Springer), 127 B.R. 702, 708 (Bankr. M.D.Fla. 1991)

In the case a hand, the creditor's complaint alleges that the debtor committed fraud when he did not schedule the creditor, among others, thereby denying the creditor a reasonable and adequate opportunity to file all appropriate responses contesting dischargeability. Therefore, creditor has sufficiently alleged a cause of action.

**WHEREFORE,** Sandra Sterling-Ahlla requests that the Court enter an order affirming the Bankruptcy Court.

## CONCLUSIONS

Based on the evidence presented, the Bankruptcy Court was well within its right to find that the Debtor made a false oath when he signed the Declaration Concerning Debtor's Schedules and that the Debtor had a financial motive for attempting to conceal his bankruptcy petition from plaintiffs because his insurance carrier would not cover any judgment against him as a result of his employer failure to purchase a "tail rider." The Court did not commit a clear error in coming to this decision because the facts presented support this conclusion. Therefore, this Court must affirmed the Bankruptcy Court.

8



**WHEREFORE,** Sandra Sterling-Ahlla requests that the Court enter an order affirming

the Bankruptcy.

Respectfully Submitted,

Sandra Sterling-Ahlla

By /s/ Darryl Robinson

Darryl Robinson
1505 East 53rd Street, Suite 200
Chicago, Illinois 60615
(773) 955-0400
Atty No. 6239030

9



1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In re:                          )
                                )
BRUCE S. SMITH,                 ) No. 05 B 40196
                                )
                    Debtor.     )
--------------------------------)
                                )
TRINA TIDWELL,                  ) No. 07 A 00011
                                )
                    Plaintiff,  )
                                )
          vs.                   )
                                )
BRUCE S. SMITH,                 )
                                )
                    Defendant.  )
--------------------------------)
                                )
SANDRA STERLING-AHLLA,          ) No. 07 A 00012
                                )
                    Plaintiff,  )
                                )
          vs.                   )
                                )
BRUCE S. SMITH,                 ) Chicago, Illinois
                                ) September 17, 2007
                    Defendant.  ) 1:30 p.m.


          TRANSCRIPT OF PROCEEDINGS BEFORE THE
              HONORABLE JACK B. SCHMETTERER


APPEARANCES:

MR. DARRYL ROBINSON
on behalf of Trina Tidwell and Sandra
Sterling-Ahalla;

MR. STEVEN H. JESSER
on behalf of Bruce S. Smith.

# I N D E X

| WITNESS: | DX | CX | REDX | RECX |
|---|---|---|---|---|
| CHYKOLA JONES | 15 | | | |
| NATHANIEL SINN | 25 | 36 | 39 | |
| BRUCE SMITH | 41 | 64 | 65 | |

1        THE CLERK:  Smith, 05 40196, with related

2  adversaries, Tidwell versus Smith, 07 A 11,

3  Sterling-Ahlla versus Smith, 07 A 12.

4        MR. ROBINSON:  Good afternoon, Your

5  Honor.  Darryl Robinson for Trina Tidwell and Sandra

6  Ahalla-Sterling.

7        THE COURT:  Good afternoon, folks.  I

8  read your opening statements contained within your

9  proposed findings of fact and conclusions of law.  I

10  assume you plan to offer the evidence that you

11  mention in there.  Does the plaintiff want to take

12  five minutes to add to that?

13        MR. ROBINSON:  Yes, Judge.

14        THE COURT:  Go ahead.

15        MR. ROBINSON:  Yes, Judge.  On

16  December -- approximately on December 18th, 2003,

17  Judge, Trina Tidwell and Sandra Sterling-Ahalla

18  filed --

19        THE COURT:  Use the microphone.  Speak a

20  little --

21        MR. ROBINSON:  Trina Tidwell and Sandra

22  Ahalla-Sterling filed a complaint in the Circuit

23  Court of Cook County, Judge, against Bruce Smith on

24  two counts.  One was sexual assault, and two was

25  respondent superior against Kennedy Medical Center.

4

THE COURT:  Is this Sandra Sterling here?

MR. ROBINSON:  No, they're not, Judge.

THE COURT:  No.  Is Trina Tidwell here?

MR. ROBINSON:  No, they're not, Judge.

THE COURT:  Okay.  Go ahead.

MR. ROBINSON:  Okay.  And --

THE COURT:  Is this your first witness?

MR. ROBINSON:  My first witness, yes.

THE COURT:  Go ahead.

MR. ROBINSON:  Against Bruce Smith,
Judge.  The case proceeded in state court.  Sometime
around September of 2005, Bruce Smith filed a
Chapter 7 bankruptcy petition in U.S. Bankruptcy
Court in the Northern District of Illinois, and in
such petition he failed to list both Trina Tidwell
and Sandra Sterling-Ahalla as creditors under the
schedule of creditors.  That petition has been
stipulated to, Judge, and should be the list of
creditors as outlined by the yellow tabs outlining
where the list of creditors is.

As a result of failing to list Trina
Tidwell and Sandra Ahalla-Sterling as creditors,
they did not receive notice of the bankruptcy, did
not receive notice of the meeting of creditors as
far as being able to file their objections.

1            On December the 23rd, 2005, a notice

2   of a motion to transfer the state case from

3   bankruptcy -- from state court to bankruptcy was

4   filed over to the Law Offices of Darryl Robinson and

5   John F. Lyke.

6            THE COURT:  You say the plaintiffs'

7   lawyer got notice of that?

8            MR. ROBINSON:  Yes.

9            THE COURT:  On what date?

10            MR. ROBINSON:  It was on December the

11   23rd, 2005, Judge, one of the documents that was

12   stipulated to.

13            THE COURT:  Go ahead.

14            That was about 16 days before the

15   deadline.

16            MR. ROBINSON:  Yes, Judge.  Let me

17   finish.  That was the notice that was faxed over to

18   the office.  The testimony will show that, in fact,

19   the attorney on the particular case was on vacation

20   until after January the 1st.  So although the

21   office --

22            THE COURT:  So when did the attorney come

23   back?

24            MR. ROBINSON:  The attorney came back on

25   January the 3rd when he obtained knowledge of the

1  bankruptcy. So notice --

2       THE COURT: That was six days before the

3  deadline.

4       MR. ROBINSON: Yes, it is, Judge.

5       THE COURT: Yes.

6       MR. ROBINSON: Six days before the

7  deadline. The hearing was heard on January the 7th.

8       THE COURT: What hearing?

9       MR. ROBINSON: The hearing on

10 transferring the case from state court to bankruptcy

11 court.

12       THE COURT: And what happened at that?

13       MR. ROBINSON: The judge agreed,

14 obviously, to transfer the case based upon the

15 pending bankruptcy, although the discharge date,

16 obviously, Judge, was --

17       THE COURT: When was there a discharge

18 entered in that bankruptcy?

19       MR. ROBINSON: The discharge would have

20 been entered on January the 17th, Judge.

21       THE COURT: So the attorney received

22 notice two weeks before the discharge entered.

23       MR. ROBINSON: Yes, but had knowledge six

24 days before, six days.

25       THE COURT: You said he received the

1    notice January 3rd.

2             MR. ROBINSON:  Yes.

3             THE COURT:  Discharge entered

4    January 17th.

5             MR. ROBINSON:  Oh, the 17th.

6             THE COURT:  Deadline for filing something

7    past January 9th.

8             MR. ROBINSON:  Yes.

9             THE COURT:  Do I have those dates right?

10            MR. ROBINSON:  Yes, Judge, you have those

11   dates right.

12            THE COURT:  Go ahead.

13            MR. ROBINSON:  Yes, Judge.  And based on

14   this information and factors that we've set out,

15   we've made a -- filed an adversary complaint, both

16   Trina Tidwell and Sandra Sterling-Ahalla, based

17   upon, one, failure to receive proper notice.  In

18   this case we believe notice is actual knowledge, as

19   written out in our findings and conclusions of law.

20   And also based on fraud.

21                 As this court laid out in the

22   beginning of this adversarial proceeding, it assumes

23   that an attorney knows what he is doing when he --

24            THE COURT:  The court laid out?

25            MR. ROBINSON:  Yes.

8

1   THE COURT:  Did I enter an opinion in

2   this case or no?

3   MR. ROBINSON:  Not a written opinion,

4   Judge.  It was a verbal opinion.

5   THE COURT:  Go ahead.

6   MR. ROBINSON:  So that an attorney knows

7   what he is doing when he is actually doing it,

8   Judge, those -- Trina Tidwell and Sandra

9   Sterling-Ahalla, along with about four or five other

10   pending creditors and lawsuits against Bruce Smith

11   at that time, were left off the schedule and put in

12   the statement of financial affairs.

13   THE COURT:  Did the same attorney

14   represent Sandra Sterling-Ahalla as well as Trina

15   Tidwell?

16   MR. ROBINSON:  Yes, Judge.

17   THE COURT:  Okay.

18   MR. ROBINSON:  And based on that, we had

19   a second account of fraud.  That's all we wanted to

20   add, Judge.

21   THE COURT:  Thank you.

22   Counsel, do you want to take five

23   minutes to add something to your proposed findings?

24   MR. JESSER:  Yes, Judge.  Thank you.

25   Steven H. Jesser, J-e-s-s-e-r, for Dr. Bruce S.

9

1    Smith. Mr. Robinson is indeed the attorney who has

2    been representing the plaintiffs throughout this

3    process. If it weren't --

4            THE COURT: Both in state court and here

5    you mean?

6            MR. JESSER: Yes.

7            THE COURT: In state court and here,

8    right?

9            MR. JESSER: Yes.

10           THE COURT: Okay.

11           MR. JESSER: Your Honor has entered no

12   written or oral opinions in the past other than the

13   orders of the court. If it were not a fiction, I

14   might be inclined to move for judgment on the basis

15   of the opening statement. But there will be

16   absolutely no testimony or evidence from either side

17   this afternoon in the nature of fraudulent conduct

18   by Dr. Smith or his attorney who prepared the

19   bankruptcy petition, who is on his way over here to

20   testify this afternoon that Dr. Smith or his

21   attorney intended to omit these two lawsuits which

22   were scheduled, but admittedly not in the preferred

23   position, not in the proper place in the bankruptcy

24   petition. I'm not going to stand before Your Honor

25   and claim that the lawsuits, which were very well

1  described, were in the right place.  They were in

2  the statement of financial affairs.

3          THE COURT:  Sir, the problem comes

4  because if they're in the statement of financial

5  affairs, that is not the way that they get on the

6  distribution list for notice of the bankruptcy,

7  which gets sent out only to people who are scheduled

8  as creditors.

9          MR. JESSER:  And --

10          THE COURT:  Do you concede that they were

11  creditors, that these two plaintiffs are creditors?

12          MR. JESSER:  Yes, Your Honor, because two

13  of the exhibits which -- if I'm speaking too loud

14  tell me.  Two of the exhibits that we submitted to

15  Your Honor pursuant to the pre-trial order were a

16  prior bankruptcy filing from a year before, the year

17  2004, where indeed there can be no argument about

18  Dr. Smith listing --

19          THE COURT:  What's the explanation why it

20  wasn't listed on the particular case that's in --

21  that's involved here, that is the second bankruptcy

22  filing?

23          MR. JESSER:  As you'll hear in a few

24  minutes from Mr. Sinn, who may be waiting outside to

25  testify, when it comes time for our case in chief,

11

1  he was a very young attorney, first year of

2  practice, in somewhat of a mill; there was an

3  impending statutory change-over date; his office was

4  extremely busy; he was handling 15 bankruptcies a

5  day.  I'm not excusing all of that, Judge.  It's

6  just background for the fact that he made a mistake.

7  His people --

8              THE COURT:  Sir --

9              MR. JESSER:  -- his staff --

10             THE COURT:  -- I'd like to ask you this

11  question:  Do you concede that an electronic

12  signature of your client's signature was put on the

13  bankruptcy filing?

14             MR. JESSER:  We concede, yes.  And we

15  concede --

16             THE COURT:  Because all signatures are

17  electronic.  Do you concede that his electronic

18  signature went on the bankruptcy filing?

19             MR. JESSER:  Yes.  And more, Judge,

20  Dr. Smith is an obstetrician and gynecologist

21  professional.  We don't back away from the fact that

22  the 2005 voluntary petition is what it is.  It's

23  Dr. Smith's petition.  He takes --

24             THE COURT:  And since -- do you take the

25  view that his electronic signature was affixed

1   without him reading it, reading the petition --

2           MR. JESSER: No.

3           THE COURT: -- he swore to or --

4           MR. JESSER: No.

5           THE COURT: -- not?

6           MR. JESSER: No, I didn't say that,

7   Judge, as you'll hear in a few minutes.

8           THE COURT: Do you concede he read it

9   before his electronic signature was affixed?

10           MR. JESSER: What I'd like to concede,

11   Your Honor, is that he sat with his attorney,

12   Mr. Sinn. Mr. Sinn went through it with him. And

13   not being a legal professional, but a medical

14   professional, he indeed signed the petition based on

15   advice of counsel. The counsel is going to come

16   into court in a few minutes and admit to you --

17           THE COURT: I think he's here.

18           MR. JESSER: Okay. Very well. Mr. Sinn

19   is here. That in retrospect, the lawsuits which

20   Mr. Robinson has prosecuted in state court were not

21   in the preferred place in the petition.

22           What's more, I may have no questions

23   of this very nice lady who works for Mr. Robinson

24   because what he has said in his survey of the

25   evidence is that on December 23 my office received a

1  fax from Johnson & Bell, which has been representing

2  Dr. Smith in state court, to come to court in early

3  January about a motion to mothball the case on the

4  bankruptcy section of Judge Maddocks.  It doesn't

5  matter that Mr. Robinson was away on vacation.  It

6  doesn't matter that when I'm out of town I'm

7  checking e-mails and voice mails 12 times a day.

8  His office received notice that there was an

9  '05 bankruptcy action pending on December 23, '05,

10  which is more than three weeks before Your Honor

11  discharged this case on January 16.  Again, and I'm

12  bucking up on my five minutes.  There's no fraud

13  here, Judge, which is the gist of the action.

14                 THE COURT:  Thank you.

15                      All right.  Case for the plaintiff.

16            MR. ROBINSON:  Yes, Judge.

17            THE COURT:  On Friday we went over the

18  stipulation which, unhappily, was filed in the

19  district court instead of the bankruptcy court.  But

20  the record is very clear that Plaintiffs' Exhibits

21  1, 2, 3, and 4 are stipulated to.

22            MR. ROBINSON:  Yes, they are, Judge.

23            THE COURT:  And, therefore, they are

24  admitted into evidence.  And you may proceed with

25  your witness.

14

1   MR. ROBINSON: Yes, Judge. Before I

2   proceed with my witness, Judge, we filed an

3   adversary complaint on two counts. On the count of

4   fraud, we want to stand on the bankruptcy petition

5   alone. We believe that the standard is

6   preponderance of evidence, so --

7   THE COURT: Use that microphone and speak

8   into it --

9   MR. ROBINSON: I'm sorry, Judge.

10   THE COURT: -- so I can hear you.

11   MR. ROBINSON: On the count of fraud, we

12   want to stand on the bankruptcy petition alone. We

13   believe that the standard is a preponderance of

14   evidence. And Bruce Smith's failure to list Trina

15   Tidwell and Sterling-Ahalla as creditors we believe

16   is fraud per se, and that the burden of proof moves

17   to the defendant to prove that it was not fraud. My

18   witness is only going to testify to the issue of

19   notice, Judge. There's two counts.

20   THE COURT: Do you have case law

21   authority for what you just said?

22   MR. ROBINSON: Yes, Judge. It's a part

23   of my findings of fact and conclusions.

24   THE COURT: Okay.

25   MR. ROBINSON: Thank you, Judge.

1        THE COURT:  One of those citations in

2   there?

3        MR. ROBINSON:  Yes, Judge.

4        THE COURT:  Okay.  Thank you.  Do you

5   want to put on your witness?

6        MR. ROBINSON:  Yes, I'd like to call my

7   first witness.

8        THE COURT:  Over there, ma'am, please.

9             (Witness sworn.)

10        THE CLERK:  Please state your name for

11   the record.

12        THE WITNESS:  Chykola Jones.

13        THE CLERK:  You may be seated.

14        THE COURT:  Spell your last name, please.

15        THE WITNESS:  J-o-n-e-s.

16        THE COURT:  J-o what?

17        THE WITNESS:  n-e-s.

18        THE COURT:  And your first name?

19        THE WITNESS:  Chykola, C-h-y-k-o-l-a.

20        THE COURT:  Proceed, counsel.

21        CHYKOLA JONES, WITNESS, SWORN

22             DIRECT EXAMINATION

23   BY MR. ROBINSON:

24        Q   Ms. Jones, what is your current

25   occupation?

16

A    I'm an office clerk.

Q    And where is your place of employment at?

A    1505 East 53rd Street.

THE COURT:   What office?  Whose office is that?

THE WITNESS:   It's a law office, Attorney Darryl Robinson and Attorney John F. Lyke.

BY MR. ROBINSON:

Q    Are there any other attorneys working in that office?

A    Yes, there are.

Q    And what are their names?

A    Roger Best.  We also have Attorney Randy Peterson who is out on leave.

Q    Approximately how long have you been working at that location, Ms. Jones?

A    Approximately three years.

Q    What are some of your primary responsibilities?

A    I answer phones, I take messages, I file, I collect faxes, I sort mail.

Q    You said that you collect faxes.  How often would you receive faxes over at that office?

A    I would say daily.

Q    And what would you do with those faxes

1   after you received them?

2       A   I would see who it's to the attention of,

3   and I would put it on the respective person's desk.

4       Q   Now, after you place that fax on the

5   respective person's desk, would you call that

6   respective person?

7       A   No, I wouldn't.

8       Q   Do you recall receiving --

9       MR. ROBINSON:   Strike that, Judge.

10  BY MR. ROBINSON:

11      Q   Are you familiar with the case of Trina

12  Tidwell versus Bruce Smith and Sandra

13  Ahalla-Sterling versus Bruce Smith?

14      A   Yes.  I know the names from the office.

15      Q   Yes.  Do you recall receiving a fax

16  concerning that case on December 23rd, 2005?

17      A   I can't say that I recall December of

18  2005.

19      Q   If you had received a fax on that day,

20  what would you have done with it?

21      A   I would have placed it on the respective

22  person's desk.

23      Q   And who was the lead attorney in the

24  Trina Tidwell and Sandra Ahalla-Sterling case?

25      A   Attorney Darryl Robinson.

1       Q   And would you have placed that fax on

2  Attorney Darryl Robinson's desk?

3       A   Yes, I would have, sir.

4       Q   Was Darryl Robinson in the office on

5  December 23rd?

6       A   I can't say that he was.

7       Q   Do you know where he would have been on

8  December 23rd?

9       A   Attorney Robinson always takes vacation

10  around that time.

11       Q   Do you know when he would have returned

12  from vacation?

13       A   It would have been after the 1st of the

14  year.

15       Q   Mrs. Jones, are you an attorney?

16       A   No, I'm not, sir.

17       Q   Have you ever worked in a bankruptcy law

18  firm?

19       A   Not at all, sir.

20       Q   If you had received that motion to

21  transfer to bankruptcy, would you have known what it

22  is?

23       A   No, I would not have.

24       MR. ROBINSON:  No further questions,

25  Judge.

THE COURT:  Any cross?

MR. JESSER:  No, Your Honor.

THE COURT:  Do you have any more questions of the witness?

MR. ROBINSON:  No more questions, Judge.

THE COURT:  You may step down.  Thank you for your help.

THE WITNESS:  Thank you.

(Witness excused.)

THE COURT:  At this point I note from the pre-trial order that all well-pleaded facts admitted in the pleadings are admitted into evidence unless objections were filed before trial, and no such objections have been noted by us.  So all of the -- I will now admit into evidence all admissions in the answers to the complaint to well-pleaded facts.

Now, do you rest?

MR. ROBINSON:  Yes, Judge, we rest.

MR. JESSER:  Judge, I'd like to move for a directed finding at this time, if that's allowed in this type of proceeding, in that the evidence is that Mr. Robinson's office received not as directly as it could have been in retrospect, but notice of doctor's pending bankruptcy before Your Honor, as early as December 23, 2005, some three weeks before

20

1   Your Honor discharged the petition on January 17,
2   2005.  There's no even conceding arguendo
3   Mr. Robinson cited standard of preponderance of the
4   evidence, there's no evidence whatsoever in the
5   plaintiffs' case in chief of any fraudulent conduct
6   on the part of Dr. Smith or any of his attorneys,
7   any intentional conduct to mislead Ms. Tidwell or
8   Ms. Sterling-Ahalla or to otherwise conceal the
9   existence of the 2005 petition for bankruptcy relief
10  before Your Honor.
11          THE COURT:  Was the signature of your
12  client, even though it was electronic, but you
13  conceded it was his signature even though
14  electronic, was the -- was it -- was his schedule
15  truthful and complete since these two cases were not
16  placed in the schedules, they were only placed in
17  the statement of affairs?
18          MR. JESSER:  With respect to the first
19  part of the court's inquiry, I might -- since we
20  both admitted to you we're not bankruptcy
21  specialists, I might like to defer that part to my
22  examination of Mr. Sinn concerning electronic
23  signatures, et cetera, since Mr. Robinson as late as
24  last week was running into problems with electronic
25  filing.

1           THE COURT:  Now, wait a second.  Did you

2  just back away from your concession that we should

3  treat the electronic signature of your client as a

4  signature by your client?

5           MR. JESSER:  No, I'm not.  This is

6  doctor's petition.  I'm not acting off of --

7           THE COURT:  Well, then assuming it's the

8  same as if he signed it with a pen on a piece of

9  paper, that's what electronic signature does, wasn't

10  part of that schedule he filed under oath erroneous?

11          MR. JESSER:  No.  Your Honor --

12          THE COURT:  There's a certificate --

13  there's a -- he scheduled -- he filed a schedule --

14  pardon me, an affidavit saying that everything on

15  the schedules were true and complete, but the

16  schedule of his creditors was not complete, right?

17          MR. JESSER:  I think there's an

18  explanation, Judge, as --

19          THE COURT:  There may be an explanation.

20  But, I mean, isn't that the state of things at the

21  moment --

22          MR. JESSER:  No.

23          THE COURT:  -- that he did not file a

24  complete schedule?

25          MR. JESSER:  Doctor's intention in

22

1   signing the petition was to certify that his

2   petition was true and complete.  As it turns out,

3   and sometimes this even befuddles attorneys such as

4   me, the precise information that should have been on

5   the schedule was somewhere off in another part of

6   the petition.

7          THE COURT:  I understand.  Thank you.  I

8   will reserve ruling on your motion until the end of

9   the case --

10         MR. JESSER:  Thank you.

11         THE COURT:  -- until all of the evidence

12  is in.  Present your evidence.

13         MR. JESSER:  All right.  Initially before

14  I call Mr. Sinn, will the court receive Defendant's

15  Exhibits 1 and 2?

16         THE COURT:  Well, let's deal with that.

17  I've got those in front of me.

18             I do believe that the defense has

19  not objected to 3 and 4; am I right, folks?

20         MR. ROBINSON:  Yes, Judge.

21         THE COURT:  So 3 and 4 are admitted.

22             And you've only objected to 1 and 2,

23  right, sir?

24         MR. ROBINSON:  Yes, Judge.

25         THE COURT:  Is there anything you want to

23

1   add to your objection?

2            MR. ROBINSON:  Judge, I'm objecting to 1

3   and 2 on the basis of, obviously, relevance and

4   prejudice.

5            THE COURT:  What do you mean prejudice?

6            MR. ROBINSON:  Well, their allegation,

7   Judge, is that, in fact, we received notice of a

8   bankruptcy in 2004.  So therefore that notice

9   transfer of the 2005 bankruptcy, that's an issue of

10  relevance.  One bankruptcy has nothing to do with

11  the other in terms of that.  And so we believe that

12  if the judge was to look at that notice as

13  transferred, then that would be prejudice to my

14  client.  That's all, Judge.

15           MR. JESSER:  Judge, if I've heard it

16  once, I've heard it 50 times, "counsel, it goes to

17  the weight.  I'll allow the exhibit but then

18  decide --"

19           THE COURT:  The two exhibits are

20  admissible.  I think they're relevant.

21           MR. JESSER:  Very well.  Thank you.

22           THE COURT:  And they are admitted.

23                Proceed with your evidence.

24           MR. JESSER:  I'm going to call --

25           THE COURT:  That's Exhibit -- so your

1   exhibit -- Defense Exhibit 1, 2, 3, and 4 have now

2   been admitted.

3           MR. JESSER: All right. I'd like to call

4   Mr. Nathaniel Sinn, S-i-n-n.

5           THE COURT: Would you go over there, sir,

6   please.

7                   (Witness sworn.)

8           THE CLERK: Please state your name for

9   the record, please.

10          THE WITNESS: Nathaniel Sinn. Last name

11  is spelled S-i-n-n, first name is N-a-t-h-a-n-i-e-l.

12          THE COURT: Spell that last name again,

13  please.

14          THE WITNESS: S-i-n-n. Two Ns like

15  Nancy.

16          THE COURT: Thank you.

17          THE WITNESS: Thank you.

18          MR. JESSER: May I examine him from here,

19  Judge?

20          THE COURT: Yes, indeed.

21          MR. JESSER: Good afternoon, Mr. Sinn.

22          THE WITNESS: Good afternoon.

23

24

25

1    NATHANIEL SINN, WITNESS, SWORN

2    DIRECT EXAMINATION

3  BY MR. JESSER:

4    Q    You have previously represented

5  Dr. Smith?

6    A    I did.

7    Q    All right.  I'd like to just ask you a

8  little background about your career, might try to

9  take the liberty of leading you just a little.

10  First, where did you attend college?

11    A    University of Notre Dame.

12    Q    And you graduated there in?

13    A    2001.

14    Q    From there you proceeded to law school?

15    A    I did.  I went to Indiana University,

16  Bloomington, and graduated in 2004.  I went straight

17  through.

18    Q    All right.  Decided to come to the big

19  city?

20    A    I did.  I was tired of the small town.  I

21  grew up in a small town in Indiana, so...

22    Q    All right.  And your first position here

23  in Chicago was?

24    A    My first job was with Macey & Aleman,

25  also known as Legal Helpers.  They do a lot of

26

1   bankruptcy work.

2       Q   All right.  And I think His Honor

3   indicated he was well familiar with Legal Helpers.

4   But what is Legal Helpers?  It is a bunch of firms?

5       THE COURT:  Oh, I don't know that I'm

6   well familiar with them.

7       MR. JESSER:  All right.

8       THE COURT:  It's just one of the many

9   firms that practices here.

10  BY MR. JESSER:

11      Q   Is it a number of firms or...

12      A   It's one firm.  They have offices in a

13  bunch of different states.  It's very similar to a

14  couple firms here in the city.  It's based on volume

15  business.  Get as many people as you can, file

16  petitions as quickly as possible, basically.

17      Q   How long did you spend at that firm?

18      A   A little over a year.  I believe December

19  of '04 to January of '06.

20      Q   Did you do mostly or exclusively

21  bankruptcy work there?

22      A   I did all of the bankruptcies, mostly

23  Chapter 7s.

24      Q   How many other attorneys were working

25  with you there?

27

1      A    In our office, in the Chicago office,

2   there was probably 25 other attorneys.

3      Q    All right.  And just for clarity, you did

4   not represent Dr. Smith in his first bankruptcy

5   petition filed in 2004?

6      A    No, I did not.

7      Q    All right.

8      A    I wasn't even licensed, I don't think, if

9   I recall.

10         THE COURT:  So you were at Legal Helpers

11  when he filed his second petition?

12         THE WITNESS:  That's correct.

13         THE COURT:  And you helped him prepare

14  it?

15         THE WITNESS:  I did.  I met with him,

16  went over the petition when he signed it.  It was

17  a -- and then I did the filing.

18         THE COURT:  Go ahead.

19  BY MR. JESSER:

20      Q    And you somehow do remember Dr. Smith of

21  all of the many clients you had?

22      A    I do.  I only remember a couple of cases.

23  I remember his just because of the nature of the

24  cases that are at issue.  My father is a doctor, and

25  so medical malpractice kind of just stuck out in my

1  mind.  It kind of hit home, if you will, so...

2      Q    How many times do you recall having

3  conferred with Dr. Smith?

4      A    Just once.

5      Q    All right.  And at that point in time,

6  was anything unusual occurring in your office?

7      A    The bankruptcy reform law was going into

8  effect.  It was probably -- I remember meeting with

9  him right before that.  I don't remember the exact

10 date.  Probably September of 2005.  So my job at

11 that time was I met with all of our clients to file

12 their petitions before the law changed, and so I met

13 with anywhere from 10 to 20 people a day.  And it

14 was my job to go through the petition with them and

15 make sure everything was accurate before we filed.

16     Q    Am I correct you met him on a Saturday,

17 or you don't recall?

18     A    I don't recall what day it was.

19     Q    Okay.  Can you explain to His Honor how

20 the petitions were prepared within this firm before

21 they reached you.

22     A    The petitions were usually prepared by

23 either a legal assistant or a law clerk or a

24 paralegal-type employee.  They were then mailed out

25 to the clients to make corrections, come back to us,

29

1   and then we would meet with them to go over and
2   ensure that everything was correct, and then we
3   would file the case for them or file the petition.
4        Q    On the day on which you met with
5   Dr. Smith, do you have an independent recollection
6   that you met with other clients as well?
7        A    Yeah, I did.  I met with quite a few, I'm
8   sure.  But I don't know the exact number.
9        Q    Do you recall how long approximately you
10  spent with Dr. Smith?
11       A    Probably -- I believe I spent probably
12  half an hour or so with him, probably a little bit
13  longer just because I was asking about the cases
14  that were on the statement of financial affairs and
15  the cases at issue, basically.
16       Q    Now, these two lawsuits, I'm not sure
17  when you walked in, but we have conferred in the
18  past that Mr. Robinson was prosecuting in state
19  court, although they're on the bankruptcy calendar
20  right now, they are within the four corners of the
21  2005 voluntary petition that your firm filed on
22  behalf of Dr. Smith?
23       A    Yeah.  I mean, if you're asking that
24  they're listed somewhere in there, they're on the
25  statement of financial affairs.

1      Q   Can you explain to His Honor why it so

2   happened that even after your review of these two

3   matters were listed on the statement of financial

4   affairs as opposed to the schedule?

5      A   Well, I know they're listed on there

6   because anytime there was any ongoing litigation, I

7   put it on the statement of financial affairs.

8   Probably -- I typically would list them as creditors

9   as well.  I'm not sure why I did not.  I don't

10   recall why they weren't on Schedule F.

11           THE COURT:  Did you have his earlier

12   bankruptcy that was filed earlier and dismissed

13   before you?

14           THE WITNESS:  I had reviewed it.  I don't

15   remember if I had it in front of me when we met.

16           THE COURT:  You didn't go over it page by

17   page to see if you covered the same topics?

18           THE WITNESS:  I know that I would have.

19   I mean, I don't remember the exact situation.  But

20   anytime there was a prior bankruptcy, I always

21   reviewed the prior petition as well.

22           THE COURT:  Well, the prior petition did

23   schedule in the schedule of creditors the two

24   lawsuits that were pending in state court.  Can you

25   explain why they were not scheduled in the new

31

1   lawsuit that you went over?

2           THE WITNESS:  I know that they were

3   scheduled on Schedule F just because I reviewed both

4   petitions recently because this matter came up.  I

5   do not know why they were omitted from Schedule F.

6   To the best of my knowledge, it was just an error on

7   my part.

8           THE COURT:  Well, you said you went over

9   the finished product with your client.

10          THE WITNESS:  I did.

11          THE COURT:  Did your client do something

12  to indicate whether or not what you had prepared was

13  accurate and complete?

14          THE WITNESS:  We went through and I asked

15  him -- basically I went through all of the creditors

16  that were listed and asked him if they were supposed

17  to be on there, and then I asked if there were any

18  other creditors.  That's basically what I did with

19  every client I met with.

20          THE COURT:  Do you remember what he said

21  when you asked him if there were any other

22  creditors?

23          THE WITNESS:  I do not remember the

24  specific conversation.  I just know that's the way I

25  handled things.

1      THE COURT: If he had told you there were

2  other creditors, would you have added them to the

3  list or omitted them?

4      THE WITNESS: I would have added them.

5      THE COURT: Now, these days, for a while,

6  for several years, all filings have been electronic

7  in our court here.

8      THE WITNESS: That's correct.

9      THE COURT: And signatures on the

10 petitions are electronic signatures, right?

11     THE WITNESS: Um-hmm, yes.

12     THE COURT: So in what way did he signify

13 his approval of the accuracy and completeness?

14     THE WITNESS: I'm pretty sure it was an

15 electronic signature.

16     THE COURT: A what?

17     THE WITNESS: Electronic signature.

18     THE COURT: Well, he doesn't affix it.

19 Who affixes it?

20     THE WITNESS: Well, we would have typed

21 it into the petition.

22     THE COURT: Right. And when you say

23 "electronic signature," apart from typing in his

24 name, what else was done, if anything, to put his

25 electronic signature on it?

1          THE WITNESS:  I know there was -- are you

2    referring -- there was a signature page that he had

3    to actually sign to certify that the electronic

4    signature was his.

5          THE COURT:  So you retained that?  Or

6    that is to say your office retained that?

7          THE WITNESS:  They would have, yes.

8          THE COURT:  Okay.  Did he sign anything

9    like that?

10          THE WITNESS:  I don't recall, but I would

11   go ahead and say yes because we wouldn't have been

12   able to file the petition otherwise.

13          THE COURT:  Okay.

14          MR. JESSER:  And, Judge, may I --

15          THE COURT:  Go ahead, counsel.

16          MR. JESSER:  -- just inject --

17          THE COURT:  You want to what?

18          MR. JESSER:  May I just inject for the

19   court's clarification --

20          THE COURT:  Go ahead.  Let the witness do

21   the injecting.

22          MR. JESSER:  Okay.

23   BY MR. JESSER:

24        Q    Notwithstanding our -- we attorneys, our

25   high accountability to the court to be factually

34

1  correct and to be forthright at all times, were you
2  under some pressure in your office at that time
3  regarding your daily or weekly production?
4          A    Yeah, I was.  I mean, we were putting a
5  lot of hours in just because of the volume right
6  before that launching.  General volume business was,
7  I mean, ridiculous.  But, I mean, I was within my
8  first year as an associate.  I was just -- you know,
9  they said be there 12 hours, I was there 12 hours.
10 So it was -- I was seeing a lot of people.
11         Q    And when they said to be there for 12
12 hours, were they saying that with a smile on their
13 face and...
14         A    Usually as they left around like 4:00 or
15 so, yeah.
16         Q    Okay.  Now, you did feel at the time
17 that placing doctor's lawsuits on the statement of
18 financial affairs was legally efficacious, legally
19 permissible?
20         A    Well, I listed them on there just to show
21 pending litigation.  I believe that I would have --
22 I should have listed them on Schedule F as well,
23 though.
24         Q    Did doctor indicate -- strike that.
25              Did doctor express or imply to you

1  that he wanted you to withhold any information from
2  his creditors?

3      A    No.    I mean, that would definitely stick
4  out in my mind if he had because, I mean, I
5  obviously wouldn't have gone along with anything
6  like that.

7      Q    Well, that was my next question.    Did
8  doctor request that you do anything that you felt
9  was either not ethical or in violation of the Code
10 of Professional Responsibility?

11     A    No, absolutely not.

12     Q    Did doctor ever request you to do
13 something or not do something that you felt was
14 contrary to the rights of his creditors?

15     A    No, no, he didn't ask me to do anything.

16     Q    Did doctor ever say anything to you or
17 imply anything to you that you felt was contrary to
18 your obligations to the United States Bankruptcy
19 Court?

20     A    No.

21     Q    Did you have any personal interest in
22 secreting any information from doctor's creditors?

23     A    No.

24     Q    Or from the court?

25     A    No.

36

1      Q    Did you make any observations or opinions
2  regarding doctor's comportment, whether he seemed
3  forthcoming or evasive with you or nervous?
4      A    No.  I remember -- I mean, this is really
5  the only reason why I even remember meeting with
6  him, was because of these cases.  And I remembered
7  to ask him -- I asked him about it, but told him,
8  you know, I didn't want to know anything about the
9  state case, just give me as few details as possible.
10 But, I mean, he was -- my recollection is that he
11 was very forthcoming with me.  I mean, he was pretty
12 open to talk about it and what his situation was.
13         MR. JESSER:  Thank you very much.  I have
14 nothing further at this time.
15         THE COURT:  Cross?
16         MR. ROBINSON:  Yes, Judge, I have a few
17 questions.
18                  CROSS-EXAMINATION
19 BY MR. ROBINSON:
20     Q    Attorney Sinn, you stated -- as you sit
21 here today, do you believe that pending litigation
22 should be on the schedule of creditors or statement
23 of financial affairs?
24     A    Well, I believe it should be on the
25 statement of financial affairs, but I believe that

1  the creditors should also be listed on Schedule F as

2  potential creditors.

3      Q    And where did you learn that from?

4      A    Basically I just kind of picked --

5  through my year working there -- or just to kind of

6  get into it a little bit, our training wasn't the

7  greatest.  You know, it was kind of by trial and

8  error.  And I would have eventually figured that out

9  looking at the bankruptcy code and talking to other

10  bankruptcy attorneys.

11      Q    Now, prior to filing the bankruptcy

12  petition for Dr. Smith --

13      A    Yes.

14      Q    -- how long had you been practicing

15  bankruptcy?

16      A    At that point, probably seven or eight

17  months.

18      Q    Approximately how many Chapter 7s had you

19  filed?

20      A    In the little over the year I was there,

21  Chapter 7 petitions, I maybe filed 350, 400.  I

22  mean, quite a bit.

23      Q    You testified earlier there was

24  approximately 25 bankruptcy attorneys in that

25  Chicago office?

1      A    To the best of my recollection, yeah.

2      Q    The same office that you work at; isn't

3  that true?

4      A    I don't work there anymore.  But when I

5  worked there, yeah.

6      Q    But the office you worked at when you

7  filed the bankruptcy petition for Dr. Smith?

8      A    That's correct.

9      Q    Wouldn't it be safe to say that the

10  experience of the attorneys working at that office

11  varied?

12      A    Yeah, it did.  The majority of the

13  attorneys were less than a year.  It was a pretty

14  high turnover rate.  But there were several that had

15  been practicing three or four years.

16      Q    Wouldn't it also be safe to say that if

17  you had any questions concerning the bankruptcy

18  petition that you could talk to one of the more

19  experienced attorneys?

20      A    Absolutely.  If I had questions, that's

21  what I'd do.

22          MR. ROBINSON:  No further questions,

23  Judge.

24          THE COURT:  Redirect?

25

1            REDIRECT EXAMINATION

2   BY MR. JESSER:

3        Q    Did the firm have any formal training or

4   in-services?

5        A    Not really.  My first day, they just gave

6   me a stack of bills and told me to type a petition

7   and figure it out.  My training was basically if I

8   had questions, there were several attorneys I

9   thought I could ask questions to, and they would

10  clarify things for me.

11       Q    How would you characterize the fact that

12  the lawsuits in question were not on the schedule of

13  creditors?  As an oversight or...

14       A    I mean, I really just think it was an

15  oversight, I mean, on my part.

16            MR. JESSER:  All right.  Thank you.

17                 May I reopen to ask one more

18  question?

19            THE COURT:  Go ahead.

20  BY MR. JESSER:

21       Q    Did Dr. Smith demonstrate to you any

22  particular layman's knowledge of bankruptcy law by

23  virtue of the fact that he had been through the

24  process once before?

25       A    I mean, I don't recall, so not to my

1    knowledge.

2              MR. JESSER: Thank you.

3              THE COURT: All righty.

4                   Are you finished?

5              MR. ROBINSON: I'm finished.

6              THE COURT: May step down. Thank you,

7    sir.

8              THE WITNESS: Thanks a lot.

9              MR. JESSER: May he be excused, Your

10   Honor.

11             THE COURT: Yes, of course.

12                  Is that all right with you?

13             MR. ROBINSON: Yes, Judge.

14             THE COURT: All right.

15                  You're excused. Thank you.

16                  (Witness excused.)

17             THE COURT: And do you have another

18   witness?

19             MR. JESSER: Yes. Our last witness is

20   Dr. Bruce S. Smith.

21             THE COURT: Doctor, will you please take

22   the stand.

23                  (Witness sworn.)

24             THE CLERK: Please state your name for

25   the record.

1          THE WITNESS:  Bruce Smith.

2          THE CLERK:  You may be seated.

3          MR. JESSER:  All right.  Good afternoon,

4     Doctor.

5                BRUCE SMITH, WITNESS, SWORN

6                     DIRECT EXAMINATION

7     BY MR. JESSER:

8          Q   I'd like to spend just a few moments with

9     you concerning your background for the court's

10    knowledge.  When were you born?

11         A   1952.

12         Q   And where did you grow up?

13         A   Brooklyn, New York.

14         Q   Which part of Brooklyn, New York?

15         A   South Brooklyn.

16         Q   All right.  And in those days, was that a

17    nice neighborhood?

18         A   It was the projects.

19         Q   And you went to elementary school in

20    South Brooklyn?

21         A   Yes.

22         Q   By the time you reached high school --

23    was there a high school right across the street from

24    you?

25         A   Yes.

1      Q    What was the name of that high school, do

2  you recall?

3      A·   East New York Vocational High School.

4      Q    All right.  Did you attend that high

5  school?

6      A    No, I did not.

7      Q    Where did you attend high school?

8      A    Brooklyn Technical High School.

9      Q    And how long did it take you to commute

10  there?

11     A    An hour.

12     Q    Each way?

13     A    Yes.

14     Q    How did you do so?

15     A    Subway.

16     Q    And when you matriculated at Brooklyn

17  Technical, how many students were there?

18     A    About 6,000 boys.

19     Q    All right.  So it sounds like Lane

20  Technical.  Would that be a fair comparison?

21     A    There are some similarities between the

22  two schools.

23     Q    All right.  And when you matriculated

24  there, what was the composition of the school, the

25  racial composition?

1    A    Well, I don't know the exact composition,

2    but there were only 50 Black and Puerto Rican

3    students.  The rest were white.

4    Q    And you were one of the 50?

5    A    Yes.

6    Q    All right.  And by the time you graduated

7    Brooklyn Technical, had you been awarded any

8    scholarships?

9    A    I got the National Merit Scholarship.

10    Q    All right.  And did they have something

11    similar to a major or area of concentration at

12    Brooklyn Technical?

13    A    Yes.  I majored in structural

14    engineering.

15    Q    Was that unusual for a young man from

16    South Brooklyn?

17    A    It's unusual for anybody.  It's one of

18    the few high schools -- it was one of the six

19    science high schools in New York where you could

20    have a major as a high school student.

21    Q    From there did you proceed to college?

22    A    Yes.  To the University of Connecticut

23    after that.

24    Q    And you transferred from UCON?

25    A    No.  I actually left UCON because I

44

1    couldn't afford the tuition anymore.  My scholarship

2    only covered --

3              THE COURT:  Sir, pull the microphone much

4    closer to you.

5              THE WITNESS:  I actually withdrew --

6              THE COURT:  Slide it closer, please.

7              THE WITNESS:  I actually withdrew from

8    the University of Connecticut to join the military

9    to get the GI Bill.

10   BY MR. JESSER:

11        Q    At the time that you withdrew, do you

12   recall your grade point average?

13        A    I don't remember.  I think it was like

14   3.0 or something like that.

15        Q    All right.  And then which branch of

16   service did you serve?

17        A    The U.S. Army.

18        Q    And how many years did you serve?

19        A    Three.

20        Q    This was in wartime?

21        A    It was at the end of the Vietnam War.

22        Q    In which divisions did you serve?

23        A    It was in military intelligence.

24        Q    And did that take you to different parts

25   of the homeland or overseas?

1      A    Mostly in the U.S.  We were assigned to

2   go overseas, but we never went.

3      Q    All right.  After your second tour, would

4   that be, was completed for three years, then where

5   did you go?

6      A    Then I went back to school.  I went to

7   the University of Hartford in Connecticut.

8      Q    And that was partially -- did they still

9   have the GI Bill in those days?

10     A    Yes.  That's what I used to go.

11     Q    And you graduated from the University of

12  Hartford?

13     A    Yes.

14     Q    Which year was that?

15     A    1980.

16     Q    Did you have enough money to go to

17  medical school at that time?

18     A    No.

19     Q    What did you do then?

20     A    I was a -- well, I did several things.

21  One, I was a high school teacher for about six

22  years.

23     Q    And that was back in New York or --

24     A    Yes, high school, a New York teacher.

25     Q    All right.  Were those in easy schools?

1        A    Actually, it was a pretty good school.

2    It was Christ the King High School in Middle

3    .Village, New York.

4        Q    All right.  I think that's a pretty

5    prominent basketball school, isn't it?

6        A    It's number one in the country.

7        Q    Okay.  That takes us to about 1986.  By

8    the way, I may be a New York attorney, but I don't

9    know the geography that well.  Did you say that

10   Brooklyn was next to Queens?

11       A    Yes.

12       Q    So Secretary Powell -- General Powell

13   grew up nearby?

14       A    Yes.

15       Q    All right.  In 1986 were you able to go

16   to medical school?

17       A    Yes.

18       Q    And where was that?

19       A    At Loyola University.

20       Q    Of Chicago?

21       A    Yes.

22       Q    And when did you graduate?

23       A    1992.

24       Q    All right.  Did you have any distinctions

25   in medical school?

1          A    No.

2          Q    All right.  Did you proceed directly into

3    residency?

4          A    Yes, I did.

5          Q    By the way, didn't we miss some civilian

6    employment for a pharmaceutical house?

7          A    No.   That was after my residency.

8          Q    Okay.  All right.  And which residency

9    did you pursue?

10          A    Obstetrics and gynecology.

11          Q    And where were you matched into a

12    residency?

13          A    Mount Sinai of Chicago.

14          Q    All right.  And Mount Sinai was in those

15    days affiliated with a medical school, University of

16    Chicago Medical School?

17          A    I believe so, yes.

18          Q    All right.  And did you then complete a

19    residency on a continuous basis or an interrupted

20    basis?

21          A    Continuous.

22          Q    And how long was that residency?

23          A    Four years.

24          Q    So that takes us to about 1996 or so?

25          A    Yes.

48

1      Q    All right.  You're not board certified in

2  obstetrics or gynecology?

3      A    Not yet.

4      Q    Are you yet board-eligible?

5      A    I'm board-eligible.

6      Q    But you still have time to take the oral

7  exams?

8      A    Yes.

9      Q    Have you taken the written exams?

10     A    Yes.

11     Q    And you've passed those?

12     A    I passed it the first time, yes.

13     Q    All right.  Is it like an integrated

14  OB-GYN, or do you pass writtens in OB and then you

15  pass writtens in GYN?

16     A    It's integrated.  You take a complete

17  exam, and then you have to present cases, surgical

18  cases and obstetric cases orally.

19     Q    Okay.  So at the end of this journey of

20  Brooklyn Technical and UCON and the University of

21  Hartford and Loyola, some years later, 1996, you

22  went in -- in Mount Sinai in 1996 you went into

23  practice?

24     A    Yes.

25     Q    Can you explain to His Honor how your

1    practice evolved from one location to another and

2    the medical staffs to which you were admitted.

3        A    I started at Trinity Hospital on the

4    south side.  I worked for Dr. Kennedy as an

5    associate.

6        Q    And you were on the medical staff at

7    which -- at Trinity?

8        A    At Trinity and Michael Reese Hospital.

9        Q    Where was your office at Trinity?

10       A    93rd Street.

11       Q    Was that an outbuilding or a doctor's

12   building?

13       A    It's a doctor's building across the

14   street.

15       Q    All right.  You were his associate.  I

16   don't know who he is.  Was he an older practitioner?

17       A    Yes.

18       Q    And then did you move into another

19   practice or your own practice?

20       A    No.  I went to work at Michael Reese

21   Hospital as an employee at the hospital.  I stayed

22   there for two years.  Then I moved to Streator,

23   Illinois, and started my own practice.

24       Q    All right.  Now, Michael Reese years ago

25   was one of the most prominent maternity centers in

50

1    the city?

2          A    Yes.

3          Q    All right.  Then somewhere in this period

4    of time was there Glaxo or the pharmaceutical --

5          A    Yes.  I was on the National Speakers

6    Bureau for GlaxoSmithKline.

7          Q    What does that mean, National Speakers

8    Bureau?

9          A    I went around the country.  I was the

10   expert from out of town that gave lectures on the

11   various products to doctors.

12         Q    Were there any other medical staffs on

13   which you were attending physician other than

14   Trinity and Reese?

15         A    Lincoln Park Hospital.

16         Q    And that's the old Grant Hospital?

17         A    Yes.

18         Q    Okay.  During your residency at Sinai,

19   did you serve an underserved population?

20         A    Yes.

21         Q    Did you serve an affluent clientele?

22         A    No.  Well, a few.  A few baseball

23   players, I took care of their wives.

24         Q    All right.  But, otherwise, what types of

25   patients did you deliver and tend to in their

51

1    gynecological disorders?

2         A    Mostly public aid patients or uninsured

3    patients.

4         Q    Was this the experience you had at

5    Trinity and at Reese as well?

6         A    Yes.

7         Q    Were many of those patients appreciative?

8         A    Most.

9         Q    Were some of those patients very

10   difficult?

11        A    Some.

12        Q    Let's just talk for a moment or two about

13   your current practice in Streator, Illinois.   Where

14   is Streator, Illinois?

15        A    It's in LaSalle County.   It's about an

16   hour-and-a-half south of Chicago.

17        Q    Are there many obstetricians in Streator,

18   Illinois?

19        A    No, there aren't.   There's three.   I'm

20   one of the three.

21        Q    And there have been times I've asked you

22   to come to Chicago, but you've been on call?

23        A    Yes.

24        Q    And that's a problem?

25        A    Yes.   It's very difficult to find

1    coverage because only one of the other obstetricians

2    actually has obstetrical privileges.  The other one

3    is retired, semi-retired.

4        Q    You've had a license to practice in

5    Illinois since 1990 something; is that correct?

6        A    That's correct.

7        Q    I'm losing track of the years here.

8        A    I guess since 1994.

9        Q    Has your -- are you in good standing with

10   the Illinois State Department of Financial and

11   Professional Regulation Division of Professional

12   Regulation?

13       A    Yes, I am.

14       Q    Has that good standing ever been

15   interrupted?

16       A    No.

17       Q    And do you have an active obstetrical and

18   gynecological practice in Streator, Illinois?

19       A    Yes.

20       Q    Now, you in the year 2004 sought

21   bankruptcy relief in the United States Bankruptcy

22   Court for the Northern District of Illinois?

23       A    That's correct.

24       Q    And we've been through the exhibits

25   before coming to court.  The voluntary petition you

53

1   filed with the assistance of this Legal Finders

2   thing was what you understand to be Exhibit 1 which

3   His Honor has?

4        A    Yes.

5        Q    And that petition was discharged by the

6   court?

7             THE COURT:  Dismissed.

8             MR. JESSER:  Dismissed --

9             THE WITNESS:  Dismissed.

10            MR. JESSER:  -- by the court.

11            THE WITNESS:  Yes.

12   BY MR. JESSER:

13        Q    But in the year 2005, apparently you

14   reassessed the need to again seek bankruptcy relief;

15   is that correct?

16        A    That's correct.

17        Q    Now, the first firm to which you went, I

18   believe it was on North Wells Street, was a

19   different firm from that firm in which Mr. Sinn

20   practiced?

21        A    Yes.

22        Q    Okay.  And did you visit this second

23   Legal Finders firm for the 2005 petition that came

24   before His Honor as the first petition, the '04 had

25   come before His Honor, did you visit this Legal

54

1   Finders firm in the year 2005 once or more than

2   once?

3           A    Just once.

4           Q    Okay.  Did you have any intention -- and

5   I'll have to dissect this question a little.  Did

6   you have any intention to defraud or mislead or

7   secrete from your creditors the fact that you were

8   seeking bankruptcy relief for a second time?

9           A    No.  I wanted to make sure that they all

10  knew.

11          Q    Did you ever express or imply to Mr. Sinn

12  that you wanted something covered up or not said or

13  put in the wrong place so that Mr. Robinson's

14  clients wouldn't find out about the second

15  bankruptcy?

16          A    No, I didn't.

17          Q    Did you have any intention to mislead or

18  secrete from Mr. Robinson or from Judge Schmetterer,

19  although that doesn't make any sense because the

20  case was coming before him again, any information

21  about your creditors?

22          A    No.

23          Q    Having now gone through bankruptcy relief

24  for the second time, did you consider yourself some

25  sort of a lay expert on bankruptcy law?

1          A    No, not at all.

2          Q    Did you rely on what Mr. Sinn was -- on

3     the counseling and the advice he was providing to

4     you?

5          A    Yes.

6          Q    And whether you signed the second

7     petition, which was the 2005 petition, manually

8     and/or electronically, as you sit here today, you're

9     not backing away -- strike that.

10                   You're not denying that it's your

11    petition?

12         A    No.   I was under the understanding that

13    everything that was on the first petition was on the

14    second petition and everything was included that I

15    gave them, and that's what I signed.

16         Q    And on the first petition in 2004, you

17    now have the knowledge that Mr. Robinson was listed

18    under the creditors section?

19         A    Yes.

20         Q    Okay.

21         A    And I did not understand the difference

22    between sections.   I just thought it was a

23    bankruptcy filing and everybody on the paper which I

24    was asked to sign was notified and included.

25         Q    And before you signed the second petition

1  which you filed in 2005, you indeed --

2          MR. JESSER:  Forgive me if I'm leading,

3  Judge.

4  BY MR. JESSER:

5      Q    But you indeed observed that Ms. Tidwell

6  and Ms. Sterling-Ahalla were listed within the four

7  corners of the 2005 voluntary petition?

8      A    Yes.

9      Q    You didn't realize then that where they

10 were listed would become a problem and end up in

11 court today?

12     A    No, not whatsoever.

13     Q    Did you in the military as a military --

14 did you say intelligence officer?

15     A    Yes.

16     Q    Did you have to -- well, to join the

17 United States Army, did you have to take an oath?

18     A    Yes.

19     Q    Did being a military officer require you

20 to swear to any additional code of conduct?

21     A    Yes.

22     Q    What was that code of conduct?

23     A    I'm sorry, Your Honor.

24     Q    Are you on call right now?

25     A    No.  I just leaned on the button.

57

1          Q     What was that code of conduct?

2          A     Just a standard U.S. Army military code

3     of conduct.

4          Q.    Did Mr. Sinn suggest to you any clever

5     ways of not having Ms. Tidwell or

6     Ms. Sterling-Ahalla not find out about the second

7     bankruptcy?

8          A     No, not at all.  As I stated before, I

9     wanted everybody to know.

10          THE COURT:  Sir, those cases Mr. Robinson

11    had filed against you in state court, they were for

12    a medical malpractice, were they, or not?

13          THE WITNESS:  No, not medical

14    malpractice.

15          THE COURT:  They were for something else?

16          THE WITNESS:  Yes.

17          THE COURT:  Did you have any form of

18    insurance that defended you for those cases?

19          THE WITNESS:  I had insurance that

20    defended me for legal costs, but not for --

21          THE COURT:  Say again.  Louder, please.

22          THE WITNESS:  I had insurance.  But the

23    way the insurance was interpreted, they would

24    provide legal counsel but not pay any claims because

25    it wasn't --

1    THE COURT:  Did they provide counsel?

2    THE WITNESS:  Yes, they did.

3    THE COURT:  And when you say it was

4    interpreted that way, was that by a declaration of a

5    court or by the insurance company's point of view?

6    THE WITNESS:  By the insurance company.

7    It was pretty gracious on their part because I had

8    actually fallen out of the grace period for the

9    insurance policy.

10   THE COURT:  So the lawyer defending you

11   in state court in those cases brought by

12   Mr. Robinson, they were insurance-funded lawyers?

13   THE WITNESS:  Yes.

14   THE COURT:  Did you have -- what did you

15   call the insurance policy that they defended you

16   under?

17   THE WITNESS:  It was under a medical

18   malpractice insurance policy, but it was a

19   claims-made policy and not an occurrence policy,

20   which means that after a certain time frame, any

21   claims that came in would not be covered unless I

22   had purchased a tail.

23   THE COURT:  Did you purchase a tail?

24   THE WITNESS:  No, I did not.

25   THE COURT:  Were your contacts with his

1  clients while you were in practice where?

2          THE WITNESS:  At Kennedy Medical Center

3  as an employee of Dr. Kennedy.

4          THE COURT:  Did Dr. Kennedy's practice

5  have any insurance --

6          THE WITNESS:  Yes.

7          THE COURT:  -- that he provided for his

8  employees?

9          THE WITNESS:  Dr. Kennedy -- this is a

10  bone of contention.  Dr. Kennedy -- I was insured by

11  a policy purchased by Dr. Kennedy.  But when the

12  policy was up, Dr. Kennedy chose not to purchase the

13  tail for that policy, and --

14          THE COURT:  And then --

15          THE WITNESS:  -- I was on my own after

16  that.

17          THE COURT:  And you went to work where?

18          THE WITNESS:  At Michael Reese Hospital.

19          THE COURT:  Did the hospital provide you

20  with any insurance?

21          THE WITNESS:  Yes, they did.

22          THE COURT:  Starting -- which covered you

23  from what date?

24          THE WITNESS:  From the day I started

25  working for them.

60

1          THE COURT:  Did you file any actions

2    against the insurance company to seek a declaration

3    that it covered you for any recovery that might come

4    against you for the suits --

5          THE WITNESS:  No, I didn't.

6          THE COURT:  -- represented by

7    Mr. Robinson?

8          THE WITNESS:  No, Your Honor.

9          THE COURT:  You did not?

10          THE WITNESS:  At this time, Your Honor, I

11    was broke and unable to afford an attorney.  And at

12    the same time, my son was in the ICU at

13    Northwestern.

14          THE COURT:  Okay.

15          THE WITNESS:  So I was, you know, unable

16    to pursue any --

17          THE COURT:  You're telling me that if for

18    any reason the suits got revived in state court,

19    you'd be represented by insurance-funded lawyers.

20    But if you lost, the insurance company would not pay

21    for anything against you; is that what you're

22    saying?

23          THE WITNESS:  That's correct.

24          THE COURT:  All right.

25    BY MR. JESSER:

61

```
 1            Q    And those attorneys are Johnson & Bell?
 2            A    Yes.
 3            Q    And were the two cases which are being
 4    mothballed down in the bankruptcy section to be
 5    revived, that would be your personal attorney?
 6            A    Yes.
 7            Q    I feel like Mike Ditka and forgot his
 8    whole family at the Hall of Fame.  I never asked you
 9    about your family.  You're married?
10            A    Yes.
11            Q    And you have children?
12            A    Yes.
13            Q    And what are their ages?
14            A    Eleven, two, and one.
15            Q    Nine months?
16            A    Yes.
17            Q    All right.  And which hospitals are you
18    on staff at in LaSalle County?
19            A    Only St. Mary's.
20            Q    Is that the only hospital in Streator?
21            A    Yes, it is.
22            Q    What is high-risk obstetrics?
23            A    High-risk obstetrics basically is
24    obstetrics involving patients who are outside the
25    normal range, meaning a normal pregnancy, nine
```

62

1  months, no medical problems, no prior history of

2  obstetrical problems.

3      Q  And occasionally even in the finest

4  facilities these can lead to catastrophic deliveries

5  and catastrophic lawsuits; is that correct?

6      A  That's correct.

7      Q  How many years have you dealt with

8  high-risk pregnancy?

9      A  Eleven years now.

10      Q  And did you deal with it in training as

11  well?

12      A  Yes.

13      Q  And does your practice now include

14  high-risk pregnancy?

15      A  Yes, it does.

16      MR. JESSER:  Your Honor, even though as

17  part of their complaints the plaintiffs alleged

18  intentional conduct on the part of doctor toward

19  them, Your Honor told us months ago you would not be

20  receiving any evidence concerning the underlying

21  facts, so I'm not going there.

22      THE COURT:  Sir, I'm not going to stop

23  you from offering into evidence -- you want subject

24  to the possibility that your opponent may object and

25  I'll have to pass on objections.

1        MR. JESSER:  All right.

2        THE COURT:  But it's clear, of course,

3   that in no way am I going to decide the issues

4   pending in the state court case.  But if you thought

5   they were relevant, don't let anything I may have

6   said some time ago dissuade you from --

7        MR. JESSER:  All right.  Well --

8        THE COURT:  -- putting it on here, okay?

9        MR. JESSER:  All right.

10  BY MR. JESSER:

11       Q    Doctor, as part of her amended complaint

12  before Judge Schmetterer, Sandra Sterling-Ahalla has

13  alleged, among other things, that you committed

14  intentionally sexual assault against her; is that

15  correct?  Is it correct that you committed on an

16  intentional basis any -- putting her in apprehension

17  of being battered or that you inappropriately or

18  maliciously touched her?

19       MR. ROBINSON:  Object to that, Judge.  I

20  object to that question, Judge.

21       THE COURT:  What is your objection?

22       MR. ROBINSON:  Well, one of the bases is

23  relevance.  He's having the witness make testimony

24  as to conclusion of law.

25       THE COURT:  Not yet.  Anything else?

1          MR. ROBINSON:  No, Judge.

2          THE COURT:  Why do you think it's

3  relevant, counsel?

4          MR. JESSER:  Because it's -- I'm reciting

5  it out of the plaintiffs' own complaint.

6          THE COURT:  I know.

7          MR. JESSER:  I don't have to --

8          THE COURT:  Why do you think it's

9  relevant here?

10         MR. JESSER:  I don't have to go there,

11  Judge.  I appreciate the latitude you've given me,

12  but I can withdraw the question.

13         THE COURT:  Very well.

14         MR. JESSER:  I have nothing further at

15  this time.

16         THE COURT:  Cross?

17         MR. ROBINSON:  Yes, Judge, a couple of

18  quick questions.

19              CROSS-EXAMINATION

20  BY MR. ROBINSON:

21      Q   Dr. Smith, by the time you filed your

22  2005 bankruptcy petition you were aware of the

23  pending lawsuits by Trina Tidwell and Sandra

24  Ahalla-Sterling; is that correct?

25      A   That's correct.

1          Q    And your attorneys in the underlying

2     state case were Johnson & Bell; wasn't that correct?

3          A    Yes.

4          Q    And when you filed that petition in

5     September of '05, did you inform them about that

6     bankruptcy petition?

7          A    Yes, I did.

8          Q    Can you recall approximately when you let

9     them know you filed that bankruptcy petition?

10         A    No.  I don't remember.

11         Q    You don't remember?

12                   Would it be in October?

13         A    I don't remember exactly when it was.

14         Q    December?

15         A    I just said I don't remember when it was.

16              MR. ROBINSON:  No further questions,

17     Judge.

18                   REDIRECT EXAMINATION

19     BY MR. JESSER:

20         Q    But you are aware that --

21              THE COURT:  Wait, wait.

22                   Have you finished your

23     cross-examination?

24              MR. ROBINSON:  Yes, that's all I'm going

25     to take.

66

1              THE COURT:  Okay.

2                   Redirect.  Go ahead.

3    BY MR. JESSER:

4         Q    You are aware that Mr. Robinson has

5    admitted into evidence without objection on our part

6    a notice to Mr. Robinson from Johnson & Bell which

7    Ms. Jones testified she received on December 23,

8    2005; is that correct?

9         A    That is correct.

10        Q    And that pertained to notifying

11   Mr. Robinson of the bankruptcy?

12        A    Yes, I am aware that he was notified.

13             MR. JESSER:  Thank you.

14             THE COURT:  Sir, after you filed this

15   bankruptcy case, the second bankruptcy case, were

16   there any sessions in state court on the cases

17   pending there?

18             THE WITNESS:  Yes, there were.

19             THE COURT:  Were you present in state

20   court?

21             THE WITNESS:  Yes, I was.

22             THE COURT:  Approximately how long after

23   you filed bankruptcy was the first time you remember

24   being in state court on one of these cases?

25             THE WITNESS:  You know, I don't really

1   remember, Your Honor.

2          THE COURT: A couple weeks or months or

3   days?

4          THE WITNESS: It must have been months, I

5   think.

6          THE COURT: Okay. Was it before or after

7   the notice went out by your state court lawyers to

8   mothball these state court cases?

9          THE WITNESS: In this particular case, I

10   don't think I was in court again.

11          THE COURT: Well, after you filed

12   bankruptcy, did you go to court on those state court

13   cases?

14          THE WITNESS: On these? No. On these

15   two particular cases? No.

16          THE COURT: No?

17          Okay. Do you have any more

18   questions of the witness?

19          MR. ROBINSON: No further questions,

20   Judge.

21          THE COURT: Do you have any more

22   questions of the witness?

23          MR. JESSER: No, Your Honor.

24          THE COURT: You may step down, sir.

25   Thank you very much.

1              (Witness excused.)

2              THE COURT:   Do you have any more evidence

3    to offer?

4              MR. JESSER:   No, Your Honor.   The defense

5    rests.

6              THE COURT:   You rest.

7                  And do you have any rebuttal?

8              MR. ROBINSON:   No rebuttal, Your Honor.

9              THE COURT:   You rest in rebuttal?

10             MR. ROBINSON:   Yes.

11             THE COURT:   I'll hear your respective

12   final argument.

13                  Plaintiff.

14             MR. ROBINSON:   Yes, Judge.

15                  Judge, as mentioned in my findings

16   of fact and conclusions of law, Judge, the purpose

17   of --

18             THE COURT:   May I just stop -- start on

19   an issue?

20             MR. ROBINSON:   Yes, Judge.

21             THE COURT:   The reason I went into

22   insurance was that there would be a different sort

23   of issue than anybody has briefed if there were

24   insurance that could pay any judgment.   There's a

25   line of cases the circuit has given us that might be

1   relevant in such a case,

2           Now, I have had testimony about

3   being defended by a policy that has no possibility,

4   the witness said, of actually paying off a judgment.

5   Would you start by telling me whether or not you

6   feel any of that is relevant to this case.  I went

7   into it only because there's a line of cases that

8   might make it relevant if there was insurance that

9   could pay a judgment.  Do you feel it's relevant

10  here or not?

11          MR. ROBINSON:  Judge, no, I don't feel it

12  is relevant.  I am slightly familiar with that line

13  of cases, Judge.

14          THE COURT:  Pardon me?

15          MR. ROBINSON:  I am slightly familiar

16  with the ruling in that line of cases, Judge,

17  particularly as it pertains to medical malpractice.

18  Obviously we're claiming an intentional tort at this

19  particular time, Judge.  So I don't really feel it's

20  relevant.

21          THE COURT:  Okay.

22          And I don't suppose you think it is

23  either?

24          MR. JESSER:  No, Your Honor.

25          THE COURT:  All right.

70

1                    Go ahead with your argument, folks.

2              MR. ROBINSON:  Yeah.  Judge, as I started

3    to say when I -- in the findings of fact and

4    conclusions of law, Judge, obviously the purpose of

5    requiring a debtor to list creditors with their

6    proper --

7              THE COURT:  Use the microphone.  Speak

8    closer to the --

9              MR. ROBINSON:  Their proper --

10             THE COURT:  -- microphone.

11             MR. ROBINSON:  -- mailing address, Judge,

12   is to afford us a due process and due notice to be

13   able to object, Judge, to any discharge of any

14   pending claims, Judge, as far as that is concerned.

15                   Judge, as was testified to, a notice

16   was faxed over to the Law Offices of Darryl Robinson

17   on December 23rd, although he was on vacation and

18   didn't receive knowledge of such notice until after

19   January the 2nd in terms of that.  As the case law

20   basically supports, Judge, there's a difference

21   between notice and knowledge.  Because a notice came

22   over doesn't necessarily mean that the plaintiff has

23   knowledge of the pending bankruptcy.  And as the

24   case law supports in the in re Walker case, Judge --

25             THE COURT:  Well, you had both notice and

1    knowledge, didn't you, two weeks ahead of the

2    discharge?

3              MR. ROBINSON:  I understand, Judge.  But,

4    obviously, as case law supports, Judge, the court

5    must take into -- the total circumstances as far as

6    that is concerned.  And in looking at the total

7    circumstances, the court must look at the knowledge

8    of the parties, the opportunity that they may have

9    to investigate the bankruptcy and find out what

10   motions to file, if any, what adversary complaints

11   they can file, if any.  In the Walker case, if this

12   court will remember, the individuals --

13             THE COURT:  What case?

14             MR. JESSER:  In re Walker case, Judge.

15   The individuals had --

16             THE COURT:  That was one of my opinions?

17             MR. ROBINSON:  I don't know if it's one

18   of your opinions, Judge?

19             THE COURT:  You cited that in your --

20             MR. ROBINSON:  Yes, I did.  I cited that.

21             THE COURT:  Walker.  Okay.

22             MR. ROBINSON:  In re Walker, Judge.  And

23   I cited that.  And in that particular case, it was

24   20 days, Judge, before the time elapsed to contest

25   discharge.  And the court in that particular case

1   says that 20 days was not enough. In·this -- in our

2   particular case, we're saying that we received

3   knowledge within six days. So if 20 days is not

4   enough in Walker, I don't understand how the

5   defendant can think six days is enough,

6   particularly, Judge --

7             THE COURT: In theory at least you could

8   have rushed into bankruptcy court and made a motion

9   to extend your time to file an adversary.

10            MR. ROBINSON: In theory, obviously,

11  Judge. But in terms of --

12            THE COURT: Now, what have you to say

13  about that theoretical possibility?

14            MR. ROBINSON: Well, in practice, Judge,

15  it doesn't necessarily. In theory, obviously, it

16  could have happened. In Walker it could have

17  happened. But in -- Judge, the court has to take in

18  the totality of the circumstances. For example, the

19  knowledge of attorneys. There's no bankruptcy

20  attorneys in that office on 1505 East Bankruptcy

21  Court (sic), so an investigation would have to

22  occur. So, in theory, an investigation would have

23  to occur within those six days to understand which

24  motions would have to be filed.

25            THE COURT: What kind of an

73

1    investigation?

2           MR. ROBINSON:  An investigation into the

3    bankruptcy, what type of bankruptcy it is, what

4    claims that needed to be made.  An attorney can't

5    just run into bankruptcy court and file any motion.

6           THE COURT:  What investigation would have

7    to be made other than just getting a bankruptcy

8    lawyer that knew what he or she was doing?

9           MR. ROBINSON:  Well, I understand that,

10   Judge, in terms of that.

11          THE COURT:  I'm not being critical --

12          MR. ROBINSON:  Right, I understand.

13          THE COURT:  -- of a state court

14   practitioner that is not familiar with the details

15   of bankruptcy.

16          MR. ROBINSON:  Right.  I understand that,

17   Judge.

18          THE COURT:  I did a lot of practice

19   myself outside of bankruptcy and had virtually no

20   bankruptcy experience when I got this job.

21          MR. ROBINSON:  Right.  I understand,

22   Judge.

23          THE COURT:  But I learned some more about

24   the bankruptcy at that point.

25          MR. ROBINSON:  I do understand that,

74

1   Judge.

2          THE COURT:  But isn't the lawyer in state

3   court someone that would have to get some bankruptcy

4   lawyer to help him out and interpret what the

5   consequences were of everything?

6          MR. ROBINSON:  Yes, Judge, that would be

7   a part of the investigation as far as that is

8   concerned, along with, Judge, like I said, the

9   totality of the circumstances, managing of the

10  caseload, dealing with every other situation in

11  terms of -- at that particular time.  Six days,

12  Judge, still is not enough time to file a motion in

13  bankruptcy court as far as contesting discharge.

14  That still is our position as far as that is

15  concerned, Judge.

16         THE COURT:  Why did you take so long to

17  file your litigation in federal court to upset the

18  discharge?

19         MR. ROBINSON:  After --

20         THE COURT:  In other words, is there

21  anything in this record that explains the answer to

22  that question?

23         MR. ROBINSON:  No, there's not anything

24  in this record that explains the answer to that

25  question.  The adversary complaint in federal court

1  was not really filed until after the attorneys for

2  Dr. Smith moved to dismiss the case in state court

3  in terms of that, and that's when -- for example,

4  the bankruptcy petition was filed, it was

5  transferred over to the bankruptcy calendar.  The

6  attorneys for the plaintiff was not aware that the

7  bankruptcy had been discharged, they hadn't received

8  any information.  They didn't even become aware that

9  the bankruptcy had been discharged until the

10  attorney for Dr. Smith had filed a motion to have

11  the case dismissed in state court months after the

12  discharge had taken place as far as that is

13  concerned.

14            So in addition to that, Judge,

15  Dr. Smith -- these cases were pending when he filed

16  his petition in September.  His attorneys were

17  Johnson & Bell, the same attorneys who filed a

18  motion to transfer to the bankruptcy calendar in

19  December, almost three months after he had initially

20  filed his notice for bankruptcy and --

21            THE COURT:  What's your explanation --

22  what's your argument, that is to say, as to why they

23  waited three -- almost three months before filing a

24  motion to mothball the cases on the bankruptcy

25  calendar?

1         MR. ROBINSON:  We think the evidence,

2   Judge, basically supports and is all

3   circumstantial -- the evidence basically supports is

4   that they were trying to get the case discharged

5   before the attorneys had an opportunity to object.

6   Why would they file a motion for a hearing on

7   January the 7th, three days before the time lapsed

8   for discharge and ten days before the case was going

9   to ask leave -- be discharged.  What were they

10  trying to gain by doing that?

11        THE COURT:  Three days before the

12  deadline for filing an adversary --

13        MR. ROBINSON:  An adversary --

14        THE COURT:   -- to object to discharge.

15        MR. ROBINSON:  Yes, Judge, three days

16  before the deadline and ten days before the actual

17  discharge.  What were the attorneys trying to gain

18  at that particular point by transferring the case at

19  that stage of the game?  It just doesn't add up.

20  It's all circumstantial evidence, Judge, but we --

21        THE COURT:  What do you argue is inferred

22  by the circumstantial evidence?

23        MR. ROBINSON:  We're arguing that -- we

24  infer that circumstantial evidence that, in fact,

25  that they intend to deny the plaintiffs' proper

77

1   notice in being able to file that adversary.

2            THE COURT:  You say you give -- you used

3   the word "proper."

4            MR. ROBINSON:  Proper notice means --

5            THE COURT:  What do you mean by "proper

6   notice"?

7            MR. ROBINSON:  Notice in -- proper

8   notice, Judge, in terms of notice to have enough

9   time to contest a discharge.

10           THE COURT:  How much time would have been

11  enough time?

12           MR. ROBINSON:  Probably two months would

13  have been enough time.

14           THE COURT:  How do we pick two months as

15  opposed to two days or three months or one month?

16           MR. ROBINSON:  Well, Judge, it's the

17  timing of the notice.  They filed it on

18  December 23rd.  There's a great likelihood that no

19  one would have been in the office on the 23rd as far

20  as that is concerned.  It was around the holiday

21  time.  So if it was --

22           THE COURT:  Part of this is your argument

23  about when they filed the notice near the holiday --

24  in the holiday season.

25           MR. ROBINSON:  Yes, as part of the notice

1   to -- as far as that is concerned, Judge.  Not only

2   that, because, as a practicing attorney, I do know

3   those tricks take place.  So it was a lot of

4   personal knowledge, too.  Typically attorneys file

5   motions during the holidays when attorneys don't

6   have an opportunity.  It may not be in the spirit of

7   practicing law, but it does happen, particularly in

8   state court as far as that is concerned.

9           THE COURT:  Oh, not only in state court.

10          MR. ROBINSON:  So that is our argument,

11  Judge, and the terms on the issue on notice.

12          On the issue of fraud, Judge, we

13  would have never expected Attorney Sinn to get up

14  here and say, "Yes, I committed fraud."  I mean, he

15  would have more issues to deal with in terms of

16  that.  But we believe that the bankruptcy petition

17  stands on its own as far as that is concerned.

18          There were six --

19          THE COURT:  Do you have any theories

20  other than fraud?

21          MR. ROBINSON:  Do I have any theories

22  other than fraud?  No.  No, Judge, no theories other

23  than fraud that we can stand on.

24          THE COURT:  Hmm?

25          MR. ROBINSON:  No theories other than

1  fraud that we can stand on, none that I'm aware of.

2  I mean, because -- if, in fact, it was a simple

3  mistake, as the law says, if it was a simple

4  mistake, it doesn't define -- the case law doesn't

5  define what a mistake is, then that wouldn't

6  necessarily be fraud.

7              But we would -- we would argue,

8  Judge, that if he had left one lawsuit out or two

9  lawsuits out of the schedule of creditors, then that

10  would be a mistake.  But to leave them all out, that

11  leans more towards fraud, Judge.

12              THE COURT:  You're referring to the fact

13  that in the second case --

14              MR. ROBINSON:  Yes, the second.

15              THE COURT:  -- he filed -- he

16  scheduled -- not scheduled, but he put in his

17  statement of affairs six lawsuits?

18              MR. ROBINSON:  Yes, six lawsuits.

19              THE COURT:  None of which were scheduled.

20              MR. ROBINSON:  None of them which were

21  scheduled.

22              THE COURT:  Did you -- in the first case

23  he didn't schedule any of them.  What he did was to

24  schedule you as a lawyer.

25              MR. ROBINSON:  Right.  Exactly.  You mean

1  in the 2004 bankruptcy petition.

2          THE COURT:  Yes.  So in the first case he

3  did not schedule his pending cases, did he?

4          MR. ROBINSON:  Schedule of creditors, I

5  don't have --

6          THE COURT:  I can't hear you.

7          MR. ROBINSON:  I don't have the 2004 with

8  me, Judge, but...

9          THE COURT:  Well, he just scheduled your

10 name.

11         MR. ROBINSON:  Okay.

12         THE COURT:  So you got notice of the

13 first bankruptcy.

14         MR. ROBINSON:  I can't recollect whether

15 or not I did get --

16         THE COURT:  Well, I'm not --

17         MR. ROBINSON:  -- notice, Judge.

18         THE COURT:  -- asking you to testify.  At

19 least --

20         MR. ROBINSON:  Yeah, I --

21         THE COURT:  -- you were put into a

22 position where you could get such notice.

23         MR. ROBINSON:  Right.  Exactly.

24         THE COURT:  Go ahead, counsel.

25         MR. ROBINSON:  So, Judge, based on that

1   alone in terms of that, the fact that all pending

2   lawsuits were not scheduled on the creditors, we

3   think that leans more to intent.  He intentionally

4   did that.

5                   THE COURT:  Whose intent?

6                   MR. ROBINSON:  The intent of Bruce Smith

7   and/or his attorneys at --

8                   THE COURT:  Do you attribute that attempt

9   to Mr. Sinn, the lawyer?

10                  MR. ROBINSON:  Yes, Judge.

11                  THE COURT:  Why?

12                  MR. ROBINSON:  Well, because he

13  purposefully did it, Judge.  He had an opportunity

14  as far as -- he had filed -- he even testified that

15  he had filled out about 350 Chapter 7s, that, in

16  fact, as he sat here today that he believed it

17  should be scheduled, that he was in an office with

18  25 attorneys, someone with great experience.  So if

19  he had any questions at that time, he could have

20  asked someone.  So it's not like the knowledge was

21  not available to him, Judge.  So we believe --

22                  THE COURT:  Well, he didn't claim that he

23  didn't know what to do.  Didn't he say he just made

24  a mistake?  And he -- and then didn't he also say

25  that he showed the petition to the doctor --

82

1      MR. ROBINSON:  Yes.

2      THE COURT:  -- and asked him if it was

3   accurate and complete, and the doctor -- if the

4   doctor had said no, then he wouldn't have filed it?

5      MR. ROBINSON:  He didn't say if the

6   doctor had objected to certain things.  He didn't

7   say what the doctor would have objected to in terms

8   of that.  My inclination would be if the doctor

9   said, well, no, those are not some of my creditors,

10  then maybe he wouldn't have filed it in terms of

11  that, not any pending lawsuit creditors.

12     THE COURT:  Well, I thought he asked the

13  -- he said he asked the doctor whether the schedules

14  were accurate and complete.

15     MR. ROBINSON:  Yes.

16     THE COURT:  And if the doctor had said,

17  no, they're not accurate or complete, he wouldn't

18  have filed it.

19     MR. ROBINSON:  That's true, Judge.  That

20  is absolutely true, not knowing what the

21  underlying intent of --

22     THE COURT:  Anything else, counsel?

23     MR. ROBINSON:  That will be all, Judge.

24     THE COURT:  Your argument, counsel.

25     MR. JESSER:  As the court is well aware,

1 for generations in the law, fraud has to be alleged
2 and proven with great factual specificity. To the
3 contrary, Mr. Sinn's testimony and Dr. Smith's
4 testimony that there was no fraudulent intention, no
5 intention to deceive or to secrete is
6 uncontroverted. The plaintiff has adduced no
7 testimony whatsoever or other evidence to refute the
8 clear and convincing -- and we don't back away from
9 our burdens, the burdens that have shifted, the
10 clear and convincing testimony of both defense
11 witnesses that this was an honest mistake, if a
12 mistake at all because Mr. Sinn testified he thought
13 in good faith he was listing the specific lawsuits
14 in the statement of financial affairs correctly.
15 It would have been another matter
16 had there been no mention of these lawsuits. But
17 the court sees in the exhibits that have been
18 received into evidence clear explanations and
19 details.
20 And even to be more semantical, I
21 really haven't tried to justify in these last few
22 months putting the lawsuits on the statement of
23 financial affairs. But it's easy for the layperson,
24 or even Steve Jesser who has been practicing 35
25 years, to make a mistake when the statement of

1 financial affairs asks for the court, civil; where,

2 Cook; status, pending. The doctor cannot, I would

3 submit, Your Honor, be expected to know the

4 intricacies of the Bankruptcy Code, as even I don't

5 know, that they should have been alternatively

6 scheduled in the creditor list.

7           Another area, Judge, is a difference

8 in styles of counsel and myself. And I've said here

9 in open court in past months, he's been a very

10 worthy adversary, and we've been very civil to each

11 other. But I have no secretary, but I have for

12 years called my receptionist. And no matter where I

13 am, since like it or not I go 365, I ask her what is

14 in the mail today. This is a routine with us. She

15 doesn't read me my junk mail. She reads me anything

16 that she thinks might be of any importance. Now,

17 with my faxes, they go into my e-mail. So I carry

18 my faxes 365.

19           THE COURT: Do you have any --

20           MR. JESSER: I just don't close up the

21 shop on December 22nd and come back to the shop on

22 January 6th.

23           THE COURT: I understand. Counsel, let's

24 assume somebody wanted to make sure that the state

25 court lawyer didn't have enough practical time to

1   come in under the wire and by the deadline find out

2   what bankruptcy is all about and get someone to file

3   an adversary complaint. You can understand that one

4   way of doing that is by not scheduling the creditor,

5   right?

6              MR. JESSER: You said the state court

7   lawyer?

8              THE COURT: Yeah. If somebody wanted to

9   keep the state court lawyer from finding out about

10  the case, the bankruptcy case, until it was too late

11  to do something about it, one way would be not to

12  schedule them so that it would deprive them of the

13  ordinary period of notice from the clerk's office.

14             MR. JESSER: I'm with you on your

15  hypothetical.

16             THE COURT: Well, in this case, why is it

17  that the state court lawyer took so much time to

18  notify this plaintiffs' lawyer about the pendency of

19  the bankruptcy case?

20             MR. JESSER: I don't have --

21             THE COURT: We don't have any answer in

22  the record, do we?

23             MR. JESSER: Well, I don't have a precise

24  answer to the court's question, but three months'

25  time when even thereafter -- let's go with your

86

1   hypothetical.  Mr. Robinson returns to his office

2   after New Year's, he's in court on January 6th, the

3   case isn't discharged by --

4          THE COURT:  His deadline is January 9th,

5   right?

6          MR. JESSER:  Well, I stood here two weeks

7   ago, Judge, and Your Honor said, "Where's the

8   notice?"  I said, "I issued it last night."  Your

9   eyebrows went up.  But as a solo practitioner,

10  believe me that happens.  Even though you and I

11  were -- and you were the First Assistant State's

12  Attorney.  There are hundreds of attorneys in our

13  office.  When you're in solo practice, things get

14  done -- and I think Mr. Robinson would admit, things

15  get done at the last minute, as with his 364th-day

16  filing of the adversary proceedings.

17          I hope I've been responsive, but I

18  don't think three months ascribes any bad motives.

19  He's taken on a huge burden by alleging fraud, so --

20  he hasn't met this burden.  There's been no -- not

21  only no factual specificity of what fraud, he

22  hasn't -- all he can stand up here and say is,

23  "Well, it goes to."  And maybe it's just a figure of

24  speech.  I found it rather odd in the plaintiffs'

25  case that they referred to --

1           THE COURT:   What figure of speech?   What

2   figure of speech?

3           MR. JESSER:   Well, they kept referring to

4   the attorney, the plaintiffs' attorney.   The

5   attorney is Mr. Robinson.   It's Mr. Robinson's

6   office, Mr. Robinson's fax machine, Mr. Robinson's

7   secretary.   And I think Mr. Robinson, although this

8   may not be in the record, would admit to you he was

9   in state court in the law division on or about

10  January 6th.

11          If we go back to the statute, Your

12  Honor, I don't want to lose the forest for the

13  trees, the statute that counsel alleges was

14  violated, 11 U.S.C. 727(a)(4) that I'm sure Your

15  Honor could cite for us word for word, requires the

16  proving of a false oath or account.   I submit there

17  has been no proof at this trial this afternoon of

18  any false oath or account.

19          THE COURT:   Sir, the oath that the

20  schedules are true and complete is false, isn't it?

21  It does not include a batch of creditors; isn't that

22  right?

23          MR. JESSER:   No, I don't concede that,

24  Judge.

25          THE COURT:   Why not?

1    MR. JESSER:  And I'm not being semantical

2    with Your Honor.  It was in, arguably, the wrong

3    place.  The next schedule --

4    THE COURT:  No, no, no.  Each schedule

5    has to be accurate.  There's one thing called a

6    statement of affairs which asks you to list

7    litigation.  There are reasons why you want to

8    require litigation to be listed.  There is another

9    section, a different section, Schedule F, which

10   requires the listing of unsecured claims, unsecured

11   creditor claims.  A creditor in Bankruptcyland is

12   very broadly defined, and it certainly includes

13   somebody that's brought a lawsuit.  It doesn't have

14   to be a liquidated claim.  Creditors in -- that is

15   claimants, plaintiffs in lawsuits, are creditors.

16   So there's absolutely no doubt that it should have

17   been listed in both places, just like the lawyer

18   said tonight.

19   MR. JESSER:  And I was going to say

20   assuming arguendo --

21   THE COURT:  Now, therefore, since it

22   wasn't listed, why is that not a false pleading or a

23   false affidavit?

24   MR. JESSER:  But assuming arguendo that

25   it is false for the sake of this very highly

1    scholarly dialogue that we're having, counsel has

2    alleged it was fraud, it was fraudulently --

3                    THE COURT:   Yes.  But as you --

4                    MR. JESSER:   -- intended.

5                    THE COURT:   -- properly recited the

6    statute, fraud may consist of a false affidavit.

7    I'm just asking you why isn't this a false

8    affidavit, that is his affidavit at the end of the

9    filing.   The bankruptcy filing is where the debtor's

10   affidavit comes, and he says it's complete and

11   truthful, everything is complete and truthful.

12                   MR. JESSER:   Well, obviously, Dr. Smith

13   is a layperson to the law.  And this may not be very

14   lawyerly for me to say, but as a nonbankruptcy

15   practitioner, I find it rather disingenuous that

16   Dr. Smith can so easily file a voluntary petition,

17   and I know the court is engaging in a very

18   scholarly, appellate-type dialogue, but then be

19   expected to know the hyper-critical nuances of the

20   Code and just where -- relying on his attorney, he's

21   yet nevertheless supposed to know where exactly to

22   schedule his creditors that he forthrightly names

23   within the four corners of the petition.

24                   THE COURT:   Counsel, there's nothing

25   hyper-technical and there's nothing complex about

1  this dialogue.  In Bankruptcyland the schedules have

2  to be filled out accurately so that the creditors

3  can get notice.

4        MR. JESSER:  And we're --

5        THE COURT:  It's that Schedule F that is

6  the basis for the clerk's notice to creditors

7  telling them about the bankruptcy.

8        MR. JESSER:  Okay.

9        THE COURT:  Now, sometimes people

10  actually send notice to their creditors.  The lawyer

11  will say, "You got to stop this lawsuit because I've

12  just filed bankruptcy."  But for some unexplained

13  reason that wasn't done until the very -- a few

14  days, only a few days were left in the deadline.

15        MR. JESSER:  Well, Judge, we have these

16  colloquial expressions sometimes put on the White

17  Sox, "They don't win pretty, they win ugly."  This

18  wasn't a textbook case.  But we seem to overlook the

19  fact that Mr. Robinson knew in 2004 the doctor had

20  sought bankruptcy relief in 2004.  I'm not --

21        THE COURT:  Yes, he did.

22        MR. JESSER:  -- hanging my hat --

23        THE COURT:  He did.

24        MR. JESSER:  -- on that.

25        THE COURT:  But, of course, that cuts --

1  that doesn't cut against the plaintiff because he

2  knew the case was dismissed. All the creditors find

3  out the case gets dismissed once it's dismissed. So

4  it didn't mean anything. It doesn't mean that he

5  should watch the bankruptcy court every day to find

6  out if there was a new case. Surely you're not

7  implying that. And, of course, it cuts the other

8  way, that your client went through bankruptcy and

9  knew to schedule Mr. Robinson, and he -- so that his

10  clients would get notice in the first case but not

11  in the second.

12  MR. JESSER: We used to have, I thought

13  at least when I went to law school, a reasonable man

14  standard. If Dr. Smith, although I did not examine

15  him on that, has knowledge that Johnson & Bell has

16  notified Mr. Robinson of his 2005 bankruptcy, what

17  is this poor man further to do?

18  THE COURT: Say that again, please.

19  MR. JESSER: Under a reasonable man

20  standard, if that still exists in the law as it did

21  when we were in law school, if Dr. Smith knows that

22  Johnson & Bell, a highly distinguished firm, is

23  notifying on December 23 Mr. Robinson that he has

24  gone and received -- he has gone into bankruptcy

25  court the end of September, what more is Dr. Smith

1  expected to do?

2  THE COURT:  Well, first of all, he's

3  expected to sign accurate schedules.  And as you

4  read the statute, counsel, and if he has filed false

5  schedules, even though his heart is pure, can he be

6  guilty of fraud?

7  MR. JESSER:  No.

8  THE COURT:  If his heart is pure but his

9  schedules are false, you're saying he cannot be

10  guilty of fraud?

11  MR. JESSER:  Well, I don't know about --

12  that's a hard characterization for me to relate to.

13  He committed no overt acts of fraud, and then we

14  have the, if I recall correctly, fraudulent

15  withholding.  He withheld nothing from Mr. Sinn.  To

16  the contrary, he told Mr. Sinn about Mr. Robinson's

17  lawsuits.

18  THE COURT:  Well, the question we're

19  going to have to decide, I guess, is whether -- I

20  mean, you have put on evidence that said, in effect,

21  his heart is pure, his lawyer made a mistake, and

22  his lawyer's heart was pure.  You haven't explained

23  why the state court lawyer didn't notify anybody

24  earlier.  But you've implied that your client

25  doesn't know what the duties are particularly, and

93

1   therefore his heart remains pure.  So it is a

2   classic type of case as to whether or not somebody

3   that files a false affidavit in bankruptcy, whether

4   he has a defense because his heart was pure.

5         MR. JESSER:  Well, the court raised with

6   me a moment ago, and I may have misinterpreted this,

7   that doctor, or any other bankrupt, it could be me

8   seeking bankruptcy court, has to almost recertify

9   every section of the petition.  I think if I were to

10  recall doctor to the witness stand, he would testify

11  that he was signing at the end.  Whether it's manual

12  or electronic, it doesn't matter.  He stands behind

13  what he signed.  But he was trying to certify the

14  accuracy and completeness of the whole petition.  I

15  submit, Your Honor, and I never use the word

16  "technicality," but we're here discussing a highly

17  procedural point.

18        THE COURT:  Well, counsel, keep in mind

19  that you are seeking the advantage of a very highly

20  procedural point, which is the deadline for filing

21  an objection to a discharge, a deadline which --

22        MR. JESSER:  He came --

23        THE COURT:  -- protects debtors.

24        MR. JESSER:  He came in on time.  He came

25  in on the 364th day.

94

1    THE COURT:  No.  He has to come in with a
2  heavy burden on the 364th day.  If he came in by the
3  first deadline, which is for filing of an adversary
4  complaint objecting to discharge, he would only have
5  to show that the type of case pending in state court
6  is a type of case which, if he won, should be one in
7  which dischargeability of that debt should be
8  denied, a much lesser burden.  I don't mean to
9  pester you with a lot of questions --
10    MR. JESSER:  No, I --
11    THE COURT:  -- but these are the
12  questions on which the case turns.
13    MR. JESSER:  Well, obviously the court is
14  not pestering me.  There are very few courts that
15  would be so intellectually -- that would engage me
16  in such an intellectual discussion.  It's for the
17  very reason that no one could ever expect -- and I'm
18  not flattering you, Judge, but no one could ever
19  expect to walk into this courtroom and try to
20  buffalo you or spin you into something that these
21  two witnesses testified as forthrightly as they did.
22  And there was no attempt to make excuses, but
23  rather, "Yeah, we put it in a place that Your Honor
24  doesn't approve of.  We're sorry.  We made a
25  mistake."  It didn't defraud anyone.  Mr. Robinson

1   had ample time to rectify it.  I get calls at 10:30

2   at night if -- when I'm trying to go to bed.  If I

3   have to, I stay up until 2:00 in the morning to fix

4   a problem so I can sleep easily.  He had time.

5                    THE COURT:  Thank you, counsel.

6                    Counsel, any rebuttal?

7                    MR. ROBINSON:  Just a small rebuttal.

8   Judge, in terms -- like I said before, the court

9   must look at the totality of the circumstances.  The

10  court must --

11                   THE COURT:  Slower, counsel, and use the

12  mic.

13                   MR. ROBINSON:  Yes, Judge.  I'm sorry.

14  The court must look at the totality of the

15  circumstances, Judge, and determine whether or not

16  there was any alleged inadequacies, and I quote

17  that, that did not prejudice the creditor.  So there

18  is no way the defendant can sit here today, Judge,

19  and say that there were not any inadequacies that

20  prejudiced Trina Tidwell and Sandra Sterling-Ahalla

21  in terms of that.  He filed his bankruptcy in

22  September, didn't file a motion to transfer the

23  bankruptcy until December the 23rd, almost three

24  months later at -- during the period of time where

25  not only attorneys, but a lot of individuals, Judge,

1    would likely be on vacation, noticing up a case for

2    a hearing -- actually, the hearing was on January

3    the 7th, Judge.

4              THE COURT:  Let's assume that he had --

5    that they had given you notice a few days after they

6    filed the bankruptcy, actual notice by a letter from

7    the lawyer saying, "I just filed a bankruptcy," but

8    they had omitted scheduling your clients or you on

9    Schedule F so the clerk never sent you notice --

10             MR. ROBINSON:  Right, Judge.

11             THE COURT:  -- but you got notice a

12   couple of days after the bankruptcy was filed.  The

13   oath would still have been false, right?

14             MR. ROBINSON:  Yes, the oath would still

15   have been false, Judge.  Yes.

16             THE COURT:  So could you rely on that

17   falsity if you had had three months' notice, actual

18   notice?

19             MR. ROBINSON:  Not in the terms of

20   notice, Judge.  No, I don't think I would be able to

21   rely on that falsity.

22             THE COURT:  Why not?

23             MR. ROBINSON:  Because I think at that

24   particular time --

25             THE COURT:  Isn't it your argument that

97

1   the oath was false and, therefore, there was fraud?

2           MR. ROBINSON:  Oh, in terms of fraud,

3   yes.  I thought you said in terms of notice.

4           THE COURT:  So could you still make that

5   argument if you had actually gotten notice a couple

6   days after the bankruptcy was filed?

7           MR. ROBINSON:  Yes.  The fraud argument

8   is --

9           THE COURT:  Not from the clerk, not based

10  on the false Schedule F, but just based on a

11  lawyerly letter from the debtor's lawyer?

12          MR. ROBINSON:  On a basis of fraud, I

13  would say, yes, Judge, that argument could be made.

14          THE COURT:  You could still argue fraud

15  if you got notice and disregarded the deadline?

16          MR. ROBINSON:  Yes, Judge, I think it

17  would be argument on fraud.  The only exception

18  would be if, in fact, it was -- there was -- had

19  bankruptcy experience or had dealt with the

20  situation before as far as that is concerned.

21          THE COURT:  So we'd have to make an ad

22  hominem, that is an analysis of the lawyer as to

23  whether the lawyer had experience?

24          MR. ROBINSON:  Well, Judge, I mean, it's

25  kind of ambiguous, but it does say the totality of



## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEARTMENT-LAW DIVISION

| | | |
|---|---|---|
| Sandra Ahlla-Sterling | ) | |
| | ) | 03L 043789 |
| Plaintiff | ) | No      CALENDAR H |
| | ) | TORT-INTENTIONAL |
| v. | ) | Plaintiff Demands Trial by Jury |
| Dr. Bruce Smith, | ) | Amount claimed: In excess of 30,000 |
| Kennedy Medical Service | ) | |
| Corporation | ) | Judge |
| | ) | |
| Defendants | ) | |

### COMPLAINT

### COMPLAINT FOR DAMAGES AGAINST THE DEFENDANTS FOR INJURIES SUFFERED BY PLAINTIFF AS A RESULT OF THE INTENTIONAL ACTS OF COMMITTING SEXAUL ASSAULT

## JURY DEMAND

NOW COMES, the plaintiff, SANDRA AHLLA-STERLING by and through her attorneys, DARRYL E. ROBINSON, P.C. and JOHN F. LYKE & ASSOCIATES, and complaining of the defendants, DR. BRUCE SMITH (Hereafter known as Dr. SMITH), and KENNEDY MEDICAL SERVICE CORPORATION stating as follows:

### FACTS:

1. On or about September 30, 2002 at approximately 2:00 p.m p.m. Kennedy Medical

   Service Corporation was duly incorporated in the State of Illinois, County of Cook, City

   of Chicago where it is organized and operats it's principle place of business.

2. That on September 30, 2002 at approximately 2:00 pm, Dr. Bruce Smith was an

   employee of and/or authorized to perform work on behalf Kennedy Medical Service

   Corporation.

3. That Sandra Ahlla-Sterling was a regular patient of Kennedy Medical Service

   Corporation approximately one and one-half years prior to September 30, 2002.

4. That on September 30, 2002 at approximately 2:00 pm, Sandra Ahlla-Sterling was

   attending her regularly scheduled prenatal exam with Dr. Smith.

5. That after Sandra Ahlla-Sterling had arrived at Kennedy Medical Service Corporation for her exam for lower abdominal pain.

6. That Dr. Smith informed Sandra Ahlla-Sterling to undress, lay on the table in the patient's room and place her legs in the sitirrups so that he could exam her stomach and vagina area.

7. That on September 30, 2002 at approximately 2:00 pm Dr. Smith was performing a prenatal examination of Sandra Ahlla-Sterling without the assistance of a nurse.

8. That Dr. Smith began to exam Sandra Ahlla-Sterling's vagina area with his hand

9. That without notice or consent, Dr. Smith unlawfully began to sexually assault Sandra Ahlla-Sterling by inserting his penis into her vaginal area, holding her right and left legs with is hands and rocking back and forth.

10. That, Sandra Ahlla-Sterling, after noticing the unlawful acts of Dr. Smith, arose from the table to stop his assault.

11. That on September 30, 2002, Sandra Ahlla-Sterling left Kennedy Medical Service Corporation and filed a Police Report concerning the unlawful acts of Dr. Smith.

12. That Sandra Ahlla-Sterling subsequently files this suit.

## Count I
**(Sexual Assault and Battery-Dr. Smith and Kennedy Medical Service Corporation)**

13. Realleging counts 1-12 and incorporating them therein.

14. Dr. Smith, acting within the scope of his agency, took indecent liberties with Sandra Ahlla-Sterling by forcibly laying hands on her, inserting his penis inside her vagina, without her consent, wile she was in the care and custody, and under the control of defendants.

15. That Sandra Ahlla-Sterling was intentionally and unlawfully assaulted and battered by defendants

2

16. That as a proximate and direct result of defendants' actions, Sandra Ahlla-Sterling suffered injury and damages including severe mental and emotional distress.

17. Defendants' actions were malicious, wanton and performed with reckless disregard for Sandra Ahhlla-Sterling's rights and feelings.

WHEREFORE, Sandra Ahlla-Sterling is entitled to compensatory damages in excess of $30,000, punitive damages in an amount to be determined, attorney fees, cost and such other relief as the Court deems proper under the circumstances.

### Count II
### (Negligent Hiring and Retention-Kennedy Medical Service Corporation)

18. Realleging counts 1-12 and incorporating them therein

19. That on or about May of 2000 Tamika Williams was a patient at the Kennedy Medical Service Corporation.

20. That on or about May of 2000, Tamika Williams was attending her regularly scheduled appointment with Dr. Smith on a referral from Trinity Hospital after complaining of experiencing pain during sexual intercourse.

21. That after Tamika Williams arrived at Kennedy Medical Service Corporation, she was told by Dr. Smith to undress, lay on the patient table and place her legs in the stirrups.

22. That Dr. Smith placed rubber gloves over both of his hands.

23. That Dr. Smith placed an unknown jelly into one of his hands and placed that hand into the vagina of Tamika Williams.

24. That Dr. Smith moved his entire body closer to Tamika Williams by placing himself directly between her legs.

25. That Dr. Smith, without notice, or consent, unlawfully sexually assaulted Tamika Williams by inserting his penis inside her vagina.

3

26. That Tamika Williams, after feeling Dr. Smith penis inserted inside her, sat up so she could see what he was doing but was pushed back onto the patient's table by Dr. Smith.

27. That after Dr. Smith unlawfully sexually assaulted Tamika Williams, he took off his gloves and left the patients room.

28. That Tamika Williams, after getting dressed, ran out of the patient room and ran into the nearest washroom.

29. That a nurse, employed by Kennedy Medical Service Corporation, after noticing Tamika William's actions, followed her into the washroom.

30. That after speaking with Tamika Williams, the nurse called the Chicago Police who arrested Dr. Smith.

31. That on August 2, 2002, Trina Tidwell was a regular patient of Kennedy Medical Service Corporation approximately four years prior to August 2, 2002.

32. That on August 2, 2002, Trina Tidwell was approximately 32 weeks pregnant.

33. That on August 2, 2002 at approximately 4:00 pm, Trina Tidwell was attending her regularly schedule prenatal exam with Dr. Smith.

34. That after Trina Tidwell had arrived at Kennedy Medical Service Corporationfor her exam she informed Dr. Smith that she was feeling a lot of pressure in her stomach area as a result of the unborn baby.

35. That Dr. Smith informed Trina Tidwell to undress and lay on the table in the patient's room so that he could exam her stomach and vagina area.

36. That on August 2, 2002 at approximately 4:00 pm Dr. Smith was performing a prenatal examination of Tina Tidwell without the assistance of a nurse.

37. That Dr. Smith began to exam Trina Tidwell's vagina area with his hand

38. That without notice or consent, Dr. Smith unlawfully began to sexually assault Trina Tidwell by inserting his penis into her vaginal area, holding her right and left legs with is hands and rocking back and forth.

4

39. That, Trina Tidwell, after noticing the unlawful acts of Dr. Smith, arose from the table to stop his assault.

40. That on august 2, 2002, Trina Tidwell left Kennedy Medical Service Corporation and filed a report with the Chicago Police Department

41. That Kennedy Medical Service Corporation was aware of the previous unlawful sexual assaults of Tamika Williams and Trina Tidwell by Dr. Smith prior to the unlawful sexual assault of Sandra Ahlla-Sterling but failed to warn, discipline, terminate or take action against Dr. Smith.

42. That Kennedy Medical Service Corporation authorized and approved of the unlawful acts of Dr. Smith by allowing him to continue to work for them even after they were on notice of his propensity to commit unlawful acts of sexual assault.

43. That the particular duties and responsibilities of Dr. Smith placed him in a unique position of power and control over otherwise defenseless persons such as Sandra Ahlla-Sterling.

44. That as a result of the particular duties and responsibilities of Dr. Smith, defendant Kennedy Medical Service Corporation had a duty to exercise ordinary care in investigating any and all allegation or charges of unlawful conduct made against Dr. Smith.

45. That, upon information and belief, defendant Kennedy Medical Service Corporation failed to act with ordinary care in investigating the prior unlawful acts of Dr. Smith

46. That upon information and belief, Kennedy Medical Service Corporation knew or should have known that Dr. Smith posed a risked of abusing and sexually assaulting female patients but failed to act with ordinary care in continuing to employ him.

47. As a proximate and direct result of defendant Kennedy Medical Service Corporation's failure to act with ordinary care, Sandra Ahlla-Sterling suffered injuries and damages, including severe mental and emotional distress.

5

WHEREFORE, Sandra Ahlla-Sterling is entitled to compensatory damages in

excess of $50,000, punitive damages I an amount to be determined, attorney fees, cost and such

other relief the Court deems proper under the circumstances.

Attorney For Plaintiff

Darryl E. Robinson
Darryl E. Robinson, P.C.
1505 East 53rd Street, Suite 200
Chicago, Illinois 60615
773-955-0400

John F. Lyke
John F. Lyke & Associates
1505 East 53rd Street, Suite 200
Chicago, Illinois 60615
773-955-0400

6



LER/GR

00190-69001

File ID 04847

IN THE CIRCUIT COURT OF COOK COUNTY
COUNT DEPARTMENT, LAW DIVISION

TRINA TIDWELL )
) Court No. 05L-15760
            PLAINTIFF, )
)
v. )
)
SMITH BRUCE, M.D. and KENNEDY )
MEDICAL SERVICE CORPORATION )
)
            DEFENDANTS. )

<u>MOTION TO TRANSFER TO THE BANKRUPTCY CALENDAR</u>

NOW COMES the Defendant, BRUCE SMITH, M.D., by and through his attorneys, JOHNSON & BELL, LTD., and hereby moves this Honorable Court to transfer this litigation to the Bankruptcy Calendar. In support thereof, the Defendant states as follows:

1.    On September 26, 2005, the Defendant filed a Voluntary Petition for Relief under Chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Illinois, which is pending as Case No. 05-40196. (A copy of the Voluntary Petition is attached hereto as Exhibit "A").

2.    On September 27, 2005, a Notice of Chapter 7 Bankruptcy was issued which provides that "the filing of the bankruptcy case automatically stops certain collection and other actions against the debtor and the debtor's property." (Notice of Chapter 7 Bankruptcy case is attached hereto as Exhibit "B").

3.    Therefore, as a result of the above filings, any further action against the Defendant is stayed under 11 U.S.C. 362(a) of the Bankruptcy Code.

Exhibit D

4. Pursuant to Section 362(a) of the United States Bankruptcy Code, the Plaintiff is stayed from taking any further action against the Defendant in this pending action without relief from the United States Bankruptcy Court for the Northern District of Illinois.

5. The Plaintiff's litigation against the Defendant should be transferred to this Court's Bankruptcy Calendar in light of the Defendant's filing of a Petition for Relief under Chapter 7 of the United States Bankruptcy Code and the entry of the stay.

WHEREFORE, the Defendant, BRUCE S. SMITH, M.D., hereby prays that this Honorable Court enter an order transferring this matter to the Court's Bankruptcy Calendar.

Respectfully submitted,

JOHNSON & BELL, LTD.

_____
One of the Attorneys for the Defendant

Jack T. Riley, Jr.
Jennifer Tomezak Rose
JOHNSON & BELL, LTD.
55 E. Monroe Street
Suite 4100
Chicago, IL 60603
(312) 372-0770
#06947

2